Docket No. 96236–Agenda 10–November 2004.

SHARON A. PRICE 
et al.
, Appellees, v. PHILIP MORRIS, INC., Appellant.

Opinion filed December 15, 2005.

JUSTICE GARMAN delivered the opinion of the court:

After a bench trial in the circuit court of Madison County, the court found defendant, Philip Morris USA, Inc. (PMUSA) (formerly known as Philip Morris, Inc.), liable for fraud in violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 
et seq
. (West 1998)), and the Uniform Deceptive Trade Practices Act (Deceptive Practices Act) (815 ILCS 510/1 
et seq. 
(West 1998)), and awarded the estimated 1.14 million members of the plaintiff class compensatory and punitive damages, attorney fees, and prejudgment interest totaling $10.1 billion. We ordered that PMUSA’s appeal be taken directly to this court pursuant to Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)).

We have permitted the Chamber of Commerce of the United States and the Illinois Chamber of Commerce; the National Association of Manufacturers and the Illinois Manufacturers’ Association; and the Product Liability Advisory Council, Inc., to file briefs 
amici curiae
 on behalf of the defendants. We have also permitted Public Citizen, Inc., along with various public health organizations; economists Robert Solow and George Akerlof; the Trial Lawyers for Public Justice, along with various consumer advocacy groups; the American Medical Association, along with numerous medical societies; and the Citizens’ Commission to Protect the Truth to file briefs 
amici curiae
 on behalf of the plaintiffs. 155 Ill. 2d R. 345. In addition, 11 Illinois law schools that, depending on the outcome of this appeal, may receive some of the proceeds of the punitive damages award have been permitted to intervene. 735 ILCS 5/2–408 (West 2002).

We now reverse the judgment of the circuit court on the basis that this action is barred by section 10b(1) of the Consumer Fraud Act (815 ILCS 505/10b(1) (West 2000)).

I. BACKGROUND

A. History of FTC Regulation of the Cigarette Industry

The immense documentary record reveals the following industry history, which is essentially undisputed.

The FTC’s jurisdiction over the advertising and testing of cigarettes is premised on the Federal Trade Commission Act, section 45(a) of which declares unlawful: “unfair methods of competition in or affecting commerce, and unfair and deceptive acts or practices in or affecting commerce.” 15 U.S.C. §45(a) (2000). As early as the 1930s, the FTC took action against tobacco companies that made unsupported claims about the health benefits of smoking their particular brand of cigarettes. See,
 e.g.
, 
Julep Tobacco Co.
, 27 F.T.C. 1637 (1938).

 In September 1955, the FTC issued its first Cigarette Advertising Guidelines, which permitted cigarette manufacturers to make claims regarding tar and nicotine yields, but only if they could substantiate their claims by “competent scientific proof”:

“No representation, claim, illustration, or combination thereof, should be made or used which directly or indirectly:

2. Represents that any brand of cigarette or the smoke therefrom is low in nicotine or tars, acids, resins, or other substances, by virtue of its ingredients, method of manufacture, length, added filter, or for any other reason or without any assigned reason, than any other brand or brands of cigarettes when it has not been established by competent scientific proof applicable at the time of dissemination that the claim is true and, if true, that such difference or differences are significant.

Note
: Words, including those relating to filtration, which imply lesser substances in the smoke, through filter comparisons or otherwise, are considered subject to this guide.” 6 Trade Reg. Rep. (CCH) par. 39,012 (1988) (FTC Release, September 22, 1955, entitled “Guides”).

Different manufacturers used different testing methods, however, making cross-brand comparison unreliable. In late 1959, the FTC Bureau of Consultation issued an industrywide advisory stating that “all representations of low or reduced tar or nicotine, whether by filtration or otherwise,” would be construed as health claims. The purpose of the advisory and the accompanying demand for prompt compliance by the tobacco industry was to “eliminate from cigarette advertising representations which in any way imply health benefit.” Letter of William H. Brain, Attorney, FTC Bureau of Consultation (December 17, 1959). The FTC indicated its intent to take enforcement action against cigarette manufacturers making such representations, effectively banning advertising regarding tar and nicotine levels. See 3 Trade Reg. Rep. (CCH) par. 7853.51, at 11,730 (1988) (reporting that, in 1960, FTC and the tobacco industry reached an agreement that the companies would refrain from advertising tar and nicotine content).

In 1964, Dr. Luther Terry released the groundbreaking Report of the Surgeon General’s Advisory Committee on Smoking and Health. The Report concluded that “[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action.” Department of Health, Education, and Welfare, U.S. Surgeon General’s Advisory Committee, Smoking and Health, at 33. Later that same year, the FTC promulgated a trade regulation rule defining it an unfair and deceptive act within the meaning of section 5 of the FTC Act to “fail to disclose, clearly and prominently, in all advertising and on every pack, box, carton or other container in which cigarettes are sold to the consuming public that cigarette smoking is dangerous to health and may cause death from cancer or other diseases.” Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8325 (1964).

Congress’ enactment in 1965 of the Federal Cigarette Labeling and Advertising Act (Labeling Act) (Pub. L. 89–92, 79 Stat. 282, codified at 15 U.S.C. §1331 
et seq
. (2000)), contained a preemption provision that vacated the newly promulgated trade regulation rule. The Labeling Act served two purposes. First, it was intended to inform the public of the hazards of smoking. Second, it was designed to address the emerging problem of inconsistent state regulation of cigarette labeling and advertising. Pub. L. 89–92, §2. The Labeling Act required manufacturers to place a specific warning label on all cigarette packs. Pub. L. 89–92, §4. The Act also required both the Secretary of Health, Education, and Welfare and the FTC to make annual reports to Congress on the health consequences of smoking and the advertising and promotion of cigarettes. Pub. L. 89–92, §5. (The content of the warning was subsequently revised on two occasions: in 1969, when the Labeling Act was amended by the Public Health Cigarette Smoking Act (Pub. L. 91–222, 84 Stat. 87 (1969)), and in 1984, when the Labeling Act was again amended by the Comprehensive Smoking Education Act (Pub. L. 98–474, 98 Stat. 2200 (1984)). Prior to the adoption of the 1984 revisions, both the FTC and the Surgeon General recommended to Congress that the required warnings address the phenomenon of compensation, which refers to smokers’ alteration of smoking behavior to achieve their accustomed level of nicotine consumption. This recommendation was not adopted by Congress.)

In 1966, the United States Public Health Service reported that scientific evidence strongly suggested that the lower the levels of tar and nicotine in cigarette smoke, the less harmful the effects on the health of the smoker. United States Department of Health and Human Services, The Health Consequences of Smoking: The Changing Cigarette, at i (1981) (quoting 1996 statement by Public Health Service). Later that same year, the FTC announced that it had sent letters to each of the major United States cigarette manufacturers ending the ban on including tar and nicotine content on labels and in advertising of cigarettes. The letters stated:

“The Cigarette Advertising Guides promulgated by the Commission in September 1955 provided that no representation should be made that any brand of cigarette or the smoke therefrom is low in nicotine or tars *** when it has not been established by competent scientific proof applicable at the time of dissemination that the claim is true, and if true, that such difference or differences are significant. On the basis of the facts now available to it, the Commission has determined that a factual statement of the tar and nicotine content (expressed in milligrams) of the mainstream smoke from a cigarette would not be in violation of such Guides, or of any of the provisions of law administered by the Commission, so long as (1) no collateral representation (other than factual statements of tar and nicotine contents of cigarettes offered for sale to the public) are made, expressly or by implication, as to reduction or elimination of health hazards, and (2) the statement of tar and nicotine content is supported by adequate records of tests conducted in accordance with the Cambridge Filter Method ... . It is the Commission’s position that it is in the public interest to promote the dissemination of truthful information concerning cigarettes which may be material and desired by the consuming public.” 6 Trade Reg. Rep. (CCH) par. 39,012.70 (1988).

When public concern about the health effects of smoking began to increase, the FTC determined that it might be desirable for consumers to be able to choose among cigarette brands based on their yield of tar and nicotine. In support of this goal, the FTC, in 1967, adopted the “Cambridge Method” (FTC method) as the single acceptable means of measuring tar and nicotine yields in cigarettes. The record is clear that both the FTC and the cigarette manufacturers were aware at that time that no method of measurement, including the FTC method, could accurately predict the actual exposure of individual smokers who smoked any particular brand of cigarette. The variations in smoking habits, including the phenomenon of compensation, are simply too complex to account for in any uniform test. However, despite this awareness that the test data would not be accurate as to any individual smoker, the FTC found this concern outweighed by the need for a basis for comparison among brands. Thus, the FTC method was adopted for the purpose of providing a consistent benchmark, not as a means of measuring the actual exposure of individual smokers to tar and nicotine. FTC Press Release–Statement of Considerations 2 (August 1, 1967).

The FTC later declared that a manufacturer’s use of tar and nicotine measurements based on the FTC method would be deemed substantiated and would not result in any regulatory action. Eventually, the FTC authorized cigarette manufacturers to include in their advertising a statement of the tar and nicotine content of their cigarettes, expressed in milligrams, as measured by the FTC method. Indeed, the FTC itself presented these measurements in its reports to Congress and published the data for circulation to consumers. 4 Trade Reg. Rep. (CCH) par. 39,012.70. See also Letter from Federal Trade Commission to major cigarette manufacturers and to Robert. B. Meyner, Administrator of the Cigarette Advertising Code (March 25, 1966).

The FTC made its first Report to Congress, pursuant to the Labeling Act, in 1967. In that report, the FTC recommended that Congress strengthen the language of the warning statement that was then required on all cigarette packages. The warning statement stated that cigarette smoking “may be hazardous” to health. The FTC recommended a more direct statement that smoking is hazardous to health. The FTC also recommended that a “statement setting forth the tar and nicotine content of each cigarette should be required to appear on the package and in all cigarette advertising.” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 30 (June 30, 1967). The recommendations were not adopted at that time.

In its 1968 Report to Congress, the FTC responded to the emerging consensus regarding the possible benefit to smokers of reducing tar and nicotine yields. “Based upon the proposition that lower yield cigarettes present a lessened hazard to the American public,” the Commission explained, it had acted during the previous year to: “(1) augment information available to the public on the tar and nicotine content of cigarettes and (2) prompt cigarette manufacturers to develop less hazardous cigarettes.” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 17 (June 30, 1968). However, the FTC observed:

“An analysis of sales data provided by cigarette manufacturers indicates that sales of comparatively low yield cigarettes, e.g., 
for purposes of this report only
, those having 15 milligrams (mg.) of tar or less, have not been extensive thus far. Three categories of cigarettes, classified according to tar yields, divided the market in 1967 as follows: 15 mg. and under–2%; 16-21 mg.–59%; 22 mg. and over–39%.” (Emphasis added.) Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 19 (June 30, 1968).

The 1968 report also reported that only a small number of companies were making voluntary tar and nicotine disclosures on their packaging, despite there being “every reason to believe that the promotion of low tar and nicotine yield cigarettes can be profitable.” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 19 (June 30, 1968). “[R]ather than alert smokers to less hazardous low yield cigarettes, advertisers sought for the most part to allay smoker anxiety by proclaiming the wonders of their filters.” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 19 (June 30, 1968).

In its 1969 Report to Congress, the FTC continued to press for mandatory disclosure of tar and nicotine content on each cigarette package and in all cigarette advertising and for stronger warnings. In addition, the FTC urged repeal of the Labeling Act and a complete ban on cigarette advertising on television and radio. Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 35 (June 30, 1969). Congress did not adopt these recommendations.

A subsequent FTC proposal that would have declared it an unfair or deceptive practice under section 5 of the FTC Act for cigarette manufacturers to fail to disclose in their advertising the tar and nicotine content of the product, based on the most recent FTC test results (see 35 Fed. Reg. 12,671 (August 8, 1970)), was dropped after five major industry members and three of the smaller companies voluntarily agreed to provide this information on all cigarette packages (see 36 Fed. Reg. 784 (1971)). See also Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 18-19 (December 31, 1970).

The voluntary approach was seen by the FTC as a more efficient means of accomplishing its goal. As then-chairman Fitzpatrick said, “Trade regulation rules, if contested in the courts, might take a long time to become effective. A workable voluntary plan by the industry could be put into effect immediately.” (As late as 1997, the voluntary agreement remained in effect. See Cigarette Testing; Request for Public Comment, Federal Trade Commission, 62 Fed. Reg. 48,158 (September 12, 1997). Nothing in the record suggests that the agreement has been terminated since that date.) As a result of this voluntary agreement, PMUSA and the other major manufacturers of cigarettes have, since 1971, included information on tar and nicotine yields as measured by the FTC method on packaging and in advertising. See Federal Trade Commission, Staff Report on the Cigarette Advertising Investigation, May 1981, at 4–5.

The descriptor “low tar” began to appear in cigarette advertising by the late 1960s as the industry responded to public interest in lowered tar and nicotine by adopting innovations, such as the use of filters, aeration holes, or wrapping paper that burned more quickly. Each of these innovations caused reductions in the amounts of tar and nicotine measured by the FTC method. As noted above, the FTC and industry members were well aware that the FTC method did not replicate actual smoking behavior. They were also aware that smokers who switched from a brand that was higher in tar and nicotine to a brand with one of these features tended to compensate by smoking more cigarettes or by smoking differently.

In 1969, the FTC informed cigarette manufacturer American Brands of its intent to charge the company with engaging in unfair, misleading, and deceptive advertising with respect to the tar content of its Pall Mall and Lucky Strike cigarettes. (American Brands, Inc., was formed in 1969 as the parent company of the American Tobacco Company, which traced its corporate roots to the founding of W. Duke & Sons in North Carolina in 1864.)

Shortly thereafter, but before a formal complaint was filed, the Code Authority of the National Association of Broadcasters sought an advisory opinion from the FTC. See 16 C.F.R. §1.1 (permitting any person, partnership, or corporation to request advice from the FTC “with respect to a course of action which the requesting party proposes to pursue”). By letter to the FTC, the Code Authority inquired whether the FTC had formulated a policy regarding the use of words such as “low,” “lower,” and “reduced” in describing the level of tar and nicotine in cigarettes. 
American Brands, Inc.
, 77 F.T.C. 1623 (1970). The FTC responded, by letter, that “the use of ‘low’ and ‘less’ or similar words when describing tar and nicotine content, create[s] an imprecise picture, which, absent a full and fair disclosure, could lead to a mistaken conclusion that the advertised brand is lower in tar and nicotine than many other brands.” 
American Brands, Inc.
, 77 F.T.C. at 1624. The FTC also stated that the “degree of imprecision created would vary,” depending on what representations were being made and the actual tar and nicotine levels of the advertised cigarette, but that “imprecision could almost always be avoided” if “clear and conspicuous disclosure” was made of the tar and nicotine content, in milligrams, of the advertised cigarette, that brand to which it was being compared, and the domestic cigarettes with the highest and lowest yields. 
American Brands, Inc.
, 77 F.T.C. at 1624. The FTC further advised the Code Authority that all representations regarding tar and nicotine levels in cigarette advertising should be based on recent test results. Finally, because the topic was of substantial public interest, the exchange of correspondence between the FTC and the Code Authority was made public. 
American Brands, Inc.
, 77 F.T.C. at 1624.

On April 1, 1970, the Public Health Cigarette Smoking Act became law, making several significant changes to the Labeling Act. Pub. L. 91–222, 84 Stat. 87 (1969). First, since November 1970, all cigarette packages have been required to carry the following warning statement: “Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health.” Pub. L. 91–222, §4. Second, s
ince January 2, 1971, the Public Health Cigarette Smoking Act has barred cigarette advertising from television and radio. Pub. L. 91–222, §6. And, third, a new preemption provision forbids any “requirement or prohibition based on smoking and health *** imposed under State law with respect to the advertising or promotion of cigarettes.” Pub. L. 91–222, §5(b). As the new preemption provision was directed only at actions by the states, the FTC remained free to regulate cigarette advertising. See 
Lorillard Tobacco Co. v. Reilly
, 533 U.S. 525, 545, 150 L. Ed. 2d 532, 553, 121 S. Ct. 2404, 2416-17 (2001).

In its 1970 Report to Congress, the FTC described the exchange with the Code Authority under the heading “Voluntary Regulation.” The FTC reported that the Code Authority had “adopted as its policy a position similar to the order” that the FTC “believed to be appropriate” as a resolution of its pending complaint against American Brands. The FTC’s clearly stated policy was that:

“if a broadcast cigarette advertisement used comparative language such as ‘low’ or ‘lower’ to describe the tar and nicotine content of the advertised cigarette, the advertisement must also disclose:

1. The tar and nicotine content in milligrams of the advertised cigarette;

2. The tar and nicotine content in milligrams of the lowest and highest yield domestic cigarettes; and

3. If the tar and nicotine content of the advertised cigarette is compared to any other specific cigarette, the brand name and tar and nicotine content in milligrams of the smoke produced by such other cigarettes.” Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 21 (December 31, 1970).

One result of the advisory opinion rendered to the Code Authority, according to the Report, was that several television commercials had been withdrawn and that only two brands made comparative claims in broadcast advertisements during 1970. Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 21 (December 31, 1970).

Subsequently, when the formal complaint against American Brands was filed, the FTC accused the company of creating the false impression that its cigarettes were low in tar when, in fact, Pall Mall Gold 100s and Lucky Filters contained approximately 20 and 21 milligrams of tar, respectively, at a time when the brand containing the lowest level of tar contained only 4 milligrams.
 In re American Brands, Inc.
, 79 F.T.C. 225 (1971). By this time, the voluntary agreement had been reached, but American Brands had not signed on to it.

The dispute between the FTC and American Brands was resolved in 1971, with the entry of a consent order that required American Brands to cease and desist from:

“Stating in advertising that any cigarette manufactured by it, or the smoke therefrom is low or lower in ‘tar’ by use of the words ‘low,’ ‘lower,’ or ‘reduced’ or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure of:

1. The ‘tar’ and nicotine content in milligrams of the smoke produced by the advertised cigarette; and

2. If the ‘tar’ content of the advertised brand is compared to that of another brand or brands of cigarette, (a) the ‘tar’ and nicotine content in milligrams of the smoke produced by that brand or those brands of cigarette, and (b) the ‘tar’ and nicotine content in milligrams of the lowest yield domestic cigarette.” 
American Brands
, 79 F.T.C. at 225.

The consent order further defined the term “tar” as “the total particulate matter in the mainstream smoke of cigarettes as determined by the testing method employed by the Federal Trade Commission in its testing of the smoke of domestic cigarettes.” 
American Brands
, 79 F.T.C. at 225.

The content of the consent order was slightly different from that of the order the FTC anticipated in its 1970 Report to Congress. Significantly, the FTC originally intended to require that any claim of low or lower tar be accompanied not only by the tar and nicotine content in milligrams, but also by the tar and nicotine content of the lowest yield domestic cigarette. See Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 21 (December 31, 1970). In the end, the order allowed the use of the words “ ‘low,’ ‘lower,’ or ‘reduced’ or like qualifying terms,” so long as the tar and nicotine content of the cigarette being advertised was clearly and conspicuously disclosed. Only if the advertised brand was being compared to another specific brand or brands of cigarettes was the manufacturer required to disclose the additional information.

Later in 1971, after having reached a voluntary agreement with most cigarette manufacturers to disclose tar and nicotine levels in their advertising (and having obtained the compliance of American Brands and other nonsigners through the 1971 consent order), the FTC announced its intention to file complaints against six cigarette companies if they failed to display in their advertising, clearly and conspicuously, the same warning that Congress had already required on cigarette packages. Again, negotiations between the FTC and the major cigarette manufacturers resulted in the entry of a consent order. 
In re Lorillard
, 80 F.T.C. 455 (1972). (In 1975, the FTC sought civil penalties against the six major cigarette manufacturers for violations of these consent orders. See 
United States v. R.J. Reynolds Tobacco Co.
, No. 76 Civ. 813 (JMC) (S.D.N.Y., February 20, 1981) (disposing of last remaining enforcement action after five other companies entered into consent judgment approved by the FTC).

In its 1971 Report to Congress, the FTC described the resolution of the American Brands dispute via consent order as part of its “[r]egulatory activity” for the year. Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 13-14 (December 31, 1971). In addition, the FTC reported under the heading of “Regulatory activity” its “extended negotiations” with “six proposed respondents” in the 
Lorillard 
matter. Settlement by consent order would “meet the public interest in this matter” and would “take effect much sooner than orders resulting from adjudicative proceedings.” Such orders, the FTC observed, would “carry the force of law” and violation of the orders could carry civil penalties. The FTC did not comment on the effect or application of the orders on companies that were not parties thereto. Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 16 (December 31, 1971).

By the early 1970s, in addition to including the tar and nicotine content numbers in their packaging and advertising in accordance with the voluntary plan and the 1971 and 1972 consent orders, several manufacturers were advertising their products as being “low” or “lower” in either or both tar and nicotine. Vantage, True, and Doral, for example, were advertised as low tar and nicotine cigarettes. Pall Mall Extra Mild, Silva Thins, Pall Mall Gold 100s, Lucky Ten, Carlton, and Iceberg 10 were advertised as low or lower in tar. Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 5 (December 31, 1973). In its 1974 Report to Congress, the FTC noted that “as the manufacturers of Raleighs, Kools, Pall Malls, Viceroy’s and Marlboros are doing, Winston now offers a Winston Light with lowered ‘tar’ and nicotine content.” Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 5 (December 31, 1974).

By 1978, the FTC was reporting to Congress that low tar cigarettes, which it defined as those with 15 milligrams or less of tar, had increased in market share from 2% in 1967 to 28% in 1978. Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 3 (1978). In addition, the FTC noted that “[m]arketing shifts to lower ‘tar’ and nicotine cigarettes may be another way of assessing the effects of health warnings.” The increasing market share of the low tar brands was seen as an indication that the public health message was reaching consumers. The FTC also noted, however, that “[w]hile there is evidence suggesting that cigarettes with lower ‘tar’ and nicotine are less hazardous, the evidence is not conclusive and even the lowest yield of cigarettes presents health hazards much higher than would be encountered without smoking at all.” Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 3 (1978).

By 1979, the FTC was reporting that the market share of low tar cigarettes had increased to 40.9%. Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 8 (1979). In this report, the FTC provided data on the total advertising expenditures and market shares for cigarettes with 15, 12, 9, 6, and 3 milligrams of tar. The report noted that advertisers sometimes described cigarettes with 3 milligrams or less of tar as “ultra low ‘tar.’ ” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 11 (1979). In a footnote, the FTC stated that it had not defined “ ‘ultra-low tar’, or any term related to ‘tar’ level except for ‘low tar’, which the FTC defines as 15.0 mg. or less tar.” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, 1979, at 11 n.8 (1979). “As a result,” the FTC observed, “advertisers use a variety of terms to distinguish among ‘tar’ levels.” Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 11 n.8 (1979). (An identical footnote appeared in the FTC’s 1980 Report to Congress. Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act, at 11 n.8 (November 15, 1982).

The FTC also employed the term “low ‘tar’ ” when it issued a press release on December 15, 1981, announcing the release of a report entitled “Report of ‘Tar,’ Nicotine and Carbon Monoxide of the Smoke of 200 Varieties of Cigarettes.” The lead paragraph in the press release stated that “Test results released today by the Federal Trade Commission show an increase in the number of cigarettes with low ‘tar,’ nicotine and carbon monoxide levels.” In addition, the report showed that 150 of the 200 brands tested had 15 milligram or less tar, compared to 125 of 187 brands tested the previous May. FTC Press Release–FTC Cigarette Report Shows More Brands on Market with Low “Tar,” Nicotine, Carbon Monoxide Levels (December 15, 1981).

Over the years, the FTC conducted multiple investigations regarding the use of tar and nicotine levels and of descriptors such as “lights” and “low tar” in cigarette advertising. Such investigations took place in 1976, 1981, 1988, and 1992.

In 1981, the FTC concluded that the warning on cigarette packages and in cigarette advertising was not effective and did not provide sufficient information to consumers regarding the health risks of smoking. Federal Trade Commission, Staff Report on the Cigarette Advertising Investigation, May 1981, at 4–7. The staff report concluded that even though warnings and disclosure of FTC test measurements of tar and nicotine were required by the FTC, the then-current state of cigarette advertising might be deemed deceptive under section 5 of the FTC Act because a substantial segment of the purchasing public was likely to be deceived. Federal Trade Commission, Staff Report on the Cigarette Advertising Investigation, May 1981, at 4–17. This conclusion was based on data in the report indicating that a large portion of the public lacked sufficient knowledge of the hazards of cigarette smoking. Federal Trade Commission, Staff Report on the Cigarette Advertising Investigation, May 1981, at 4–21, 4–36. The Commissioners unanimously agreed that this staff report should be transmitted to Congress. With only one Commissioner objecting, the staff report was released to the public. The entire Commission endorsed the substance of the report. See letter from David A. Clanton, Acting Chairman of the FTC, to George Bush, Vice President (May 21, 1981) (transmitting the staff report to the Senate). Nevertheless, neither the FTC nor Congress acted upon this staff suggestion that cigarette advertising under the then-current FTC policy and regulations should be deemed deceptive.

Also in 1981, the FTC began an investigation of Barclay cigarettes. The investigation was triggered by complaints from manufacturer Brown & Williamson’s competitors, who claimed that the design of the Barclay filter caused it to falsely register very low tar measurements on the FTC smoking machine. 
Federal Trade Comm’n v. Brown & Williamson Tobacco Corp.
, 778 F.2d 35, 37 (D.C. Cir. 1985). The FTC determined that the Barclay claim of 1 milligram of tar was false and deceptive and attempted to require Brown & Williamson (B&W) to state an estimated tar content of 3 to 7 milligrams. B&W refused, but changed its advertisements to state that the 1 milligram tar measurement was obtained using a method recognized by “independent laboratories.” 
Brown & Williamson
, 778 F.2d at 38. The FTC thereafter sought an injunction to prevent such advertising and the district court granted injunctive relief. The Court of Appeals, although affirming the finding that B&W violated section 5 of the FTC act (
Brown & Williamson
, 778 F.2d at 43), reversed on first amendment grounds (
Brown & Williamson
, 778 F.2d at 45).

After the 1988 investigation, the FTC recommended to Congress that it not adopt a proposed amendment to the Labeling Act that would have permitted states to impose additional duties with respect to such advertising. The FTC argued that allowing individual states to impose their own rules would conflict with the FTC program.

In the 1992 investigation, the FTC considered whether the use of terms such as “low tar” and “light” in cigarette advertising should be banned because they were deceptive, given what was known about the limits of the FTC method and the real world phenomenon of compensation by smokers. The FTC concluded, however, that if the use of such terms was substantiated by FTC method results, they were not false, unfair, or misleading under the provisions of the FTC Act.

In the course of at least two of the investigations, the FTC reexamined the test method and considered whether the protocol should be changed to render it a more accurate representation of human behavior, given the changes in cigarette design. In both cases, the FTC solicited public comment on the FTC method. The first reexamination occurred in 1977 and was triggered by the suggestion of Lorillard, Inc., that the protocol of the FTC method be changed so that the cigarette being tested would not be inserted quite as far into the machine. Lorillard’s concern was that when its cigarettes were inserted to the prescribed depth, the machine blocked the ventilation holes, resulting in a higher tar and nicotine rating than if the holes had remained uncovered. In the end, Lorillard was the only industry member to advocate altering the standard insertion depth. The FTC concluded that the protocol should not be changed. The agency reiterated its 1967 statement that the purpose of the testing was not to predict the tar and nicotine exposure of any individual smoker but, rather, to determine the amount of tar and nicotine generated when the cigarette was smoked by a machine under a prescribed protocol. 43 Fed. Reg. 11,856 (March 22, 1978). Noting that innovations such as aerated filters had complicated the task of providing comparability among cigarette brands, the FTC concluded that “a change in the insertion depth would cause a lack of continuity with previous test results.” 43 Fed. Reg. 11,856-57 (March 22, 1978). Further, the FTC noted that if a consumer “smoked each different cigarette the same way, he would inhale ‘tar’ and nicotine in amounts proportional to the relative values of the FTC figures.” 43 Fed. Reg. 11,856 (March 22, 1978). Thus, “in the absence of information indicating that a new insertion depth would be me more consistent with the manner in which smokers insert cigarettes in actual use,” the FTC decided not to modify the protocol. 43 Fed. Reg. 11,857 (March 22, 1978). In the end, the FTC concluded this investigation by issuing an advisory opinion stating that the tar values set forth in cigarette advertisements must be consistent with the latest applicable FTC tar number, based on the FTC methodology, and that any tar and nicotine claims not so substantiated were not permitted. See 
In re Lorillard
, 92 F.T.C. 1035 (1978).

The second reexamination of the FTC method occurred in the early 1980s, when some manufacturers began using channel ventilation systems rather than air holes. The channels remained open when the cigarette were inserted in the machine, yielding very low numbers. Competitors complained that the results were inaccurate because the channels did not remain open when the cigarette was in the hands of an actual smoker. In addition to initiating the Barclay investigation, noted above, the FTC invited public comment on this development and on possible modifications of its method that might render it a more accurate representation of actual smoking behavior. 48 Fed. Reg. 15,953-54 (April 13, 1983). The FTC also asked for comments on whether such modifications might result in unintended consequences or affect further innovation in cigarette design. 48 Fed. Reg. 15,954-55 (April 13, 1983). In addition, the FTC sought comment on the possibility of using a system of ranges or “bands” of tar content, as opposed to specific numerical values expressed in milligrams of tar. Finally, the FTC reiterated its long-standing position that its ratings were intended to be relative, not absolute, even as it posed the question: “should consumers be advised that the cigarettes’ actual ‘tar’ delivery depends on how it is smoked?” 48 Fed. Reg. 15,955 (April 13, 1983).

Comments were received not only from those in the cigarette industry, but also from a number of health organizations. The opinions expressed were widely disparate, ranging from a call for development of a testing system that did approximate actual smoking behavior to a suggestion that all such testing be abolished. In response to the idea of a “banding” system, which would categorize cigarettes as high tar, medium tar, low tar, and ultra low tar, several manufacturers noted that this would tend to concentrate brands near the upper level of each range, in contrast to the existing system that gave manufacturers an incentive to create a product that would deliver the lowest possible level of tar. In the absence of a consensus on any means of eliminating or reducing the limitations of the FTC test method, the FTC made no changes to its testing methodology.

The issue of cigarette labeling and advertising rules remained 
status quo
 until February 27, 1992, when The Coalition on Smoking OR Health (made up of the American Heart Association, the American Lung Association, and the American Cancer Society), filed a petition with the FTC in which it sought the issuance of an administrative complaint against PMUSA and other tobacco companies pursuant to section 5 of the FTC Act. Specifically, the Coalition alleged that PMUSA’s labeling and advertising of one of its low tar products and similar labeling and advertising by other manufacturers were false and misleading because the use of terms such as “low tar,” “light,” and “ultra low tar” falsely implied that these cigarettes were safer than other products. The Coalition charged that the failure of PMUSA and other manufacturers “to disclose that while the tar yield of their low tar cigarettes may be less than other tobacco-related products, there are numerous known carcinogens in the constituents of these tobacco products, carcinogens which pose a health hazard to the consumer,” and that this failure to make such additional disclosures “is a material omission in violation of the Federal Trade Commission Act.” Petition of The Coalition on Smoking OR Health before the Federal Trade Commission, par. 25 (February 27, 1992).

The FTC responded to the Coalition’s petition by means of a letter from C. Lee Peeler, the Associate Director of the FTC. Peeler’s letter stated that after giving careful consideration to the questions raised in the Coalition’s petition, the FTC had asked the National Cancer Institute (NCI) to convene a “consensus conference” on this topic. Letter from C. Lee Peeler to Matthew L. Myers, Counsel to Coalition on Smoking OR Health (August 8, 1994).

The National Cancer Institute Conference on the FTC Cigarette Test Method was also brought about by the request of Representative Henry A. Waxman, chairman of the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce, who asked the NCI to convene a conference to review the FTC’s method of determining the relative tar and nicotine content of cigarettes. At the “direction of the Commission,” the FTC chairman wrote to the NCI director, noting the substantial overlap between the issues identified by Chairman Waxman and those the FTC was then examining. The FTC chair asked that the consensus conference “provide a comprehensive review of the existing scientific evidence on issues relating to low-tar and ultra-low tar cigarettes.” The letter further asked that the conference consider whether the “current rating system is sufficiently flawed as to pose harm to consumers who rely on the ratings.” Among the list of specifically suggested topics for the conference, the letter listed:

“are low-tar cigarettes (cigarettes rated at 15 mg. or less of tar) less dangerous than high-tar cigarettes (those rated at more than 15 mg. of tar) and, if so, what is the extent of their health benefit?”

and:

“are ultra low-tar cigarettes (cigarettes rated at 6 mg. or less of tar) less dangerous than low-tar and/or high-tar cigarettes and, if so, what is the extent of their health benefit?”

Letter from Janet D. Steiger, FTC Chairman, to Samuel Broder, M.D., Director, National Cancer Institute (July 20, 1994).

The conference was held on December 5 and 6, 1994, in Bethesda, Maryland. The conferees concluded that yield numbers and descriptors of yield numbers, such as “light” and “ultra light,” were health claims. They recommended that such numbers and descriptors in labeling and advertising be accompanied by appropriate disclaimers as to health consequences of smoking, but did not recommend banning such descriptors. See NCI Monograph 7: The FTC Cigarette Testing Method for Determining Tar, Nicotine, and Carbon Monoxide Yields of U.S. Cigarettes (1996). The FTC, in the end, did not adopt a trade regulation rule or take other regulatory action to require such disclaimers for light and low tar descriptors.

In 1994, the FTC initiated an investigation into the practices of the American Tobacco Company, which by this time had been sold by its corporate parent, American Brands. American Tobacco was advertising its Carlton brand cigarettes by showing 10 packs of Carltons next to a single pack of another brand. The tar and nicotine ratings for each brand was shown, along with a claim that 10 packs of Carltons had less tar than one pack of the other brand. In other ads, the claim was made that an entire carton of Carltons had less tar than a single pack of the other brand. The FTC complaint alleged that these ads were false and misleading because consumers would not, in fact, get less tar by smoking 10 packs of Carlton than by smoking one pack of the other brands. Although the other cigarettes were, indeed, rated as having 10 times or more tar, measured in milligrams, than Carltons, “those ratings are obtained through smoking machine tests that do not reflect actual smoking, in part because the machines do not take into account such behavior as compensatory smoking.” 
In re American Tobacco Co.
, 119 F.T.C. 3 (1995).

Again, the matter was resolved by agreement. American Tobacco agreed to abandon any representation of the tar and nicotine levels of Carlton cigarettes by using “a numerical multiple, fraction or ratio” of the tar or nicotine levels of other brands or by depicting more than one pack of Carltons versus one pack of any other brand. The agreed order provided, further, that “presentation of the tar and/or nicotine ratings of any of respondent’s brands of cigarettes and the tar and/or nicotine ratings of any other brand (with or without an express or implied representation that respondent’s brand is ‘low,’ ‘lower,’ or ‘lowest’ in tar and/or nicotine) shall not be deemed” to violate the ban on numerical comparisons. 
American Tobacco
, 119 F.T.C. at 11. Prior to the entry of the agreed order, the FTC described this provision as a “limited ‘safe harbor’ for advertising that complies with certain requirements in its use of official tar and nicotine ratings.” Analysis of Proposed Consent Order to Aid Public Comment, 
In re American Tobacco Co.
, F.T.C. File No. 932 2268 (August 31, 1994).

Most recently, in 1997, the FTC solicited public comment on various proposals for altering the FTC testing method and for changing cigarette advertising so that it would more accurately reflect the limits of the testing method. The request for comment explained that the 1970 voluntary agreement between the FTC and most cigarette manufacturers “remains in effect today, and it forms the basis for current disclosure of tar and nicotine yield.” The request for comment also raised the issue of compensation and noted the inability of the current testing method to allow for compensatory behavior by smokers. See Cigarette Testing: Request for Public Comment, Federal Trade Commission, 62 Fed. Reg. 48,158 (September 12, 1997). The record suggests that this inquiry is still ongoing.

B. PMUSA’s Marlboro Lights and Cambridge Lights

Against this industry backdrop, in 1971, PMUSA responded to increasing consumer concerns about the health effects of smoking by introducing Marlboro Lights cigarettes as an alternative to its Marlboro Reds. PMUSA began selling Cambridge Lights in 1986. In addition to the use of the word “light” in the names of these new products, which suggested that they were in some way “lighter” than their “full-flavored” counterparts, the Marlboro Lights label promised “lowered tar and nicotine.”

Marlboro Lights became the most popular cigarette brand in the country and inspired many imitators. Light cigarettes, including the PMUSA brands, eventually constituted 89% of the United States cigarette market.

The tobacco contained in Marlboro Lights did not carry any less tar or nicotine than the tobacco in so-called “full-flavor” cigarettes. Instead, the claim of low tar and nicotine was premised on the use of a different type of filter, which was designed to dilute the smoke and to make it more difficult for the smoker to draw smoke, and therefore tar and nicotine, into his or her lungs. When subjected to testing by the FTC method, Lights indeed delivered less tar and nicotine.

In actual experience, however, smokers who changed from regular cigarettes to Lights were likely to compensate for the lower amount of nicotine delivered by the more restrictive filter by smoking more cigarettes, smoking them longer, taking more frequent drags as they smoked, or inhaling more deeply. As a result, many smokers of Lights likely inhaled just as much tar as they would have had they remained smokers of regular cigarettes.

C. Procedural History

1. 
The Pleadings

On February 10, 2000, plaintiffs, as individuals and on behalf of a class of similarly situated individuals, brought this lawsuit alleging violations of the Consumer Fraud Act and the Deceptive Practices Act. They did not seek damages for the health effects, if any, of their consumption of Lights. Instead, they sought only economic damages based on their claim of having purchased a product in reliance on statements by PMUSA that were fraudulent, deceptive, and unfair.

In response to plaintiffs’ first amended complaint, PMUSA raised 27 separate affirmative defenses including 
laches
, waiver, the statute of limitations, federal preemption, and the statutory exemption contained in section 10b(1) of the Consumer Fraud Act for conduct that is specifically authorized by a state or federal regulatory body (815 ILCS 505/10b(1) (West 1998)).

On February 11, 2003, plaintiffs filed their second amended complaint and a motion for withdrawal of three of the five named plaintiffs, which was granted by the circuit court.

The second amended complaint establishes the parameters of this litigation. The relevant factual allegations contained in plaintiffs’ second amended complaint are:

“7. At all relevant times, Defendant sold and packaged Cambridge Lights and Marlboro Lights as ‘light’ and as having decreased tar and nicotine.

8. While marketing and promoting decreased tar and nicotine deliveries, Defendant designed Cambridge Lights and Marlboro Lights cigarettes to register lower levels of tar and nicotine to the ‘Cambridge’ or ‘Ogg’ testing apparatus–the testing machine used by the tobacco industry to ‘measure’ tar and nicotine levels in cigarettes–than would be delivered to the consumers of the product. Defendant controlled the tar and nicotine delivery of Cambridge Lights and Marlboro Lights under machine testing conditions to achieve apparent support for their representations that their Cambridge Lights and Marlboro Lights cigarettes are ‘light’ and contain decreased tar and nicotine and that their Marlboro Lights cigarettes contain ‘lowered tar and nicotine.’

9. Defendant’s representation that Cambridge Lights and Marlboro Lights cigarettes are lower in tar and nicotine than regular cigarettes is deceptive and misleading.

10. Not only do consumers receive higher levels of tar and nicotine than the testing apparatus registers, the smoke produced by Cambridge Lights and Marlboro Lights is more mutagenic (causing genetic and chromosomal damage) per milligram of tar than ‘regular’ cigarettes.”

Plaintiffs’ second amended complaint further alleged the following “deceptive and unlawful conduct” by PMUSA in connection with its “manufacture, distribution, and marketing and sale of Cambridge Lights and Marlboro Lights cigarettes”:

“a. falsely and/or misleadingly representing that their product is ‘light’ and/or delivers lowered tar and nicotine in comparison to regular cigarettes;

b. describing the product as light when the so-called lowered tar and nicotine deliveries depended on deceptive changes in cigarette design and composition that dilute the tar and nicotine content of smoke per puff as measured by the industry standard testing apparatus, but not when used by the consumer.

c. intentionally manipulating the design and content of Cambridge Lights and Marlboro Lights cigarettes in order to maximize nicotine delivery while falsely and/or deceptively claiming lowered tar and nicotine. These manipulations include, but are not limited to, the modification of tobacco blend, weight, rod length, and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH levels by chemical processing and additives, such as ammonia, which resulted in the delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendant represented by use of the ‘light’ description;

d. employing techniques that purportedly reduce machine-measured levels of tar and nicotine in Cambridge Lights and Marlboro Lights cigarettes, while actually increasing the harmful biological effects, including mutagenicity (genetic and chromosomal damage) caused by the tar ingested by the consumer per milligram of nicotine.”

In answer to the second amended complaint, PMUSA continued to assert the same 27 affirmative defenses.

2. 
Class Certification and Class Representatives

On September 8, 2000, plaintiffs moved for class certification pursuant to section 2–801 of the Code of Civil Procedure (735 ILCS 5/2–801 (West 1998)). A hearing on plaintiffs’ motion for class certification was held on November 28, 2000, with a supplemental hearing on January 12, 2001.

On February 8, 2001, the circuit court granted plaintiffs’ motion to certify a plaintiff class of consumers who purchased Cambridge Lights and Marlboro Lights in the State of Illinois for personal consumption between their introduction and February 8, 2001. Thus, the class period for purchases of Cambridge Lights was from 1986 to 2001; the class period for Marlboro Lights was from 1971 to 2001.

On July 7, 2002, PMUSA filed a motion to decertify the class based on this court’s decision in 
Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134 (2002). In 
Oliveira
, this court held that “to properly plead the element of proximate causation in a private cause of action for deceptive advertising brought under the Act,” the plaintiff must allege that he was “in some manner” deceived by the advertisement. 
Oliveira
, 201 Ill. 2d at 155. The circuit court denied the motion to decertify the class, rejecting PMUSA’s argument that class certification was improper because the question of deception was necessarily an individual question, not a common question of fact that could be determined for the class as a whole.

Notice of the class action was published in 21 newspapers, including the Chicago Tribune, the St. Louis Post-Dispatch, USA Today, and 18 regional Illinois newspapers. In addition, notice was given to the general public via the Internet and a press release to PR Newswire International Newslines Service. PMUSA’s request that notice be given to individual Illinois residents whose names and addresses were available from its own database of consumers was denied.

PMUSA requested that the circuit court adopt a trial plan that would allow it to address the questions of actual deception, actual reliance, and other issues that, it argued, were individual issues. The circuit court rejected the proposed trial plan. Similarly, PMUSA’s request to depose individual class members other than the named plaintiffs and those selected by plaintiffs’ counsel was denied by the circuit court.

At the close of evidence, on March 10, 2003, PMUSA again moved for decertification of the class. In the final judgment order, the circuit court again found that class certification was proper because common issues of law and fact predominated. Specifically, “Philip Morris has engaged in a course of conduct that affects this Class in such a way that all members share various elements of this cause of action.” The following factual issues were determined by the circuit court to be common to all members of the class:

“a. whether Class members understood the descriptor ‘lights’ and ‘lowered tar and nicotine’ to mean less harmful, safer and/or delivering less tar;

b. whether these representations were false and/or misleading to Class members;

c. whether Defendant Philip Morris intended for the Class to rely upon these representations;

c. [
sic
] whether Philip Morris’s conduct violated the Illinois Commerce Fraud Act [
sic
] and whether this violation was willful and wanton; and

d. whether Class members sustained damage as a result of Philip Morris’ deceptive conduct.”

On appeal, PMUSA argues that the circuit court erred in certifying the class because of the predominance of individual issues. In particular, PMUSA questions whether it was proper for the circuit court to conclude that the elements of actual deception and reliance could be established for all members of the class. PMUSA argues that the expert testimony offered by plaintiffs on these issues could not and did not establish the existence of these facts as to every member of the plaintiff class.

In addition, PMUSA argues that the circuit court improperly applied the discovery rule to toll the running of the statute of limitations (815 ILCS 505/10a(e) (West 1998)). According to PMUSA, Consumer Fraud Act claims based on purchases that occurred more than three years prior to the filing of this lawsuit are barred by section 10a(e) of the Consumer Fraud Act. The discovery rule tolls the running of the limitations period with respect to claims that would have put a reasonable person on notice of the need to investigate “ ‘whether actionable conduct is involved.’ ” 
Hermitage Corp. v. Contractors Adjustment Co.
, 166 Ill. 2d 72, 86 (1995), quoting 
Knox College v. Celotex Corp.
, 88 Ill. 2d 407, 416 (1981). Thus, PMUSA asserts, application of the discovery rule to extend the class period beyond three years raises additional individual questions of fact regarding when individual class members were exposed to public information about the controversy regarding “light” and “low tar” cigarettes.

Plaintiffs respond that because the circuit court found each of the factual elements of the fraud claimed proven, PMUSA cannot now argue that the class certification was improper without demonstrating to this court that each of the court’s factual findings was against the manifest weight of the evidence.

3. 
Motion for Summary Judgment Based on PMUSA’s

Claims of Preemption and Exemption

PMUSA filed a motion for summary judgment on its affirmative defenses of express and implied federal preemption and exemption from liability under sections 2 and 10b of the Consumer Fraud Act (815 ILCS 505/2, 10b (West 1998)).

On October 28, 2002, a hearing was held to consider PMUSA’s motion for summary judgment. PMUSA argued that plaintiffs’ claim is expressly preempted by the Federal Cigarette Advertising and Labeling Act, which provides that “[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with [this Act].” 15 U.S.C. §1334(b) (2000). PMUSA also argued that under the Supreme Court’s decision in 
Cipollone v. Liggett Group, Inc.
, 505 U.S. 504, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992), plaintiffs cannot base their claim on an allegation that defendant has neutralized the warning Congress requires on cigarette packages and, under 
Buckman Co. v. Plaintiffs’ Legal Committee
, 531 U.S. 341, 148 L. Ed. 2d 854, 121 S. Ct. 1012 (2001), plaintiffs’ claim cannot be predicated on an alleged fraud upon the FTC. Based on the comprehensive federal regulatory scheme governing the labeling and advertising of cigarettes as well as the disclosure of tar and nicotine levels, PMUSA argued implied preemption.

PMUSA further argued that section 10b(1) of the Consumer Fraud Act “exempts conduct that complies with federal laws or the rules, regulations, or decisions of federal agencies” and that the “enormous record” of “advertising guides, agreements, proposed trade regulation rules, consent orders, investigations, determinations, and rulemakings *** related specifically to the use of ‘low tar’ and ‘lights’ ” in cigarette advertising and labeling. Because the record clearly demonstrates that PMUSA has used these terms only on products “below the fifteen milligram cutoff,” PMUSA asserted that such compliance provided a “full defense” to plaintiffs’ Consumer Fraud Act claim. Relying on this court’s decisions in 
Lanier v. Associates Finance, Inc.
,114 Ill. 2d 1, 18 (1986) (finding compliance with disclosure requirements of federal Truth in Lending Act as interpreted by Federal Reserve Board staff to be a defense to liability under the Consumer Fraud Act), 
Jackson v. South Holland Dodge, Inc.
, 197 Ill. 2d 39, 47 (2001) (finding compliance with federal statute to be a defense to liability under the Consumer Fraud Act), and 
Jarvis v. South Oak Dodge, Inc.
, 201 Ill. 2d 81, 88 (2002) (recognizing state policy against extending consumer disclosure requirements beyond those mandated by federal law), PMUSA attempted to rebut plaintiffs’ argument that the lack of trade regulation rules governing the use of these descriptors meant that their use could not have been “specifically authorized” by the FTC.

Plaintiffs’ argument on this point was that the FTC had not specifically authorized PMUSA to use the terms “lights” or “lowered tar and nicotine” and, “in fact, lacks the authority to do so.”

The circuit court took the matter under advisement. Between that date and November 8, 2002, the date upon which the circuit court issued its order, plaintiffs filed their first amended complaint. In the first amended complaint, plaintiffs abandoned some of the claims that defendants had argued were preempted. The remaining complaint, according to plaintiffs, was that defendant’s use of the terms “lights” and “lowered tar and nicotine” was an affirmative misrepresentation and, thus, according to 
Cipollone
, not preempted by the Act.

The circuit court’s order noted PMUSA’s argument that this claim of affirmative misrepresentation necessarily depends on plaintiffs’ proving neutralization of the warning and a fraud on the FTC and acknowledged that “to the extent that their claims do depend on such a showing,” such claims would be preempted under 
Cipollone 
and 
Buckman
. However, the circuit court reserved judgment on the preemption question, finding it premature to address these defenses because there were “significant disputes about several material facts” that could not be resolved without live testimony. “A trial,” according to the circuit court, would be required before the court could decide, “on a full and complete record whether the plaintiffs have stayed within the bounds of
 Cipollone 
and whether they are attempting to cross the line laid down in 
Buckman
.”

The November 8, 2002, order did not address PMUSA’s affirmative defense based on the exemption provision contained in section 10b(1) of the Consumer Fraud Act. The order did not, however, reject this defense. Thus, when the circuit court “specifically reserve[d] judgment until trial on the issues presented in defendants’ motion for summary judgment,” judgment on this defense was reserved, presumably in order for the circuit court to determine, at trial, whether the FTC had specifically authorized the use of the disputed terms.

4. 
Trial

At trial, plaintiffs’ case in chief consisted of the testimony of the 2 class representatives, 4 other class members, and 12 expert witnesses. PMUSA presented the testimony of 18 class members (one of the class representatives, 3 of the originally named plaintiffs who had withdrawn, and 14 others) and 7 experts. On rebuttal, plaintiffs recalled 2 of their experts and offered 2 additional experts.

Little of the testimony presented by plaintiffs in their case in chief was directed at PMUSA’s affirmative defenses for the obvious reason that the burden of proving these defenses rested with the defendant. For purposes of resolving the issue that this court finds dispositive, only the testimony of two expert witnesses is relevant.

Plaintiffs’ expert witness Dr. Neil Benowitz holds an M.D. from the University of Rochester and is board certified in internal medicine, clinical pharmacology, and medical toxicology. He is a full professor on the faculty of the University of California at San Francisco, where he is chief of the clinical pharmacology division in the department of medicine. In addition to teaching and seeing patients, Dr. Benowitz does research involving the actions of various drugs, including nicotine, and has written numerous articles on the subject of smoking and health.

Dr. Benowitz testified at length about nicotine addiction, the health effects of smoking, compensatory behavior, and the limitations of the FTC testing method. On cross-examination, Dr. Benowitz testified that he had recently received a letter from the FTC eliciting his opinion on a number of issues, including the FTC testing method and the use of the term “lights” and other descriptors. A copy of the letter was admitted into evidence. In addition to replying to the FTC inquiry, Dr. Benowitz and other scientists who had received similar inquiries wrote a joint letter to the FTC in which they expressed their concern that their responses to the FTC inquiries might be used to suggest that they supported the FTC’s testing method. The joint letter also expressed the scientists’ opinion that the terms “low tar,” “light,” and “ultra-light” are deceptive. The joint letter was also admitted into evidence. Dr. Benowitz stated that the FTC had not yet concluded the inquiry and that the use of the descriptors was still under consideration.

At this point in the cross-examination, the circuit court sustained plaintiffs’ objection to further questioning on the subject of descriptors on the basis of relevance. PMUSA argued that the FTC’s ongoing consideration of the use of descriptors was “directly relevant to pre-emption.” The court ruled that there was “no question in this court on pre-emption.” Although counsel for PMUSA reminded the circuit court that it had reserved ruling on its affirmative defenses pending the resolution of factual issues, the court would not permit further questioning of this witness with regard to his knowledge of or participation in the recent FTC inquiry into the use of low tar descriptors.

The circuit court thereafter sustained a series of objections to questions regarding the FTC testing method and the use of descriptors, but allowed PMUSA to make a written offer of proof. Nothing in the redirect or re-cross-examination of this witness related to the question of whether the FTC authorized use of the disputed descriptors. At the conclusion of re-cross-examination, counsel for PMUSA clarified that the written offer of proof would be filed, addressing three of its affirmative defenses. The circuit court reiterated its ruling that any currently pending FTC consideration of the use of descriptors was not relevant to this case.

Plaintiffs have not called our attention to any other portion of the trial transcript in which they elicited testimony, either on direct examination or cross-examination, on the question of whether the FTC may or may not have specifically authorized the use of descriptors such as “light” or “low tar” in cigarette labeling or advertising.

Dr. John Peterman testified as an expert witness on behalf of PMUSA. Dr. Peterman holds a Ph.D. in economics and has taught at the University of Chicago and the University of Virginia. He was employed at the FTC from 1976 to 1993. From 1988 until he left the FTC, he was the director of its Bureau of Economics. His area of expertise is regulatory economics. He testified that he had made an extensive study of regulation of the tobacco industry, including the history of FTC regulation of cigarettes, especially those described as “light” or “low tar.”

According to Dr. Peterman, the FTC tar and nicotine program, which began in 1966, has two goals. First, it aims to provide consumers with information about tar and nicotine yields with the aim of facilitating their movement from higher yield products to lower yield products. Second, the FTC seeks to promote an overall reduction in tar and nicotine yields by encouraging tobacco companies to compete to bring lower yield products to market. The FTC adopted several mechanisms in support of these goals. First, it adopted a “single uniform protocol” to derive the tar and nicotine numbers that could be conveyed to consumers. Second, it published the numbers derived from the testing program. Initially, the numbers were reported to Congress. Later, the FTC permitted (and eventually required) that the numbers be included in cigarette packaging and advertising. Thus, in keeping with both goals, the FTC encourages competitive advertising of tar and nicotine yields. Dr. Peterman further testified that a third part of the FTC program is the permitting of the use of certain designators such as “light” and “low tar” if the product meets certain conditions specified by the FTC.

In response to questions regarding the FTC’s regulatory activity, Dr. Peterman testified that the FTC can undertake the promulgation of formal rules. In lieu of formal rulemaking, the FTC can withdraw proposed rules if those affected voluntarily agree to comply. In addition, the FTC can issue advisory opinions upon request by an industry actor or other interested party. Finally, the FTC can undertake investigative and enforcement efforts pursuant to section 5 of the FTC Act. 15 U.S.C. §45(a) (2000). After filing a formal complaint charging a violation of the Act, the FTC can resolve the complaint and achieve its regulatory objective by means of a consent order. Such orders are a matter of public record and are published in the Federal Register. According to Dr. Peterman, the FTC uses such orders to “provide guidance to other firms in the industry.” He stated, “While I was at the Commission, we considered all the activities that resulted in changes in firm behavior in response to Commission action as the FTC regulation of that activity.” Thus, the FTC selected cases for enforcement “with the aim” of providing “significant guidance” to industry members.

A substantial part of Dr. Peterman’s testimony involved the history of the regulation of cigarette advertising that this court has already summarized, above, based on the documentary record. In addition, he testified regarding the FTC’s own use of and definitions of the terms “low tar” and “ultra low tar.” Specific reference was made to the FTC’s annual Report to Congress, which Dr. Peterman described as a report summarizing “what’s going [on with regard] to cigarette advertising, the regulatory activities the commission is engaged in, and to make recommendations to Congress for changes in the law.” The Annual Report is an official statement of the FTC, which the FTC is required by the Labeling Act to prepare.

Copies of the annual FTC Reports to Congress from 1967 to 2000 were identified by Dr. Peterman and admitted into evidence without objection. Dr. Peterman testified that he reviewed the reports in preparation for his testimony and that they reflected the official position taken by the FTC at the time they were transmitted to Congress. Specifically, he called attention to the portions of the 1968, 1970, 1971, 1979, and 1980 reports in which the FTC used or defined the term “low tar.” He opined that the FTC has adopted an “official definition” of the term as a cigarette containing 15 milligrams or less tar.

Through the testimony of Dr. Peterman, PMUSA also called the circuit court’s attention to several reports prepared by FTC staff that were placed on the public record and transmitted to Congress. According to Dr. Peterman, such reports represent the position of the FTC. In one report, the FTC staff noted that FTC annual reports to Congress “began in early 1967 and signaled the beginning of a new submarket trend based upon the FTC’s official definition of low-tar cigarettes (15 or less milligrams of tar).” See FTC Staff Report, Bureau of Economics, Brand Performance in the Cigarette Industry and the Advantage to Early Entry, at 35 (June 1979). In 1981, the FTC reported to Congress on the conclusion of a study undertaken in 1976, in response to FTC’s taking notice of extensive promotion and development of low tar and nicotine cigarettes. According to Dr. Peterman, the staff report “reconfirmed” that FTC “formally defines” low tar as 15 milligrams or less. See FTC Staff Report, Cigarette Advertising Investigation, at 1–50 n.175 (May 1981).

Over plaintiffs’ objection, PMUSA was allowed to admit into evidence a copy of a November 24, 1998, letter from Senator Frank R. Lautenberg of New Jersey to then-FTC Chairman Robert Pitofsky. The Senator urged Chairman Pitofsky “to begin a proceeding to suspend the right of tobacco companies to market any cigarettes as ‘Light’ or ‘Ultra Light’ or list supposed nicotine and ‘tar’ ratings on their products and advertisements until and unless an accurate system of measuring the health implications of smoking is established.” Lautenberg accompanied the letter with copies of “tobacco industry documents” that provided, in Lautenberg’s words, “strong evidence that the tobacco industry knows that the nicotine and tar ratings used to determine what constitutes ‘Light’ cigarettes are false and misleading to consumers.” Peterman described the Senator’s request as specifically targeting the use of the word “light” as a descriptor by PMUSA and other tobacco companies.

The FTC responded to the letter in a news release, a copy of which was also admitted into evidence. The FTC acknowledged receipt of documents of which it was not previously aware and that the “existing testing methodology both significantly understates actual tar and nicotine intakes and doesn’t properly account for differences in tar and nicotine intakes.” The FTC also announced that its staff had been working with the Department of Health and Human Services on an informal basis to address these issues and that it had “now formally requested, and HHS has agreed,” to conduct a review of the FTC testing methodology and of the “limited health benefits, previously believed to be associated with lower tar and nicotine cigarettes.” FTC Statement in Response to Senator Frank Lautenberg’s Release of Tobacco Documents, November 24, 1998.

Dr. Peterman then testified that the FTC does regulate the use of the descriptor “lights” and that it permits “the use of the descriptor ‘lights’ in cigarette advertising under certain conditions.” He based this conclusion on his expert understanding of the FTC’s functions and operations and on the 1971 consent order, the 1995 consent order, and the results of the various FTC investigations and deliberations on the subject of the use of measurements and descriptors of tar in cigarette advertising. He further testified that, based on his investigation and experience, that PMUSA’s advertising of Marlboro Lights and Cambridge Lights is in compliance with the FTC requirements. Both cigarettes yield less than 15 milligrams of tar based on the FTC test method and both brands are lower in tar than their full-flavor counterparts, Marlboro Reds and regular Cambridge cigarettes.

Regarding the 1971 American Brands consent order, Dr. Peterman testified that the order was an “official act” of the FTC and that it was published for the purpose of providing guidance to industry members regarding the use of descriptors. He stated that the consent order said to industry members, in effect: “If in the future you use the term ‘low,’ ‘lower,’ or any light [
sic
] qualifying terms to describe your product, it [will be] necessary to put the tar and nicotine yield in the ad.”

Regarding the FTC investigation into the “channel” filter used by the manufacturer of Barclay cigarettes, Dr. Peterman explained that because the construction of the filter caused the mandatory FTC method to produce unreliable results, there were no accurate yield numbers that the manufacturer could include on the package or in its advertising. Thus, he opined, the FTC “indicated to Barclay that if it wished, it could advertise the product simply as low tar,” because the FTC estimated that, if not for the channel filter construction, the yield under the FTC method would have measured in the 3 to 7 milligrams range, well within the 15 milligrams or less definition of a low tar cigarette.

Similarly, when it investigated Carlton cigarettes in 1994, the FTC acted to ban use of “fractions, multiples, or ratios that implied actual intake differences” between Carlton and other brands. Nevertheless, Dr. Peterman stated, the FTC allowed American Brands, the manufacturer of Carltons, to make the claim that Carlton cigarettes were “low” or “the lowest” in tar. He was allowed to testify, over plaintiffs’ objection, that the publication of the consent order in this matter was intended by the FTC to give guidance to the rest of the industry.

Dr. Peterman further testified that on September 12, 1997, the FTC caused the publication in the federal register of a request for comments regarding cigarette descriptors. Specifically, “it asked for comments as to whether the descriptors ‘low tar’ and ‘light,’ which covered products between [
sic
] 15 milligrams and less, should be changed or in any way are potentially misleading. And they asked for similar comments with respect to ‘ultra light’ products, which were cigarettes ranked using the FTC test method from 6 and under milligrams of tar.” According to Dr. Peterman, that investigation remained open as of the date of his testimony.

PMUSA’s expert summarized the FTC’s rules regarding the use of “low,” “lower,” “light,” and similar descriptors as follows: use of the terms “low tar” and “lowered tar” is permitted if the cigarette yields 15 milligrams or less of tar under the FTC test method; it is not permissible for a manufacturer to make representations of specific numeric reductions in tar intake by smokers; the term “lights” is deemed by the FTC to be synonymous with the term “low tar”; and, finally, the FTC “intended the industry generally to conform its advertising to these rules.” Dr. Peterman specifically relied upon the various consent orders to formulate this opinion.

Questioned further about the terms “light” or “lights” as applied to cigarettes, Dr. Peterman testified that the FTC equates the term “light” with “low tar.” He based his opinion on an internal study conducted during his tenure at the FTC which revealed that the two terms were used synonymously to refer to cigarettes with a tar yield of 15 milligrams or less. The FTC considers the term “lights” to be a description of a “low tar” cigarette.

He testified further regarding the FTC investigation that began in 1976 and concluded in 1981 with an FTC staff report to Congress. The staff report stated that the FTC had determined that such descriptors were not false or misleading. As a result, the report did not recommend banning the use of such descriptors. Instead, the report recommended strengthening the required warnings on cigarette packages and rotating several different warnings to keep the message fresh in the minds of consumers. According to Dr. Peterman, the FTC responded to the staff report by recommending changes in the warning program, but continued to permit use of the descriptors.

The cross-examination of Dr. Peterman focused almost entirely on questions related to the issue of federal preemption. He was not asked in any detail about the FTC’s authorization of the use of the terms “low tar,” “lower tar,” “lights,” or other descriptors. Rather, he was questioned in great detail about whether state regulation of the use of such terms would conflict with the FTC’s program.

During a recess in the cross-examination of Dr. Peterman, the circuit court indicated to counsel for PMUSA that “if you’re relying on [
sic
] just on him, you lose preemption, and I–I’ll just go ahead and not waste your time and strike your defense.” Counsel for PMUSA explained that Dr. Peterman’s testimony also went “directly to the primary jurisdiction defense,” and that the testimony regarding “the use of descriptors is very direct evidence of our primary jurisdictional affirmative defense.”

After cross-examination resumed, Dr. Peterman admitted that he could not identify any FTC trade regulation rule that regulated the use of low tar descriptors. He also agreed with plaintiffs’ assertion that no FTC trade regulation rule either requires the use of such descriptors or approves the use of such descriptors. He was then asked if the use of such descriptors by a tobacco company was “a voluntary one.” He replied that it would be a decision to be made by the individual firm. A cigarette manufacturer could drop the use of the term “light” or other low tar descriptors if it chose to do so, but would still, under FTC policy, have to publish the tar and nicotine numbers.

With regard to the 1971 consent order entered into by the FTC and American Brands, Dr. Peterman was asked whether he believed that the consent order provided guidance to the cigarette industry and if, even though PMUSA was not a party to the order, it would “sort of know how far they can go and how far they can’t go.” He agreed with this statement.

The evidence offered by plaintiffs on the issue of damages is worthy of mention. Plaintiffs’ expert Jeffrey Harris, M.D., testified regarding the “contingent valuation analysis” that he conducted using data obtained by J. Michael Dennis, Ph.D. Dr. Harris holds a bachelor’s degree from Harvard University and masters and doctoral degrees from the University of Pennsylvania. He is currently on the faculty of the economics department of the Massachusetts Institute of Technology and holds an appointment with the Harvard Medical School. Dr. Dennis is the vice president and managing director of the Government and Academic Research Department of Knowledge Networks in California.

Dr. Dennis testified that Knowledge Networks conducts surveys on the Internet, primarily for university professors or other academics who are conducting federally sponsored research. The company has “web-enabled” a panel of some 40,000 randomly selected United States households to participate in various surveys. The demographic characteristics of these households is generally similar to the United States population as a whole.

For purposes of this case, 2,701 panel members were invited to participate in a survey on the basis of their being current or recent smokers. 1,779 of these responded to the on-line invitation by completing the “screening survey”; 276 of these “qualified for the main interview” based on their answers to three screening questions. The screening questions eliminated those who had not smoked in the previous year, those who did not smoke Marlboro or Cambridge products, and, finally, those who did not smoke Lights. In addition, the panel members were eliminated if they answered “no” to the question whether they could recall the reason they initially chose to smoke a light or lower tar and nicotine cigarette. About 23% of those remaining could not. In addition to answering a series of questions about their beliefs regarding the relative safety of lower tar cigarettes compared to full-flavor cigarettes, the remaining respondents were asked to assume that Marlboro Lights were more hazardous than full-flavor cigarettes and to imagine the existence of a Marlboro Light that was identical in all other respects to the current product, except that it was truly safer to smoke. The respondents were then asked to state how much of a discount would be required to cause them to purchase the more hazardous product if the safer version were actually available.

Based on the answers to this question, Dr. Harris calculated that class members, on average, would demand a 92.3% discount from the market price if they were to continue to purchase Marlboro Lights. Applying this discount to all purchases of Marlboro and Cambridge Lights during the relevant class periods, and calculating prejudgment interest at 5%, noncompounded, Harris concluded that the 1.14 million members of the class had suffered $7.1005 billion in economic damages.

On cross-examination, Dr. Harris agreed that he had provided input into language used in the survey questions used by Knowledge Networks. He agreed that he was not an expert in survey design and did not consult such an expert before formulating the questions. He was unaware of any texts or guides for the formulation of contingent valuation surveys, although he was aware that such surveys are controversial. When asked if his diminution-in-value analysis “assumes both the reliability and the validity of the Knowledge Networks survey,” he answered “yes,” but offered no basis for his assumption.

PMUSA’s expert, W. Kip Viscusi, Ph.D., is a professor of economics who holds four degrees from Harvard University. He has taught at Northwestern University and the University of Chicago and is presently on the faculty at Harvard University, where he holds an endowed chair and heads the program on Empirical Legal Studies. Dr. Viscusi described his particular expertise in the area of survey design and analysis. He has been analyzing survey data since 1976 and designing surveys since 1981 and has been published in numerous peer-reviewed books and journals. His specialty is the subject of risk and uncertainty.

Dr. Viscusi testified that the price of Marlboro Lights and Cambridge Lights has always been identical to the price of their full-flavored counterparts and, therefore, because the plaintiffs did not pay a premium for the claimed “lightness” of these products, they could not have suffered any economic loss. With regard to Dr. Harris’ reliance on the Knowledge Networks survey offered by plaintiffs as evidence of economic damages, Dr. Viscusi explained that a contingent valuation survey attempts to determine the value in the marketplace of a hypothetical product. He offered three guidelines that he described as “good, sound practice” for such surveys. First, the survey should be pretested to ensure that the people taking the survey understand the questions. Second, the hypothetical “good” that is being described must be made fully understandable to the survey respondents, so that they will be able to “value the good.” Third, because the “good” is a hypothetical product, “not a real market transaction,” it is necessary for the survey to contain “internal consistency checks.” When real market data is not available to compare to the survey answers and the survey itself does not ensure consistency, it may not be possible to determine whether the survey respondents took the questions seriously. They may perceive the hypothetical transaction as involving only “funny money.” Dr. Viscusi testified that the Knowledge Networks survey violated all three of these guidelines.

At the close of evidence, PMUSA again sought decertification of the class and moved for judgment as a matter of law. After considering proposed findings of fact and conclusions of law submitted by both parties, the circuit court declined to decertify the class, rejected each of PMUSA’s 27 affirmative defenses, and entered judgment for the plaintiffs on the issue of liability.

5. 
Judgment Order

The circuit court issued its judgment order on March 21, 2003. The portion of the order relating to the issue of class certification was noted above.

In the judgment order, the circuit court ruled on issues upon which it had earlier reserved judgment. Ruling that the Labeling Act does not expressly preempt plaintiffs’ claims under the Consumer Fraud Act, the circuit court stated that plaintiffs’ Consumer Fraud Act claims are based upon “ ‘a state-law duty not to make false statements of material fact or to conceal such facts’ ” (quoting 
Cipollone
, 505 U.S. at 528, 120 L. Ed. 2d at 430, 112 S. Ct. at 2623). Further, the circuit court ruled that even if plaintiffs’ Consumer Fraud Act claim is expressed in terms of an omission rather than misrepresentation, the omission of information qualifying the claim of lower tar cannot be read as a claim of failure to warn. See 
Cipollone
, 505 U.S. at 528, 120 L. Ed. 2d at 430, 112 S. Ct. at 2623. A claim of concealment of a material fact–that the claim of lowered tar was based on a laboratory measurement that was known to be an inaccurate representation of the actual delivery of tar–is a claim of fraud, not a claim of failure to warn.

Further, the circuit court noted that neither the Labeling Act nor the regulations of the FTC govern a cigarette manufacturer’s voluntary use of the terms “lights” and “lowered tar and nicotine” as descriptors on packaging. The mere fact that the FTC has, at times, considered and rejected such regulations does not create conflict preemption. The circuit court also rejected defendant’s reliance on the first amendment and on article I, sections 4 and 5, of the Illinois Constitution as bases for finding plaintiffs’ claim preempted. The circuit court stated that neither the federal nor the state constitution protects commercial speech that is false and misleading.

Then, without specifically referring to section 2 or section 10b(1) of the Consumer Fraud Act, the circuit court stated:

“Philip Morris’ Seventh Affirmative Defense–Compliance with Government Regulations–is denied. The false and misleading use of the descriptors ‘Lights’ and ‘Lowered Tar and Nicotine’ has never been specifically authorized by law. Philip Morris voluntarily chose to use these terms on its packages of Marlboro Lights and Cambridge Lights. No regulatory body has ever required (or even specifically approved) the use of these terms by Philip Morris. The court finds that Philip Morris has not established that its conduct is ‘specifically authorized’ by law.”

The circuit court characterized plaintiffs’ Consumer Fraud Act claim as being based on two distinct types of fraudulent statements by PMUSA. First, plaintiffs alleged that the representations “light” and “lower in tar and nicotine” on Marlboro Lights and Cambridge Lights labels were “material and false.” Second, with regard to plaintiffs’ claim that the smoke delivered by Marlboro Lights and Cambridge Lights is more mutagenic than the smoke delivered by their full-flavored counterparts, the circuit court characterized the claim as one of misrepresentation by omission. That is, the descriptors “light” and “lowered tar and nicotine” were “fraudulent and misleading because [they] did not state matters which materially qualify the statement as made.” The “matters not stated,” according to the circuit court, were that the tar from Marlboro Lights and Cambridge Lights “is higher in toxic substances and more mutagenic” than tar from regular cigarettes. The circuit court expressly noted its reliance on the testimony of plaintiffs’ experts, whom it found more credible than PMUSA’s experts. In its findings of fact, the circuit court stated that although PMUSA’s “misrepresentations in this case were not in the form of an explicit statement” of increased health or safety, class members “universally understood the message of reduced risk from these products.” The court also found that PMUSA was aware, as a result of its own research, of increased mutagenicity of the smoke from its light cigarettes. In addition, the court found that even if a smoker of light cigarettes does not compensate completely, he or she will receive higher levels of most of the toxic substances contained in cigarette smoke than a smoker of regular cigarettes.

As for the elements of the Consumer Fraud Act claim, the circuit court found:

“After considering all the testimony and evidence admitted at trial, the Court finds that the Plaintiffs have proven that Philip Morris has violated the Consumer Fraud Act through the deceptive act of misrepresenting its Cambridge Lights and Marlboro Lights products as ‘Lights’ and misrepresenting Marlboro Lights as ‘Lowered Tar and Nicotine.’ The Court further finds that Philip Morris intended that the Class members in this case rely upon the deception created by these misrepresentations. These misrepresentations occurred in the course of conduct involving trade or commerce and caused actual damage to the Plaintiffs in the amount of $7.1005 Billion. This actual damage to the Plaintiffs’ was proximately caused by the misrepresentations of Philip Morris.”

The circuit court awarded $3 billion in punitive damages, to be paid to the State of Illinois and attorney fees in the amount of 25% of the compensatory award.

In response to a posttrial motion raising the issue of whether the multistate tobacco settlement agreement barred the state from receiving any of the punitive damages amount, the court modified its judgment so that the punitive damages award would revert to the members of the plaintiff class if the state were found to be barred from receiving such funds. See 
People v. Philip Morris, Inc.
, 198 Ill. 2d 87, 92-93 (2001) (explaining the circumstances under which the State of Illinois joined the multistate “Master Settlement Agreement” of claims against several tobacco industry defendants).

II. ISSUES ON APPEAL

On appeal, PMUSA argues that (1) the circuit court erred by rejecting certain of its affirmative defenses, (2) the circuit court erred by certifying a plaintiff class, (3) plaintiffs failed to establish their claims and the claims of the class members, (4) the damages award is erroneous, and (5) the circuit court erred in finding that certain documents were not privileged. Under each of these issues, PMUSA raises numerous subissues.

III. PMUSA’S AFFIRMATIVE DEFENSES

Since the mid-1950s, the FTC has regulated the labeling and advertising of cigarettes, including the disclosure by manufacturers of tar and nicotine levels in their products. PMUSA unsuccessfully argued to the circuit court that the existence of a comprehensive federal regulatory scheme governing these topics bars plaintiffs’ claim as a matter of law on four separate bases. PMUSA renews these arguments before this court. First, PMUSA asserts that sections 2 and 10b of the Consumer Fraud Act (815 ILCS 505/2, 10b (West 2000)) bar plaintiffs’ claim. Second, PMUSA argues that even if state law permits such a claim, plaintiffs’ Consumer Fraud Act action is expressly preempted by the Federal Cigarette Labeling and Advertising Act (Labeling Act) (15 U.S.C. §1331 
et seq
. (2000))
. Third, PMUSA contends that this claim is barred by the doctrine of conflict preemption. Fourth, PMUSA argues that labeling of its light cigarettes comes within the protection of the first amendment and article I, section 4, of the Illinois Constitution. In addition, PMUSA cites the three-year statute of limitations applicable to actions brought under the Consumer Fraud Act (815 ILCS 505/10a(e) (West 1998)), which, it argues, precludes class certification and limits the damages period. Because we find section 10b(1) of the Consumer Fraud Act bars plaintiffs’ claim, we need not address the other issues raised in this appeal.

The Consumer Fraud Act was enacted in 1961 as a regulatory and remedial statute for the purpose of protecting consumers and others against fraud, unfair methods of competition, and unfair or deceptive acts or practices in the conduct of any form of trade or commerce. 
Robinson v. Toyota Motor Credit Corp.
, 201 Ill. 2d 403, 416-17 (2002). It is to be liberally construed to effectuate this purpose. 
Cripe v. Leiter
, 184 Ill. 2d 185, 191 (1998). Section 10b(1) of the Consumer Fraud Act provides that nothing in the Act shall apply to “[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.” 815 ILCS 505/10b(1) (West 1998).

Illinois enacted the Deceptive Practices Act in 1965 primarily for the purpose of defining and prohibiting deceptive trade practices (see 1965 Ill. Laws 2647, eff. January 1, 1966 (title of Act)) and unfair competition (see 
Chabraja v. Avis Rent A Car System, Inc.
, 192 Ill. App. 3d 1074, 1079 (1989) (noting that the prefatory notes to the statute specifically refer to deceptive conduct that unreasonably interferes with another in the promotion and conduct of his business). Section 4(1) of the Deceptive Practices Act provides: “This Act does not apply to: (1) conduct in compliance with the orders or rules of or a statute administered by a Federal, state or local governmental agency.” 815 ILCS 510/4 (West 1998).

Before this court can determine whether section 10b(1) of the Consumer Fraud Act bars plaintiffs’ claim, we must be clear about the precise nature of the conduct alleged by the plaintiffs to have constituted fraud. Having carefully reviewed the pleadings, we reject PMUSA’s attempt to cast plaintiffs’ claim as one of failure to make additional disclosures beyond the warning required by federal law. Plaintiffs’ claim is not based on failure to warn or on neutralization of the required warnings. It is not a claim of fraud on the FTC, nor is it a claim for damage to plaintiffs’ health.

Plaintiffs have pleaded a pure case of consumer fraud. They allege that PMUSA used the descriptive terms “light” and “lowered tar and nicotine” on its packaging and in its advertising with the knowledge that these terms are deceptive, and with the intent that consumers rely upon the false message in making purchasing decisions. Plaintiffs have further alleged that the class members relied, to their detriment, on these false claims. See 
Oliveira
, 201 Ill. 2d at 149 (listing elements of a cause of action under the Consumer Fraud Act). In addition, plaintiffs assert that the smoke that was delivered by the PMUSA products was even more toxic and more mutagenic than smoke from full-flavor cigarettes.

If the use of these descriptive terms in the manner alleged has been specifically authorized by the FTC in the course of carrying out the duties assigned to it by Congress, this action cannot stand, even if the terms might be found deceptive by a trier of fact. 815 ILCS 505/10b(1) (West 1998). Similarly, if these terms have been used by PMUSA in compliance with the orders or rules of the FTC, an action under the Deceptive Practices Act is also barred. 815 ILCS 510/4 (West 1998).

A. Standard of Review

PMUSA suggests that its affirmative defenses raise questions of law and, therefore, the proper standard of review is 
de novo
, citing 
Woods v. Cole
, 181 Ill. 2d 512, 516 (1998). Plaintiffs have not objected to 
de novo 
review. We conclude that 
de novo
 review is warranted, but not for the reason suggested by PMUSA.

As a threshold matter, we must construe the language of section 10b(1). Statutory construction is a question of law, subject to 
de novo
 review. 
Advincula v. United Blood Services
, 176 Ill. 2d 1, 12 (1996). Once the statute is properly construed, its terms must be applied to the circumstances of the individual case to determine whether it bars this action. It is arguably a question of fact whether the FTC did, or did not, specifically authorize the use of certain descriptive terms in cigarette labeling and advertising. Indeed, the circuit court felt it necessary to reserve judgment on the affirmative defenses pending the creation of a factual record at trial. It could, therefore, be argued that the application of section 10b(1) to the facts should be reviewed under a more deferential standard. See, 
e.g.
, 
Carpetland U.S.A., Inc. v. Illinois Department of Employment Security
, 201 Ill. 2d 351, 369 (2002) (noting that when the “issue presented cannot be accurately characterized as either a pure question of fact or a pure question of law,” it may be properly reviewed under an intermediate standard of review).

We, nevertheless, review 
de novo
 the application of section 10b(1) to the facts of this case. Although the circuit court made a finding that the FTC did not specifically authorize the use of the disputed terms, this is not a finding of fact that proceeded from the circuit court’s assessment of credibility of witnesses or the weight it chose to give to conflicting pieces of evidence. Rather, the actions of the FTC with relation to the use of these terms in cigarette advertising and labeling are a matter of public record. Thus, the statute is being applied to facts that are essentially undisputed. Because we need not evaluate the credibility of witnesses or weigh conflicting testimony to determine whether the actions of the FTC have resulted in specific authorization of the use of these terms by cigarette manufacturers, we 
may properly draw our own conclusion on the issue. 
Steinbrecher v. Steinbrecher
, 197 Ill. 2d 514, 523 (2001) (where the question on appeal is limited to application of the law to undisputed facts, the standard of review is 
de novo
).

B. PMUSA’s Argument

PMUSA argues that section 10b(1) bars this action based on the FTC’s regulatory scheme and Congress’ regulation of cigarette advertising through the Labeling Act. Citing this court’s decisions in 
Lanier
, 114 Ill. 2d at 17, and 
Jackson
, 197 Ill. 2d at 49, which are discussed in detail below, PMUSA argues that its compliance with federal law, combined with the policy against extending disclosure requirements beyond what is mandated by law, satisfy the requirements of section 10b(1). At oral argument, counsel for PMUSA characterized section 10b(1) as a “safe harbor for those whose conduct does not violate federal law.”

In the alternative, PMUSA argues that even if compliance with applicable law is not sufficient to bar Consumer Fraud Act liability (see 
Jackson
, 197 Ill. 2d at 58-60 (Kilbride, J., specially concurring, joined by Harrison, C.J.) (rejecting view that mere compliance with the applicable regulatory scheme, by itself, is sufficient to trigger the operation of section 10b(1))), the FTC has specifically authorized the use of the disputed descriptors in cigarette labeling and advertising. PMUSA asserts that regulatory agencies, including the FTC, “use a wide array of tools other than formal regulations to control industry conduct.”

Throughout the history of FTC regulation of cigarette marketing, PMUSA claims, the agency has used advisory opinions, voluntary cooperation obtained in response to threatened regulation, investigations of individual industry actors, reports to Congress, and other methods of influencing the behavior of industry actors. Specifically, PMUSA argues, the FTC “has found that one especially effective method of regulation is to bring an enforcement action against one company to announce to an entire industry what behavior is and is not authorized.” By resolving such actions with a consent decree, as the FTC did in the 1971 and 1995 cases, the FTC communicated to all industry actors the circumstances under which they may use “low tar” descriptors. For this assertion, PMUSA relies, in part, upon 
National Labor Relations Board v. Bell Aerospace Co.
, 416 U.S. 267, 294, 40 L. Ed. 2d 134, 153-54, 94 S. Ct. 1757, 1771, (1974) (“ ‘[A]djudicated cases may and do ... serve as vehicles for the formulation of agency policies, which are applied and announced therein’ ”), quoting 
National Labor Relations Board v. Wyman-Gordon Co.
, 394 U.S. 759, 765, 22 L. Ed. 2d 709, 714-15, 89 S. Ct. 1426, 1429 (1969) . Further, PMUSA insists, the FTC itself considers such conduct to be regulatory activity, as evinced by the testimony of Dr. Peterman and the many FTC documents admitted into evidence at trial.

In addition, PMUSA notes that the circuit court found in paragraph 148 of its judgment order that its practices “offend public policy, are immoral, unethical, oppressive and unscrupulous and that this course of conduct caused a substantial injury to the Class members,” in violation of both the Consumer Fraud Act and the Deceptive Practices Act. Because an action under the Deceptive Practices Act is barred if the defendant’s conduct is “in compliance with” FTC rules, PMUSA argues that it cannot be held liable under the Deceptive Practices Act in the absence of proof a violation of a governing rule or statute.

C. Plaintiffs’ Response

Plaintiffs argue that the FTC has never “specifically authorized the fraudulent use of any descriptor, and it would lack the legal authority to do so in any event.” They further argue that, whatever is meant by the term “specifically authorized,” it clearly requires something more than mere compliance with federal law.

Plaintiffs point to Dr. Peterman’s testimony on cross-examination in which he acknowledged that the FTC generally does not adopt trade regulation rules that approve conduct that a regulated entity may or may not choose to engage in. Rather, the FTC adopts regulations that require certain conduct or forbid other conduct. They note that no FTC document or official statement has ever announced that a tobacco company has “substantiated” its use of such descriptors. Further, they point to the FTC’s “disavowal” of any “official” definition of these terms. See Cigarette Testing, Request for Public Comment, 62 Fed. Reg. 48,158, 48,163 (September 12, 1997) (noting that the FTC itself does not define terms such as “low tar,” “light,” “medium,” “extra light,” “ultra light,” “ultra low,” or “ultima,” although “they appear to be used by the industry to reflect ranges of FTC tar ratings”).

With regard to the 1971 and 1995 consent orders, plaintiffs dispute their relevance to the conduct of any industry actor other than the company that was a party to the enforcement action. The 1971 consent order, according to plaintiffs, did not mention “lights” and did not define “low tar.” It imposed conditions upon the use of such terms with which, it argues, PMUSA has never complied. The 1995 consent order neither defined “lights” nor established a “numerical standard for ‘low tar.’ ”

Plaintiffs distinguish 
Lanier
 on the basis that it involved an alleged fraudulent failure to disclose while this case involves PMUSA’s “active and direct misrepresentations.” In addition, plaintiffs offer 
Jenkins v. Mercantile Mortgage Co.
, 231 F. Supp. 2d 737, 752 (N.D. Ill. 2002), in which the federal district court, applying Illinois law, stated that
 Lanier
 did not hold that mere compliance with federal law does not bar liability under the Consumer Fraud Act.

D. Analysis

We begin our analysis with the observation that each party overstates its case with respect to this issue.

PMUSA asserts that mere compliance with applicable FTC regulations is enough to bar a Consumer Fraud Act action, correctly noting that application of section 10b(1) of the Consumer Fraud Act has never been held by this court to require that a federal agency or statute expressly authorize the conduct at issue. Rather, according to PMUSA, so long as the challenged conduct is in compliance with applicable federal law, section 10b(1) bars liability under the Consumer Fraud Act. Citing 
Lorillard Tobacco
, 533 U.S. at 548, 150 L. Ed. 2d at 555, 121 S. Ct. at 2418. PMUSA notes that by enacting the Labeling Act, Congress not only mandated the precise warnings that must appear on cigarette packaging and in cigarette advertising but also vested authority in the FTC to enact additional targeted regulations of cigarette advertising. See 
Lorillard Tobacco
, 533 U.S. at 550, 150 L. Ed. 2d at 556, 121 S. Ct. at 2419 (holding that the Labeling Act preempts state regulations specifically targeting cigarette advertising, but does not preempt state regulation of cigarette use or sales, or imposition of regulations of general applicability, such as zoning, which may have an effect on cigarette advertising). PMUSA argues that, pursuant to the authority vested in it by Congress to enact additional regulations regarding cigarette advertising, the FTC “has addressed precisely how cigarette manufacturers may communicate with consumers about tar and nicotine levels and has specifically considered and allowed the use of the descriptors at issue here.” PMUSA asserts that its use of the terms “lights” and “lowered tar and nicotine” are in undisputed compliance with FTC regulations governing cigarette labeling and advertising and, as a result, plaintiffs’ claims under the Consumer Fraud Act are barred.

We reject PMUSA’s assertion that section 10b(1) operates to bar plaintiffs’ claim merely because PMUSA may have been in compliance with applicable federal law. The plain language of section 10b(1) requires that two separate conditions be present before a claim is barred. First, a regulatory body or officer must be operating under statutory authority. In this case, the first condition is met. The FTC operates under the authority of the FTC Act (15 U.S.C. §45(a) (2000)), and the Labeling Act (15 U.S.C. §1331 
et seq
. (2000)), to regulate the packaging and advertising of cigarettes. Second, liability under the Consumer Fraud Act is barred by section 10b(1) only if the action or transaction at issue is “specifically authorized by laws administered” by the regulatory body. 815 ILCS 505/10b(1) (West 1998). As we explain in detail, below, PMUSA’s mere compliance with the rules applicable to labeling and advertising is not sufficient to trigger the exemption created by section 10b(1).

Similarly, while the FTC’s own use of the terms “low tar” and “ultra low tar” and its apparent adoption of definitions of these terms (15 milligrams or less of tar and 6 milligrams or less of tar, respectively) clearly invites others to use the same or similar terms to describe certain cigarettes, it cannot be said that the FTC’s own use of such terms in its reports to Congress or elsewhere “specifically authorizes” cigarette manufacturers to use these terms in labeling and advertising. Conduct is not specifically authorized merely because it has not been specifically prohibited. Conduct is not specifically authorized merely because it has been passively allowed to go on for a period of time without regulatory action being taken to stop it. Instead, we must look to the affirmative acts or expressions of authorization by the FTC to answer this question.

Plaintiffs’ argument that the FTC “has never ‘specifically authorized’ the fraudulent use of 
any
 descriptor, and it would lack the legal authority to do so in any event” (emphasis in original), is similarly overstated. Whether these terms are deceptive goes to the merits of the fraud claim, not to the threshold question of exemption under section 10b(1), under which the real issue is whether the FTC has specifically authorized PMUSA and other cigarette manufacturers to use these terms on their packaging and in their advertising, no matter how vague or unhelpful these terms might be to consumers.

Plaintiffs also claim that PMUSA’s use of these terms cannot be deemed authorized by the 1971 consent order because PMUSA has not accompanied its use of these terms with “a clear and conspicuous disclosure of” the tar and nicotine content of the advertised cigarette 
and
 of the cigarettes to which it was being compared. This argument has no merit because the quoted language applies only when the manufacturer is making a direct comparison between its brand of cigarettes and a competing brand. See 
American Brands
, 79 F.T.C. 255 (permitting advertising of cigarettes using “the words ‘low,’ ‘lower,’ or ‘reduced’ or like qualifying terms,” if the statement is accompanied by a “clear and conspicuous disclosure” of the tar and nicotine content of the advertised cigarette; and, if a direct comparison is made to another brand or brands, disclosure of the tar and nicotine content of that brand or brands and of the “lowest domestic yield cigarette”). Indeed, the consent order expressly provides that “a comparison to a class of cigarettes, or to many or most of the cigarettes of a class, shall not be deemed a comparison to another brand or brands of cigarettes.”

Having disposed of these arguments, we turn to the interpretation and application of section 10b(1) of the Consumer Fraud Act.

1. 
The Statutory Language

In determining whether section 10b(1) of the Consumer Fraud Act operates to bar the action at issue, we are guided by established principles. The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. 
Bridgestone/Firestone, Inc. v. Aldridge
, 179 Ill. 2d 141, 149 (1997), quoting 
Illinois Power Co. v. Mahin
, 72 Ill. 2d 189, 194 (1978). To do so, we examine the language of the statute, which is the most reliable indicator of the legislature’s objectives in enacting the law. 
Michigan Avenue National Bank v. County of Cook
, 191 Ill. 2d 493, 504 (2000). When interpreting statutes, this court gives undefined words their plain and ordinary meaning. 
Granite City Division of National Steel Co. v. Illinois Pollution Control Board
, 155 Ill. 2d 149, 181 (1993). It is entirely appropriate to employ the dictionary as a resource to ascertain the meaning of undefined terms. 
People ex rel. Daley v. Datacom Systems Corp.
, 146 Ill. 2d 1, 16 (1991).

The statutory language at issue provides that the Consumer Fraud Act shall not apply to actions “specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.” 815 ILCS 505/10b(1) (West 1998). It is undisputed that the FTC acts under federal statutory authority to administer federal laws regarding the labeling and advertising of cigarettes.

To authorize is to “give legal authority; to empower,” “[t]o formally approve; to sanction.” Black’s Law Dictionary 143 (8th ed. 2004). Although the dictionary definition clearly encompasses formally promulgated trade regulation rules of the FTC, neither the definition nor the statute itself limit the application of the provision to authorization via formal agency rulemaking. Rather, so long as the conduct is specifically authorized “by laws administered by” the regulatory body, it is exempt from Consumer Fraud Act liability. Based on the dictionary definition, therefore, the specific authority contemplated by section 10b(1) may be either express or implied.

Authorization is “specific” if it is “[o]f, relating to, or designating a particular or defined thing; explicit,” “[o]f or relating to a particular named thing.” Black’s Law Dictionary 1434 (8th ed. 2004). The term “specifically” in section 10b(1) describes the substance or content of the authorization. It refers to the conduct that has been authorized, rather than the manner in which the authorization has been communicated. The term “specifically” indicates a legislative intent to require a certain degree of specificity or particularity in the authorization.

Neither party has offered any argument as to the meaning of the phrase “by laws administered by.” However, we conclude that the legislature must have intended the phrase to require deference to agency policy and practice as it carries out the duties delegated to it by Congress or the General Assembly. If the legislature had intended to require that the specific authorization be contained in the law itself, it would have exempted conduct “specifically authorized by state or federal statute,” not conduct “specifically authorized by laws administered by” a regulatory body.

Our focus, therefore, must be on the actions of the FTC with regard to cigarette labeling and advertising to determine whether, as a matter of state law, it specifically authorized PMUSA to use the disputed terms in its labeling and advertising. If the FTC has specifically authorized the use of the terms “lights” and “lowered tar and nicotine” by PMUSA in its labeling and advertising, PMUSA may not be held liable under the Consumer Fraud Act, even if the terms might be deemed false, deceptive, or misleading.

2. 
Legislative Intent and Public Policy

Our reading of the plain and ordinary meaning of the language of section 10b(1) is consistent with apparent legislative intent and with the public policy embodied in the Consumer Fraud Act. Although the Consumer Fraud Act is to be liberally construed to effectuate its purposes of protecting “consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices” (
Robinson
, 201 Ill. 2d at 416-17), the legislature clearly intended for certain actions or transactions engaged in by entities otherwise subject to the Consumer Fraud Act to be exempt from liability under the Consumer Fraud Act and the Deceptive Practices Act, without regard to the possible merits of the asserted claim.

Section 10b(1) reflects a legislative policy of deference to the authority granted by Congress or the General Assembly to federal and state regulatory agencies and a recognition of the need for regulated actors to be able to rely on the directions received from such agencies without risk that such reliance may expose them to tort liability.

Further, section 10b(1), by exempting certain conduct from liability even if the conduct itself is objectionable, serves to channel objections to agency policy and practice into the political process rather than into the courts. See 
City of Chicago v. Beretta U.S.A. Corp.
, 213 Ill. 2d 351, 432 (2004) (suggesting that change in law affecting highly regulated industry be left to the legislature and the political process); 
Charles v. Seigfried
, 165 Ill. 2d 482, 493 (1995) (noting that public and social policy should emanate from the legislature). Parties who desire to bring about change in agency policies or rules can take their complaints to the agency itself and can participate in the formal rulemaking process. If their concerns are not addressed by the agency, they may seek assistance from their legislators and may use the political process, including the power of the ballot box, if their voices are not heard.

We conclude that neither the language of section 10b(1) nor the public policy of the State of Illinois, as expressed by the legislature, requires that a regulatory agency engage in formal rulemaking before it can specifically authorize conduct by the entities over which it has regulatory authority.

3. 
Illinois Case Law

As noted above, both parties rely on this court’s decision in 
Lanier
, 114 Ill. 2d 1, as the seminal case regarding application of section 10b(1) of the Consumer Fraud Act. PMUSA argues that, under 
Lanier
, compliance with a federal regulatory scheme is sufficient to trigger the exemption of section 10b(1). Plaintiffs argue that this case is readily distinguishable from 
Lanier
.

In 
Lanier
, the consumer plaintiff alleged that the creditor defendants violated the Consumer Fraud Act and the Deceptive Practices Act by failing to explain the effect of the “Rule of 78s” if she prepaid her loan. 
Lanier
, 114 Ill. 2d at 5. Application of the rule to her loan caused her to have to pay more than $4,600 more than she would have been charged under the actuarial method of calculating interest. She argued that since the rule was understood by few borrowers, the defendants were obliged to explain the rule at the time of making a loan and that failure to do so constituted fraud. 
Lanier
, 114 Ill. 2d at 6. Defendants argued that their full compliance with the requirements of the federal Truth in Lending Act (TILA) (15 U.S.C. §§1601 through 1665 (1982)) was a defense to liability under the Illinois Consumer Fraud Act. 
Lanier
, 114 Ill. 2d at 11.

Relying on a Federal Reserve Board staff interpretation of the applicable regulation (
Lanier
, 114 Ill. 2d at 12-13), this court determined that the defendant did not violate the TILA by failing to explain the operation of the Rule of 78s. 
Lanier
, 114 Ill. 2d at 14. This court then considered whether compliance with the TILA was a defense to liability under the Consumer Fraud Act and concluded that the Consumer Fraud Act did not create more extensive disclosure requirements than the TILA. Rather, we noted “a consistent policy against extending disclosure requirements under Illinois law beyond those mandated” by federal law, in situations where both the TILA and Illinois statutes apply. 
Lanier
, 114 Ill. 2d at 17. Thus, this court held:

“Because the [Truth in Lending] Act is a law administered by the Federal Reserve Board, we find that, under section 10b(1) of the Consumer Fraud Act, the defendant’s compliance with the disclosure requirements of the Truth in Lending Act is a defense to liability under the Illinois Consumer Fraud Act in the present case.” 
Lanier
, 114 Ill. 2d at 18.

PMUSA argues that 
Lanier 
and the policy recognized therein against imposing disclosure requirements beyond those mandated by applicable federal law require the application of the bar of section 10b(1) to plaintiffs’ claim. Plaintiffs respond that PMUSA’s reliance on 
Lanier
 is misplaced because the basis of their claim of fraud is not PMUSA’s failure to make additional disclosures. Their claim is based on allegations of “active and direct” misrepresentation.

Our decisions since 
Lanier
 make it clear that mere compliance with applicable federal regulations is not necessarily a shield against liability under the Consumer Fraud Act. For example, in 
Martin v. Heinold Commodities, Inc.
, 163 Ill. 2d 33 (1994), this court held that a broker’s failure to reveal certain information in its disclosure statement was not authorized by the Commodity Futures Trading Commission (CFTC) or its regulations and, therefore, could be the basis for liability under the Consumer Fraud Act. The defendant did not fail to accurately disclose the amount of fees it charged investors for processing commodity options contracts. Rather, defendant failed to reveal the true nature of the fees being charged. Specifically, Heinold failed to reveal that the “foreign service fee” it was charging was instead a commission from which it would derive a share and that the fee was not authorized by the CFTC. 
Martin
, 163 Ill. 2d at 40-42. Citing 
Lanier
, Heinold argued that its literal compliance with the disclosure requirements of the CFTC was a complete defense to liability under the Consumer Fraud Act. 
Martin
, 163 Ill. 2d at 49. This court concluded that the deception was “neither specifically authorized by the Commission, nor in compliance with the Commission’s regulations.” 
Martin
, 163 Ill. 2d at 50. In addition, this court commented that the CFTC itself had noted that “literal compliance” with its disclosure requirements would not “necessarily ensure that a violation of the Commission’s regulations has not occurred.” 
Martin
, 163 Ill. 2d at 50. The CFTC was on record as stating that “ ‘a customer may be deceived about [material facts] despite receipt of the information required by [the Commission’s regulations.]’ ” 
Martin
, 163 Ill. 2d at 50, quoting 
Hammond v. Smith Barney, Harris Upham & Co.
 [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) par. 24,617 (C.F.T.C. 1990).

In 
Jackson
, this court again considered whether a defendant’s compliance with its obligations under the TILA provided a defense to a claim under the Consumer Fraud Act. The specific issue was whether the car dealership and Chrysler Financial Corporation, the assignee of the car sales contract, could be held liable when the dealership failed to reveal in the contract that it would retain a substantial portion of the amount charged for an extended warranty rather than transmit the entire amount to the manufacturer.
 Jackson
, 197 Ill. 2d at 41-42. The trial court dismissed the complaint and the appellate court affirmed, relying on 
Lanier
. 
Jackson
, 197 Ill. 2d at 43. This court affirmed, following the rule established in 
Lanier
 and holding that “compliance with the disclosure requirements of TILA is a defense to the Consumer Fraud Act claim against Chrysler [Financial] in this case.” 
Jackson
, 197 Ill. 2d at 50. In addition, this result was based on an exemption clause in the TILA that exempts assignees from liability under federal law unless the creditor’s violation of the TILA is “apparent on the face of the disclosure statement.” 15 U.S.C. §1641(a) (2000). Thus, we held that “an assignee is not responsible for the misrepresentations made by the dealer to the consumer outside of reviewing the face of the assigned document for apparent defects.” 
Jackson
, 197 Ill. 2d at 50. In effect, we held that the assignee was “specifically authorized” (815 ILCS 505/10b(1) (West 2000)) to do no more than meet its obligations under section 1641(a) of the TILA.

It is significant that in both 
Lanier
 and 
Jackson
, the holding was limited to the facts of the particular case. 
Lanier
, 114 Ill. 2d at 18 (“in the present case”); 
Jackson
, 197 Ill. 2d at 50 (“in this case”). As we noted in
 Jackson
, 
Lanier
 did “not confer a blanket immunization” from Consumer Fraud Act liability. If the alleged fraud were “active and direct,” such as a scheme to make false statements on the financing statement, liability under the Consumer Fraud Act could be imposed. 
Jackson
, 197 Ill. 2d at 51-52. As Justice Kilbride noted in his special concurrence, mere compliance with applicable law does not necessarily bar Consumer Fraud Act liability. Instead, the conduct at issue must be specifically authorized. 
Jackson
, 197 Ill. 2d at 59 (Kilbride, J., specially concurring, joined by Harrison, C.J.).

In 
Lanier
 and 
Jackson
, this court held that full compliance with applicable disclosure requirements is a defense, under section 10b(1), to a claim of fraud based on the failure to make additional disclosures. In the present case, however, the plaintiffs’ claim is not based on an alleged failure to disclose and, thus, compliance with disclosure requirements cannot constitute a defense.

Consider, for example, if the alleged fraud was the practice of a cigarette manufacturer to put only 19 cigarettes instead of 20 in every fifth pack of cigarettes. Such a scheme would increase profits by 1% by selling 99 cigarettes instead of the 100 promised on the labels. Without a doubt, the manufacturer would be liable under the Consumer Fraud Act for the fraud, notwithstanding scrupulous compliance with all applicable rules and regulations of the FTC. Such a fraud would be “active and direct.” See 
Jackson
, 197 Ill. 2d at 51-52. See also 
Hill v. St. Paul Federal Bank for Savings
, 329 Ill. App. 3d 705, 713 (2002) (rejecting argument that defendant’s failure to disclose posting order of checks in its fee schedule was deceptive, even if in compliance with federal law, because the Consumer Fraud Act does not require more extensive disclosure than that required by the TILA).

Plaintiffs’ claim in the present case is that the use of the terms “lights” and “lowered tar and nicotine” on PMUSA’s packaging and in its advertising is every bit as false as the package label that promises 20 cigarettes but delivers only 19. Plaintiffs argue that 
Martin
 should control the result in this case because the use of these terms has not been specifically authorized by the FTC and was not done in compliance with FTC rules. We conclude that 
Martin
 does not provide the answer; it merely helps us formulate the dispositive question. Unless the use of these terms has been specifically authorized by the FTC, section 10b(1) of the Consumer Fraud Act does not exempt PMUSA from liability.

The circuit court, in rejecting PMUSA’s section 10b(1) defense, relied on 
Aurora Firefighter’s Credit Union v. Harvey
, 163 Ill. App. 3d 915 (1987). After the credit union brought a collection action against the guarantor of a loan, he raised affirmative defenses and filed counterclaims under the TILA, the Consumer Fraud Act, and the Deceptive Practices Act. 
Aurora Firefighters
, 163 Ill. App. 3d at 918. With regard to his counterclaim that the credit union failed to make required disclosures under the TILA, the court held that the TILA requires disclosure only to the borrower, not to the guarantor, in a credit transaction. 
Aurora Firefighters
, 163 Ill. App. 3d at 919. With regard to his counterclaims under the Consumer Fraud Act and Deceptive Practices Act, the court agreed with the credit union it could not be held liable because its alleged failure to disclose was both authorized by and in compliance with the TILA. 
Aurora Firefighters
, 163 Ill. App. 3d at 921-22. However, the court further held that the defendant should be allowed to assert defenses under the Consumer Fraud Act and the Deceptive Practices Act based on alleged abuses other than disclosure violations. 
Aurora Firefighters
, 163 Ill. App. 3d at 926. Rejecting the credit union’s reliance on its regulation by and compliance with the Credit Union Act, the court stated that the mere existence of such a statute does not create “a blanket exemption” for credit unions from the operation of the Consumer Fraud Act.

We conclude that the present case can be distinguished from
 Lanier
 and its progeny because it does not involve the alleged lack of disclosure in the context of loans, leases, or other transactions. Rather, this case involves the use of allegedly deceptive terms in the name and description of a consumer product. That is, this is not a case in which the plaintiff argues that the defendant should have made disclosures in addition to the disclosures specifically required by the applicable regulations. In the present case, the question is whether the FTC specifically authorized the use of the disputed terms.

Despite this distinction, 
Lanier
 and its progeny, including the case upon which the circuit court relied, do stand for three separate propositions that are relevant to the present case. First, if section 10b(1) is to apply to bar a claim, the authorization relied upon must come from a state or federal regulatory body. See 
Lanier
, 114 Ill. 2d at 13 (the Federal Reserve Board “is the agency empowered by Congress to prescribe implementing and interpretive regulations” for the TILA); 
Lanier
, 114 Ill. 2d at 18 (applying section 10b(1) because the TILA is “a law administered by the Federal Reserve Board). See also 
Datacom Systems
, 146 Ill. 2d at 33 (defendant corporation, which engaged in impermissible conduct while attempting to collect unpaid parking fines under a contract with the City of Chicago, was not exempt under section 10b(1) of the Consumer Fraud Act; although hired by the city to perform this function, its “actions were not specifically authorized by any laws administered by a regulatory body acting under statutory authority of this State”).

Second, such a regulatory body may specifically authorize conduct by regulated entities without engaging in formal rulemaking. A Federal Reserve Board staff interpretation, for example, may be a sufficient basis for a finding of specific authorization. See 
Lanier
, 114 Ill. 2d at 13 (agency is “entitled to the greatest respect in the interpretation of its own regulations”; and noting that both Congress and the Supreme Court have expressed approval for treating staff interpretations as authoritative).

Third, while the authorization must be specific–related to a particular thing–it need not be express. Thus, in 
Lanier
, full compliance with disclosure requirements of the TILA was a defense to liability because the required disclosure implicitly provided specific authorization not to make any additional disclosures 
Lanier
, 114 Ill. 2d at 17. Neither the rules nor the staff interpretation of the Federal Reserve Board expressly stated that lenders need not disclose the effect of the Rule of 78s; rather, the regulatory body dictated the content of the required disclosure, implying that no additional disclosure was necessary and, thus, specifically authorizing lenders not to disclose the information.

Although there is extensive Illinois case law dealing with applicability of section 10b(1) in the context of financial transactions where the alleged fraud is related to the issue of disclosure, this case involves alleged fraud in the advertising and promotion of a consumer product. It also requires us to delve deeply into the functions and actions of a federal agency. For these purposes, we turn to other authorities.

4. 
Other Authorities

We look to the FTC’s own published materials and cases from the United States Supreme Court and the federal courts for additional authority in our effort to determine what constitutes “specific authorization” and whether PMUSA used the terms “lights” and “lowered tar and nicotine” under such authority.

PMUSA argues that, over the years, the FTC used a number of mechanisms to regulate and to authorize the making of claims regarding the tar and nicotine content of cigarettes. These include formal agency rulemaking, the issuance of advisory opinions, the use of voluntary agreements with cigarette manufacturers to obviate the need for rulemaking, and the initiation of enforcement proceedings against an individual manufacturer. Such enforcement proceedings might result in a judgment against the particular manufacturer or in the entry of a consent order. Although the consent order may be enforced only against the party who agreed to the terms of the order, PMUSA asserts that an enforcement action against one industry actor is an “especially effective method of regulation” that the FTC employs “to announce to an entire industry what behavior is and is not authorized.”

Thus, PMUSA argues, American Brands was specifically authorized by the 1971 consent order to use the terms “low,” “lower,” “reduced,” or “like qualifying terms” in its advertising and packaging to describe the level of tar and nicotine in its cigarettes, so long as it also provided the actual measurement of the level in milligrams. 
American Brands
, 79 F.T.C. 255. Similarly, the 1995 consent order prohibited American Tobacco Company from representing the tar and nicotine levels of Carlton cigarettes by using “a numerical multiple, fraction or ratio” of the tar or nicotine levels of other brands or by depicting more than one pack of Carltons versus one pack of any other brand. The agreed order provided, further, that “presentation of the tar and/or nicotine ratings of any of respondent’s brands of cigarettes and the tar and/or nicotine ratings of any other brand (with or without an express or implied representation that respondent’s brand is ‘low,’ ‘lower,’ or ‘lowest’ in tar and/or nicotine) shall not be deemed” to violate the ban on numerical comparisons. 
American Tobacco
, 119 F.T.C. at 11. Both consent orders, PMUSA argues, specifically authorized other members of the tobacco industry to act in accordance with their terms.

This assertion is supported by the FTC’s own statements and actions. In 1964, the FTC announced the promulgation of a trade regulation rule requiring the disclosure on all cigarette packaging of the fact that “cigarette smoking is dangerous to health and may cause death from cancer and other diseases.” Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. at 8325. This rule was rendered unnecessary the following year with the enactment of the Labeling Act. However, the FTC’s “Statement of Basis and Purpose of the Trade Regulation Rule” (Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. at 8325-75 (hereinafter 1964 FTC Statement)), contains valuable insights into the FTC’s use of rulemaking and adjudication in the regulatory process.

The 1964 FTC Statement offers “ten reasons why a formal rule-making proceeding may be preferable to an adjudicative proceeding, or a series of adjudicative proceedings.” 1964 FTC Statement, 29 Fed. Reg. at 8368. Among these reasons are: in formal rulemaking proceedings, all interested persons are given an opportunity to be heard; the rules of evidence and other procedural safeguards that operate in the adjudicative process are not tailored to the needs of rulemaking; and rulemaking through adjudication may be a more costly and time-consuming means of dealing with a problem common to an entire industry. 1964 FTC Statement, 29 Fed. Reg. at 8366-68. Nevertheless, the Statement clearly reveals that the FTC considered the adjudicative process as an alternative means of rulemaking:

“Rule-making through adjudication is not always completely fair and even handed in its results. This is especially true where a practice sought to be eliminated is industry-wide and the agency sues the members of the industry one-by-one to stop the practice.” 1964 FTC Statement, 29 Fed. Reg. at 8367.

In addition,

“The focus in adjudication is on settling a dispute over past practices, and while a rule may be announced in the process, it tends to be done incidentally and without sufficient concern for laying down clear guidelines for the future. Most often, rules contained in adjudicative decisions, whether judicial or administrative, are not designated as rules or stated in the form of rules. The rule must be inferred from the language of the opinion and the facts of the case; it is implicit rather than explicit; and it may remain uncontroversial and uncertain until many subsequent adjudications have refined and clarified it. It may take a long time for a rule even to be recognized and understood as such.” 1964 FTC Statement, 29 Fed. Reg. at 8367.

Despite these concerns, however, the FTC did not repudiate adjudication as a regulatory tool:

“We do not suggest, however, that the agencies in general, or the Federal Trade Commission in particular, should abandon reliance on the adjudicative method in all situations where a substantive principle or standard of conduct having general application is to be declared. The force of each of the [10] reasons discussed above varies with the concrete situation in which a choice between approaches is presented. That is why the supreme court has held that the choice between rule-making and adjudicative proceedings is ordinarily within the agency’s discretion.” 1964 FTC Statement, 29 Fed. Reg. at 8368, citing
 Securities & Exchange Comm’n v. Chenery Corp.
, 332 U.S. 194, 202, 91 L. Ed. 1995, 2002, 67 S. Ct. 1575, 1580 (1947).

The 1964 FTC Statement did not mention the use of advisory opinions or the resolution of adjudicative actions by consent order. However, the expressed concern about the ability of regulated entities to discern clear rules from the opinions rendered after adjudication is not present when the enforcement action is resolved by entry of a consent order. Such an order is clearly intended to serve as a rule, at least with respect to the parties to the consent order. The question for this court is whether the entry of a consent order, expressly directing one industry member to behave in a certain way, is an implicit authorization for other industry members to conduct themselves in the same manner. The FTC’s observation that adjudication could be used to announce “a substantive principle or standard of conduct having general application” suggests that a consent order may serve as authorization for nonparties to the order to follow its directives.

The United States Supreme Court has considered the role of adjudication as a means of establishing agency policy. 
Bell Aerospace
 involved a dispute between an employer and a union over the proper classification of certain buyers within the company’s purchasing procurement department. 
Bell Aerospace
, 416 U.S. at 269, 40 L. Ed. 2d at 140, 94 S. Ct. at 1759. The National Labor Relations Board (NLRB) determined that the buyers were not managerial employees and, therefore, were entitled to the protections of the National Labor Relations Act. 
Bell Aerospace
, 416 U.S. at 288-89, 40 L. Ed. 2d at 150-51, 94 S. Ct. at 1768-69. The Court of Appeals held, 
inter alia
, that although the NLRB was not precluded from determining that some buyers or all buyers were not managerial employees, it could not do so without invoking its rulemaking procedures under the National Labor Relations Act. 
Bell Aerospace
, 416 U.S. at 290, 40 L. Ed. 2d at 152, 94 S. Ct. at 1770. The Supreme Court reversed in part, disagreeing with this portion of the appellate court’s holding. 
Bell Aerospace
, 416 U.S. at 294, 40 L. Ed. 2d at 154, 94 S. Ct. at 1771-72.

As noted above, PMUSA cites 
Bell Aerospace 
for the proposition that “ ‘[A]djudicated cases may and do ... serve as vehicles for the formulation of agency policies, which are applied and announced therein.’ ” 
Bell Aerospace
, 416 U.S. at 294, 40 L. Ed. 2d at 153-54, 94 S. Ct. at 1771, quoting 
Wyman-Gordon
, 394 U.S. at 765, 22 L. Ed. 2d at 714-15, 89 S. Ct. at 1429. The Supreme Court also stated in that case that the NLRB was “not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the [NLRB’s] discretion.” 
Bell Aerospace
, 416 U.S. at 294, 40 L. Ed. 2d at 154, 94 S. Ct. at 1771.

Bell Aerospace
, therefore, offers some support for PMUSA’s contention that the 1971 and 1995 consent orders could be the source of specific authorization for the conduct described therein. The Court in 
Bell Aerospace
, however, emphasized the importance of a regulatory agency to have the ability to make case-by-case determinations when the question is such that it would be of marginal utility to announce a generalized standard for an entire industry. 
Bell Aerospace
, 416 U.S. at 294, 40 L. Ed. 2d at 154, 94 S. Ct. at 1771-72. Thus, the Court observed, “ ‘an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.’ ” (Emphasis omitted.) 
Bell Aerospace
, 416 U.S. at 293, 40 L. Ed. 2d at 153, 94 S. Ct. at 1771, quoting 
Chenery
, 332 U.S. at 202, 91 L. Ed. at 2002, 67 S. Ct. at 1580. 
Bell Aerospace
, however, offers little support for PMUSA’s contention that the 1971 and 1995 consent orders resolving disputes between the FTC and individual tobacco companies should be deemed by this court to specifically authorize PMUSA or other cigarette manufacturers to follow the directives contained in the orders.

PMUSA also points to numerous documents in the record that, it contends, reveal that the FTC itself considers the resolution of adjudicated cases, either by judgment or by consent order to constitute “regulatory activity.” See, 
e.g.
, Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 13-14 (December 31, 1971) (describing the resolution of the 
American Brands
 dispute via consent order and its “extended negotiations” with “six proposed respondents” in the 
Lorillard 
matter as part of its “[r]egulatory activity” for the year); Federal Trade Commission, Report to Congress Pursuant to the Public Health Cigarette Smoking Act, at 1 (December 31, 1972) (noting that by October of 1972 “almost all cigarette advertising published in this country was in compliance with the terms of consent orders” directly involving only six cigarette companies). PMUSA’s characterization of the documentary record is consistent with the testimony of Dr. Peterman, a former FTC bureau director, who stated that the FTC uses consent orders to provide guidance to the entire cigarette industry.

We conclude that the FTC’s informal regulatory activity, including the use of consent orders, comes within the scope of section 10b(1)’s requirement that the specific authorization be made “by laws administered by” a state or federal regulatory body. 815 ILCS 505/10b(1) (West 2000). This is consistent with our holding in 
Lanier
, which found specific authorization for the challenged conduct in an agency staff interpretation (
Lanier
, 114 Ill. 2d at 17), and with the plain meaning of the statute and the public policy expressed by the legislature.

The United States Court of Appeals for the Seventh Circuit, applying Illinois law in the case of 
Bober v. Glaxo Wellcome PLC
, 246 F.3d 934 (7th Cir. 2001), cited in 
Avery v. State Farm Mutual Insurance Co.
, 216 Ill. 2d ___, ___ (2005), found that the plaintiff’s claim was properly dismissed by the district court because it was, as a matter of law, not deceptive under the Consumer Fraud Act. 
Bober
, 246 F.3d at 940. However, because one member of the panel disagreed with this holding, the court made an alternate holding affirming the district court’s conclusion that the plaintiff’s claim was barred by section 10b(1) of the Consumer Fraud Act. 
Bober
, 246 F.3d at 941 n.4.

Bober, like the present case, involved a claim of fraud in the marketing of a consumer product. The defendant drug company marketed both over-the-counter and prescription forms of the drug ranitidine, which is a stomach acid reliever. By means of its consumer hotline and other marketing practices, Glaxo indicated to Bober and other consumers that the two medicines, known as Zantac 75 and Zantac 150, were not substitutable. 
Bober
, 246 F.3d at 936-37. In fact, although the two products contained exactly the same medication, the cost to consumers of one tablet of Zantac 150 was almost twice the cost of two 75 milligram tablets of Zantac 75. 
Bober
, 246 F.3d at 937. Plaintiff filed a claim under the Consumer Fraud Act, alleging that Glaxo’s statements that the two products were not readily substitutable were deceptive and caused consumers to pay an inflated price. 
Bober
, 246 F.3d at 937-38.

The court noted that the “case law interpreting the relevant portion of the [Consumer Fraud Act’s] exemption provision is not entirely clear on the question of what is meant by ‘specifically authorized.’ ” 
Bober
, 246 F.3d at 940. After reviewing this court’s decisions in 
Martin
, 163 Ill. 2d 33 (discussed in detail, above), and 
Weatherman v. Gary-Wheaton Bank of Fox Valley
, 186 Ill. 2d 472 (1999) (compliance with federal statute is defense to Consumer Fraud Act liability when the statute specifically authorizes the making of a good faith estimate of fees), the Seventh Circuit concluded that:

“Taken together, the [Illinois] cases stand for the proposition that the state [Consumer Fraud Act] will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations. If the parties are doing something specifically authorized by federal law, section 10b(1) will protect them from liability under the [Act]. On the other hand, the [Consumer Fraud Act] exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate.” 
Bober
, 246 F.3d at 941.

The Seventh Circuit defined the issue as “whether the statements Bober complains of are sufficiently within what is authorized by federal law that Glaxo is entitled to section 10b(1) protection.” 
Bober
, 246 F.3d at 941. The only statement that the court found “potentially misleading” (
Bober
, 246 F.3d at 941) was the statement of Glaxo’s hotline operator, who told Bober that the two tablets were “not the same medications” and that he “could not substitute two Zantac 75 tablets for one Zantac 150 tablet.”
Bober
, 246 F.3d at 937.

The statement that the two dosages of the same drug were “not the same medication” was found to be specifically authorized by a rule formally adopted by the FDA and codified in the Code of Federal Regulations. 
Bober
, 246 F.3d at 941. The exemption of section 10b(1) applied to this statement, the court stated, “even if the statement may have led Mr. Bober as a layperson to misunderstand what was being said.” 
Bober
, 246 F.3d at 941.

The second part of the operator’s statement regarding the nonsubstitutability of the two tablets was “not so easily dealt with” because “Glaxo was required by federal law to say a certain amount and simultaneously required not to say too much.” 
Bober
, 246 F.3d at 942. Although the applicable regulations did not expressly authorize Glaxo to answer a consumer’s question with the statement “you cannot substitute,” the statement was consistent with federal regulations prohibiting drug companies from suggesting “off-label” uses for its products. 
Bober
, 246 F.3d at 942.

In the end, even though there was no express authorization for the “cannot substitute” statement, the Seventh Circuit concluded that what Glaxo “chose to say and not to say was a sufficiently careful compromise to fall within what is specifically authorized by federal law.” 
Bober
, 246 F.3d at 942. The court explained further:

“The pharmaceutical industry is highly regulated, both at the federal level and internationally. Technical requirements abound, and it is not only possible but likely that ordinary consumers will find some of them confusing, or possibly misleading as the term is used in statutes like Illinois’s [Consumer Fraud Act]. But, recognizing the primacy of federal law in this field, the Illinois statute itself protects companies from liability if their actions are authorized by federal law. (Such protection would amount to nothing if it applied only to statements that were not susceptible to misunderstanding; those statements would escape liability under the [Consumer Fraud Act] in any event.) Because Glaxo’s statements fall within the boundaries established by federal law, under 
Weatherman
 [186 Ill. 2d 472] and 
Martin
 [163 Ill. 2d 33] they are entitled to protection under section 10b(1) of the [Consumer Fraud Act].” 
Bober
, 246 F.3d at 942-43.

Bober
 is particularly helpful to our analysis of the present case, because, unlike 
Lanier
, 114 Ill. 2d 1, 
Martin
, 163 Ill. 2d 33, and 
Jackson
, 197 Ill. 2d 39, it does not concern federal disclosure requirements. Like the present case, it concerns whether the federal regulatory agency has specifically authorized the making of certain statements about the product. The Seventh Circuit has read the statutory term “specifically authorized by laws administered by” in section 10b(1) to encompass the making of statements that “fall within the boundaries established by federal law” (
Bober
, 246 F.3d at 943) in a highly regulated industry, even if those statements may tend to be confusing or misleading and even if there is no express authorization for the making of such statements in the applicable federal regulations. This is entirely consistent with our previous decisions, our reading of the statutory language, and our understanding of the legislative policy underlying section 10b(1).

The United States Court of Appeals for the District of Columbia Circuit long ago noted the FTC’s tendency to regulate by obtaining voluntary compliance with its policies, rather than engaging in formal rulemaking. See 
Holloway v. Bristol-Myers Corp.
, 485 F.2d 986, 995 (D.C. Cir. 1973) (noting that, due to its “expertise in dealing with commercial practices,” the FTC is able to secure “voluntary compliance through informal proceedings,” and, in its sound discretion, determines when “formal enforcement measures” are necessary; and, further, that Congress has “voiced approval” of the FTC’s “record in shaping the fluid contours of generalized statutory policy pronouncements into meaningful and coherent rules of business conduct”). In reaching its holding that the FTC Act did not create a private cause of action under which that the 
Holloway
 plaintiffs could bring their claim, the court of appeals provided a detailed history of the FTC Act and its amendments and of the FTC itself. The court noted that when considering the 1939 amendments to the FTC Act, Congress made a fundamental policy judgment regarding the FTC’s “expertise in dealing with commercial practices, its ability to act as a buffer in securing voluntary compliance through informal proceedings, and its sound discretion in determining when formal enforcement measures were necessary.” 
Holloway
, 485 F.2d at 995. 
Holloway
 also offers support for the conclusion that the consent orders obtained by the FTC with respect to one industry member provided specific authorization for other industry members to act in conformity with those orders.

Finally, although lacking in significant precedential weight, we note with great interest the memorandum opinion and order of the federal district court for the Eastern District of Arkansas in 
Watson v. Philip Morris Cos.
, No. 4:03–CV–519 GTE (E.D. Ark., December 12, 2003), 
aff’d
, No. 04–1225 (8th Cir. August 25, 2005). The 
Watson
 class of plaintiffs was comprised of smokers who had consumed at least one pack of Marlboro Lights during the six years prior to the filing of their action pursuant to the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §4–88–107). The substance of their complaint was that Philip Morris advertised Marlboro Lights as being lighter or lower in tar, despite the fact that the cigarettes actually delivered more tar and nicotine than shown by the FTC testing method. Philip Morris removed the action to federal court pursuant to 28 U.S.C. §1442(a)(1) (2000), on the basis that it had raised a colorable federal defense to the plaintiffs’ claims. Specifically, Philip Morris argued that its actions were at the direction of a federal agency–the FTC–and that there was a causal nexus between the FTC’s actions and Philip Morris’ marketing practices with regard to light cigarettes. The district court denied the plaintiffs’ motion to remand the matter back to state court.

For our purposes, the relevant portion of the 
Watson
 decision is the district court’s discussion of the FTC’s regulation of advertising of light and low tar cigarettes and the FTC’s use of mechanisms other than formal rules to direct the actions of regulated entities.

After an exhaustive recounting of the history of regulation of cigarette advertising, the district court noted that Philip Morris was not required to advertise its cigarettes as “light” or “low tar.” Nevertheless, the court acknowledged:

“[Philip Morris] is permitted by the FTC to so advertise its cigarettes if they meet the FTC’s standard. Philip Morris is required to adhere to the FTC’s regulation of ‘lights’ advertising. The FTC requires disclosure of Cambridge Filter Method tar and nicotine ratings in cigarette advertisements, and has stated that a cigarette may be advertised as light if its rating using the FTC Method is less than 15mg using the FTC Method. Therefore, any contention that Philip Morris’ advertising of these two cigarette brands as ‘Lights’ is misleading squarely confronts the FTC’s mandate that cigarette companies disclose FTC Method results in their advertising and use the Method to determine whether a particular cigarette may be classified as ‘Light.’ ” 
Watson
, No. 4:03–CV–519 GTE.

The district court also observed that a “formal rule is not required in order for a federal agency to direct the actions of a private company.” The FTC “often regulates the industries it governs by compelling voluntary agreements and consent orders rather than promulgating formal rules.” In reaching this conclusion, the district court relied upon a documentary record similar to the record in the present case. In addition, the district court cited the 1987 testimony before Congress of then-chairman of the FTC Daniel Oliver, in which he described the FTC’s preference for informal regulation via the use of enforcement actions and consent orders rather than formal rulemaking. Oliver stated that it is “more efficient” to bring a single case against one industry actor than to use scarce resources to engage in rulemaking and that in “the case of the cigarette industry,” it was “entirely reasonable to suppose that one action against [one] cigarette company would have an effect on all of them, and that you would not have to make a rule.” Quoting Statement of Daniel Oliver, Chairman of the Federal Trade Commission, Hearing before the Subcommittee on Transportation, Tourism, and Hazardous Materials of the House Comm. on Energy and Commerce, 100th Cong. 17-19 (1987).

The 
Watson
 court noted that the FTC coerced Philip Morris and other cigarette manufacturers into “voluntary” cooperation with its cigarette labeling and advertising policies “in such a way that a formal rule” was not required to create federal jurisdiction. Finally, although formal rulemaking “may be one of the principal ways federal agencies regulate,” “it is clearly not the only way. In the FTC’s case, it is not even the preferred way to regulate the cigarette industry.”

The issue addressed by the
 Watson
 court–whether removal to federal court was proper–has no bearing on the present case. However, the federal district court’s detailed analysis does support our conclusion that specific authorization for the use of the disputed descriptors may be found in consent orders rather than in formally promulgated trade regulation rules of the FTC.

5. 
Summary

Based on these other authorities, read in conjunction with Illinois law, we conclude that the FTC could, and did, specifically authorize all United States tobacco companies to utilize the words “low,” “lower,” “reduced” or like qualifying terms, such as “light,” so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the “tar” and nicotine content in milligrams of the smoke produced by the advertised cigarette. See 
American Brands
, 79 F.T.C. 255. Further, the FTC reiterated this authorization in the 1995 consent order, which forbade the representation of tar ratings as “a numerical multiple, fraction or ratio of the tar or nicotine ratings of any other brand,” but specifically allowed the “express or implied representation” that a cigarette is “ ‘low,’ ‘lower,’ or ‘lowest’ in tar and/or nicotine.” 
American Tobacco
, 119 F.T.C. at 10, 11. Thus, we hold that plaintiffs’ claim is barred by section 10b(1) of the Consumer Fraud Act.

At oral argument, plaintiffs’ counsel noted that the circuit court made two separate findings of fraud: (1) a finding that PMUSA’s use of the terms “light” and “lowered tar and nicotine” was fraudulent and deceptive based on the known phenomenon of compensation, and (2) a finding that the members of the plaintiff class were defrauded because PMUSA failed to disclose that its “light” cigarettes were more mutagenic than full-flavor cigarettes. Counsel argued that, even if this court were to reverse on the merits of the first claim, the second portion of the circuit court’s judgment must still stand.

We have not reached the merits of either aspect of plaintiffs’ fraud claim, having found the entire claim barred by section 10b(1) of the Consumer Fraud Act. However, our discussion thus far has focused on the PMUSA’s use of the disputed terms. The question we must next address is whether, even if the use of the terms was specifically authorized by the FTC, a claim may be brought under the Consumer Fraud Act based on PMUSA’s describing more mutagenic cigarettes as “light” and as delivering “lower tar and nicotine.” For two reasons, we find that the claim of fraud based on increased mutagenicity cannot stand.

First, plaintiffs’ claim regarding mutagenicity is inextricably linked to their claim that the terms “lights” and “lowered tar and nicotine” are fraudulent and deceptive. Even though the circuit court found that members of the plaintiff class understood these terms as making an implied claim of safety and relied on this understanding, their Consumer Fraud Act claim is barred by section 10b(1). It is clear from the record that the FTC has defined both terms as meaning 15 milligrams or less of tar. Because PMUSA was specifically authorized to use these descriptive terms on its labels and in its advertising of products meeting this definition, any claim based on the use of these terms is barred by section 10b(1) of the Consumer Fraud Act, no matter what meaning the plaintiffs might have attributed to them.

Second, plaintiffs’ mutagenicity claim is based on PMUSA’s failure to make additional disclosures beyond those required by federal statute and the voluntary agreement with the FTC–the tar and nicotine content in milligrams and the mandatory warning label. Thus, the claim is barred by this court’s decisions in 
Lanier
, 114 Ill. 2d at 18 (finding compliance with disclosure requirements of federal statute to be a defense to liability under the Consumer Fraud Act), 
Jackson
, 197 Ill. 2d at 47 (same), and 
Jarvis
, 201 Ill. 2d at 88 (recognizing state policy against extending consumer disclosure requirements beyond those mandated by federal law).

IV. OTHER ISSUES RAISED IN THIS APPEAL

Our resolution of plaintiffs’ claim on the threshold issue of statutory exemption moots most of the other issues raised in this appeal. One issue, however, is not resolved by our determination that plaintiffs’ claim is barred by section 10b(1) of the Consumer Fraud Act. 
PMUSA argues that the circuit court erred by ruling that its delivery of some 39,000 documents to Congress in compliance with a congressional subpoena constituted waiver of both attorney-client privilege and work-product protection for those documents. Although only one of the disputed documents was actually admitted into evidence in the present case, PMUSA urges this court to reverse the circuit court’s ruling on the issue. PMUSA’s concern is that if it does not raise the issue in this appeal, it may be estopped from doing so in subsequent litigation in which an adverse party seeks to admit these documents into evidence.

Despite plaintiffs’ well-supported arguments in favor of upholding the circuit court’s determination, we decline to address the issue except to note that PMUSA did make the privilege argument before this court and, thus, cannot be deemed to have acquiesced in the admission of the single document into evidence in this case.

Several of the other issues raised in this appeal are of great importance and deserving of consideration by this court in the proper case. In particular, the circuit court’s certification of a plaintiff class of 1.14 million individuals with claims covering decades raises several significant issues. The circuit court found sufficient commonality of issues to certify the class. Citing 
Oliveira
, 201 Ill. 2d at 155, in which this court held that the proximate cause element of a Consumer Fraud Act claim must be met by proof of a plaintiff’s having been deceived in some manner, PMUSA argues that the element of causation is an individualized issue that makes class certification improper.

We note that the five common questions of fact justifying class certification that were enumerated by the circuit court in its judgment order do not correspond to the five elements of a private cause of action under the Consumer Fraud Act that this court has repeatedly spelled out. See 
Zekman v. Direct American Marketers, Inc.
, 182 Ill. 2d 359, 373 (1998); 
Oliveira
, 201 Ill. 2d at 149. Specifically, although the circuit court considered what the class members understood the terms “lights” and “lowered tar and nicotine” to mean, and whether PMUSA intended reliance on its allegedly false and misleading statements, and whether the class members sustained damages as a result, it did not make the specific inquiry required by 
Oliveira
–whether the members of the plaintiff class were deceived by the use of the terms. That is, did they hold a false impression intentionally created by PMUSA’s use of these terms when they made each and every purchase decision over a period of as long as 30 years?

Similarly, in the portion of the judgment order listing five elements of a claim under the Consumer Fraud Act, the circuit court cites 
Oliveira
 as the source for the elements, but does not mention actual deception as a necessary finding under the element of proximate cause. However, in making its factual findings as to each element, the circuit court did find that the false message of lighter smoke and lower tar was “relied upon as a causative or determining factor for all Class members even if the degree or extent may have varied between Class members.”

In the present case, the causation issue has at least two aspects. First, to meet the causation element of a Consumer Fraud Act claim (
Oliveira
, 201 Ill. 2d at 154), the members of the class must have actually been deceived in some manner by the defendant’s alleged misrepresentations of fact. In 
Oliveira
, this court equated cause-in-fact with deception. 
Oliveira
, 201 Ill. 2d at 150. In the context of a fraud claim, as in a negligence claim, cause-in-fact is “but for” cause. That is, the relevant inquiry is whether the harm would have occurred absent the defendant’s conduct. 
Evans v. Shannon
, 201 Ill. 2d 424, 434 (2002). The circuit court’s use of the words “may have relied to different degrees” causes us to question the existence of cause-in-fact. Even if, as the circuit court found, every purchaser must have relied to some degree on the disputed language, perhaps upon making the first purchases of a light cigarette, we question whether it can reasonably be said that the words “light” and “lowered tar and nicotine” actually deceived over a million people for decades.

 The circuit court cited 
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83 (1995), for the proposition that “[a] person is liable for his or her conduct whether it contributed wholly or partly to the plaintiffs’ injury as long as it was one of the proximate causes of the injury.” 
Leonardi
, however, was a medical malpractice action in which the question was whether the defendant hospital and physicians could admit evidence of the alleged negligence of another physician who was not a party to the suit to demonstrate lack of proximate cause. 
Leonardi
, 168 Ill. 2d at 91. Unlike 
Leonardi
, the present case does not involve the apportionment of causation among multiple tortfeasors. The question is not whether PMUSA’s use of the descriptors was “one of the proximate causes” of plaintiff’s injury. Again, the question is whether it can reasonably be said that deception created by the presence of the words “Lights” and “lowered tar and nicotine” on packages of Marlboro Lights and Cambridge Lights was the “but for” cause of millions of purchasing decisions made over a period of some 30 years by the 1.14 million members of the plaintiff class.

We question, for example, whether all or most of the young people who began smoking long after these products were brought to market were deceived by the disputed words when choosing these brands of cigarettes. It may be just as likely that peer group pressure was the proximate cause of their adopting Marlboro Lights as their preferred brand. Similarly, there is no way of knowing how many smokers first tried Marlboro Lights because they were deceived by the promised lower level of tar, then tried one or more other brands, only to return to Marlboro Lights as a matter of personal preference.

Second, a great deal of evidence was presented on the phenomenon of compensation, which is the term applied to the tendency of smokers to change their smoking behavior after switching to a lower tar and nicotine product in order to achieve the level of nicotine delivery that they had become accustomed to. The circuit court concluded, based on the testimony of plaintiffs’ experts, that plaintiffs demonstrated that compensation is “complete.” That is, that every smoker compensates fully for the effects of the lowered tar and nicotine cigarette. However, even if this is true with respect to smokers of full-flavor cigarettes who switch to the so-called “light” or “low tar” brands, we question whether the members of the class who never smoked prior to smoking Marlboro Lights would have felt the need to compensate when they lacked a prior habit to compensate for.

In addition to our reservations about the existence of individual issues that might make class certification inappropriate, we have grave reservations about the novel approach to the calculation of damages that was offered by the plaintiffs and accepted by the circuit court.

However, despite the importance of these questions and the parties’ having thoroughly briefed and argued them, we decline to address them. Because we have resolved this appeal on the threshold question of a statutory bar to maintaining the action, these are issues for another day.

V. CONCLUSION

Plaintiffs note that the FTC has never adopted a trade regulation rule approving the use of descriptors such as “light” or “low tar,” and that the FTC has never stated that the use of such descriptors has been “substantiated” by any cigarette manufacturer. Further, plaintiffs argue that PMUSA has never claimed to have any proof that its “Lights” are safer than regular cigarettes. These statements are true, but do not resolve the question whether the FTC has specifically authorized the use of these terms. Plaintiffs also assert that the FTC has, fairly recently and after entering into the consent orders, expressly disavowed any “official” definitions of the terms. See Cigarette Testing, Request for Public Comment, 62 Fed. Reg. 48,158, 48,163 (September 12, 1997) (“There are no official definitions for these terms but they appear to be used by the industry to reflect ranges of FTC tar ratings”). It is not clear to this court what the FTC meant by “no official definitions,” unless it was referring to the absence of a trade regulation rule. The FTC itself certainly uses these terms in its publications and its reports to Congress. Perhaps the FTC’s published definitions of these terms in these contexts are considered by the agency to be “unofficial.”

We conclude that the specific authorization required to trigger the exemption of section 10b(1) does not require formal rulemaking or official definitions. See 
Lanier
, 114 Ill. 2d at 12-13 (finding specific authorization in Federal Reserve Board staff interpretation of the applicable regulation). It is sufficient if the authorization proceeds from regulatory activity, including the resolution of an enforcement action by means of a consent order. The consent order provides express authority for the party that was the target of the enforcement action to engage in the conduct described in the consent order. In addition, a consent order entered into by the FTC with one member of a regulated industry, which is published pursuant to statute, provides implied authority for other members of the regulated industry to engage in the same conduct. It would elevate form over substance to say that FTC specifically authorized American Brands to use such descriptors so long as certain conditions were met (
American Brands
, 79 F.T.C. 255), but did not thereby specifically authorize other members of the industry to act accordingly. Thus, while the authorization given to American Brands was express, the authorization given to the rest of the industry was implied, but no less specific.

The necessary degree of specificity is provided by the language of the consent orders and by the FTC’s long-standing use, if not formal adoption, of the definition of “low tar” as meaning 15 milligrams or less of tar per cigarette.

Because PMUSA was specifically authorized to use the disputed terms without fear of the FTC challenging them as deceptive or unfair, it is exempt from civil liability under 10b(1) of the Consumer Fraud Act for the use of the terms so long as the other conditions set out in the consent orders were met. We find no evidence in the record that PMUSA failed to use these terms in compliance with the terms of the consent orders.

The increased mutagenicity of the smoke delivered by Marlboro Lights and Cambridge Lights cannot be a separate basis for a claim under the Consumer Fraud Act because, even if the terms “light” and “lowered tar and nicotine” do convey a message of safety, their use is specifically authorized by the FTC. In addition, any claim of fraud based on PMUSA’s failure to disclose increased mutagenicity is barred by this court’s long-standing rule against imposing additional disclosure requirements beyond those established by statute or agency regulation.

Plaintiffs’ claim under the Deceptive Practices Act must also fail. Section 4 of the Deceptive Practices Act exempts from liability “conduct in compliance with the orders” of a federal agency. 815 ILCS 510/4 (West 2000). Because we have concluded that the 1971 and 1995 consent orders provided specific authorization to all industry members to engage in the conduct permitted by the orders, these orders fall within the scope of section 4, even though PMUSA was not a party to either consent order. See also 
Mario’s Butcher Shop & Food Center, Inc. v. Armour & Co.
, 574 F. Supp. 653, 655 (N.D. Ill. 1983) (noting parallel between exemption clauses of the Consumer Fraud Act and the Deceptive Practices Act).

We have resolved the present case entirely on the basis of state law by construing and applying an exemption clause in a state statute. We do not address PMUSA’s arguments that this action is expressly or impliedly preempted by federal law. Operation of section 10b(1) is not dependent on the intent of Congress. Rather, it is dependent on the intent of the Illinois General Assembly to allow regulated entities to engage in commercial conduct that might otherwise be alleged to be fraudulent or deceptive without risk of civil liability, so long as that content is specifically authorized by the regulatory body.

Finally, we share the concerns expressed by plaintiffs and their 
amici
 about the devastating health effects of smoking and, in particular, the scourge of smoking among young people. We emphasize that because this action is barred by section 10b(1) of the Consumer Fraud Act, it is unnecessary to reach the merits of plaintiffs’ claim that PMUSA intentionally deceived the public. Our resolution of the present case is in no way an expression of approval of PMUSA’s alleged conduct. Nevertheless, as justices, our role is to apply the law as it exists, not to decide how the law might be improved. We must defer to the policy of the legislature as expressed in the language of the Consumer Fraud Act. Therefore, plaintiffs and others who would seek to alter the conduct of tobacco companies must take their case to the General Assembly, where they might seek amendment of section 10b(1); to the FTC, where they might seek changes in regulations; or to Congress, where they might seek amendments to the Labeling Act.

We reverse the judgment of the circuit court and remand with instructions to dismiss pursuant to section 10b(1) of the Consumer Fraud Act.

Circuit court judgment reversed;

cause remanded with instructions.

CHIEF JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE KARMEIER, specially concurring:

I agree that the judgment of the circuit court should be reversed. In my view, however, that conclusion is not dependent on the applicability of section 10b(1) of the Consumer Fraud Act (815 ILCS 505/10b(1) (West 2000)). Plaintiffs’ consumer fraud claim is fatally infirm for an additional and more basic reason: plaintiffs failed to establish that they sustained actual damages.

In 
Avery v. State Farm Mutual Automobile Insurance Co.
, 216 Ill. 2d 100, 195 (2005), this court recently reiterated the well-settled principle that in order to maintain a private cause of action under the Consumer Fraud Act, a plaintiff must prove that he or she suffered actual damages as a result of a violation of the Act.
(footnote: 1) Actual damages are thus an element of a private right of action under the statute. See 815 ILCS 505/10a (West 2000); 
Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134, 140 (2002). If a plaintiff cannot establish that the defendant’s conduct caused him or her to suffer actual damages, no recovery under the Act will lie. See 
Avery
, 216 Ill. 2d at 196-200.

The requirement of actual damages means that the plaintiff must have been harmed in a concrete, ascertainable way. That is, the defendant’s deception must have affected the plaintiff in way that made him or her tangibly worse off. Theoretical harm is insufficient. Damages may not be predicated on mere speculation, hypothesis, conjecture or whim. See 
Petty v. Chrysler Corp
., 343 Ill. App. 3d 815, 823 (2003).

The record in the case before us shows that PMUSA developed and marketed Marlboro Lights and Cambridge Lights cigarettes in response to heightened public concern over health risks posed by smoking. The company believed that it could forestall declining sales by offering a product which consumers perceived as better for them than conventional “full-flavored” brands. Pursuant to that strategy, PMUSA advertised Marlboro Lights and Cambridge Lights cigarettes in a way that led consumers to believe that the brands posed a lower health risk than their “full flavored” counterparts. In reality, 
and as PMUSA was fully aware, the so-called “light” cigarettes not only offered no health benefits, but were actually more toxic. 

When a consumer chooses one product over another in the belief that it will be less harmful to his or her health, only to discover later that it may have been more harmful, the existence of damages might seem self-evident. In this case, however, plaintiffs are not seeking damages based on any heightened adverse effects on their health. Personal injury is not at issue. The losses for which plaintiffs seek compensation are purely economic. Their claim is simply that they did not receive what they bargained for. They paid for health benefits they did not get. 

The benefit-of-the-bargain rule invoked by plaintiffs governs common law fraudulent misrepresentation cases. 
Gerill Corp. v. Jack L. Hargrove Builders, Inc.
, 128 Ill. 2d 179, 196 (1989). Although plaintiffs’ cause of action is statutory in nature, the parties agree that the benefit-of-the-bargain rule provides the appropriate standard for ascertaining plaintiffs’ right to damages in this case. Under the rule, damages are determined by looking at the loss to the plaintiff rather than the gain to the defendant. The rule is based on the rationale that the defrauded party is entitled to be placed in the same financial position he would have occupied had the misrepresentations in fact been true. See 
Martin v. Allstate Insurance Co.
, 92 Ill. App. 3d 829
, 
835 (1981). Consistent with this rationale, the measure of damages

“is such an amount as will compensate the plaintiff for the loss occasioned by the fraud, or, as it has been expressed, the amount which the plaintiff is actually out of pocket by reason of the transaction ***.” 19A Ill. L. & Prac., 
Fraud 
§ 61 (1991).

When this case ultimately proceeded to trial, two individuals were identified as representing the plaintiff class, Sharon Price and Michael Fruth. Both named plaintiffs testified that they switched to light cigarettes because they believed such cigarettes to be lower in tar and nicotine and therefore healthier. Price also stated that she valued the health component of light cigarettes, or what she thought was the health component of lights. Significantly, however, Price also admitted that she continued smoking PMUSA’s light cigarettes even after this litigation alerted her to the fact that the cigarettes were not, in fact, any healthier and may actually be more harmful than the regular version of those cigarettes. News that PMUSA’s low tar and light representations were illusory likewise did not deter Fruth from continuing to smoke, although he testified that he did switch back from lights to regulars.

Whatever valuation the class representatives may have placed on the health component of light cigarettes, that valuation had no observable economic consequences. Neither Price nor Fruth offered any testimony suggesting that switching from regulars to lights resulted in their paying any more for cigarettes than they would have otherwise. There was no price disparity between light cigarettes and their full-flavored counterparts, and there is no indication that the switch from regulars to lights caused them to buy more packages of cigarettes. The price they paid did not go up. The quantity they purchased did not increase. No additional ancillary or incidental costs were identified. Moreover, neither Price nor Fruth complained that the cigarettes were not worth what they paid for them. To the contrary, Price’s continued purchase of lights even after being alerted to their lack of health benefits suggests that she was entirely satisfied with the value of what she received for her cigarette-purchasing dollar.

Under these circumstances, Price and Fruth cannot be said to have sustained any actual damages as a result of the misrepresentations made by PMUSA. Because they did not show any actual damages, Price and Fruth failed to prove a private right of action under the Consumer Fraud Act. Under 
Avery v. State Farm Mutual Automobile Ins. Co.
, that is fatal not only to their own cause of action, but to the entire class action. As we held in 
Avery
, when a class representative has not proven his claim for consumer fraud, the consumer fraud claim asserted on behalf of the class cannot stand either. The consumer fraud judgment in favor of the class must be reversed.
 Avery
, 216 Ill. 2d at 204. There is no basis for reaching a contrary result here. Accordingly, regardless of the applicability of section 10b(1) of the Consumer Fraud Act (815 ILCS 505/10b(1) (West 2000)), the judgment in favor of plaintiffs must be set aside.

At trial, counsel for plaintiffs did not attempt to compensate for
the absence of actual damages to the class representatives by relying on testimony from other members of the class, for the smoking experiences
of the other class members were similar to those of Price and Fruth andtherefore similarly unhelpful. Instead, class counsel presented the results of an internet survey they had commissioned. Plaintiffs have not cited, and I am not aware of, any authority that would permit the
opinions of internet survey respondents to establish actual damages under the Consumer Fraud Act where, as here, the class representatives have not been shown to share the survey respondents’
views and have not themselves been harmed in the way those who answered
the survey claimed they would be under the hypotheticals presented to them.

Even if I could look past these problems, plaintiffs’ damages model is insufficient as a matter of law to support the circuit court’s
judgment. Plaintiffs contend that their damages under the benefit-of-the-bargain rule, as applied to the facts of this case, are equal to the difference between the value the cigarettes would have had if they possessed the qualities they were represented to have and their value as actually sold. See 
Gerill Corp. v. Jack L. Hargrove Builders, Inc
., 128 Ill. 2d 179, 196 (1989). Because defendant’s misrepresentations as to the properties of their cigarettes were believed to be true, ascertaining the market value of cigarettes possessing the qualities defendants claimed its lights to possess is straightforward. It is the price PMUSA actually charged and the amount plaintiffs actually paid for those cigarettes.

The problem in plaintiffs’ analysis arises from the second value, 
i.e.
, the value of the cigarettes as actually sold. To compute that value, which is equivalent to the price the cigarettes would have commanded in the marketplace had they not possessed the health attributes suggested by PMUSA’s misrepresentations, plaintiffs did not look to the marketplace or actual consumer behavior. Instead, they relied on the Internet survey mentioned earlier, which was commissioned by class counsel. Based on the results of that survey, which sampled fewer than 300 respondents, plaintiffs’ expert, Dr. Jeffrey Harris, postulated that the price of lights would have to be discounted by 77.7%
before consumers would still be willing to buy them, assuming the cigarettes were the same healthwise as their full-flavored counterparts. When the hypothetical was changed to assume that lights might be more harmful than regular cigarettes, Harris’ analysis determined that the amount of the discount would have to be increased to 92.3%. Based on these figures, plaintiffs argued that difference between the hypothetically discounted prices and the prices consumers actually paid showed that consumers had significantly overpaid for PMUSA’s light cigarettes in the false hope that those cigarettes would be healthier for them. In plaintiffs’ view, the difference was equivalent to the value of the perceived health benefit of the lights, and the overpayment was the measure of plaintiffs’ damages.

Professors Robert Solow and George Akerlof, both recipients of the Bank of Sweden Prize in Economic Sciences in Memory of Alfred Nobel, submitted a brief as 
amici curiae
 attesting that the benefit-of-the-bargain rule expressed by our court in 
Gerill Corp. v. Jack L. Hargrove Builders, Inc.
, 128 Ill. 2d at 196, comports with accepted principles of economics. Although they made general statements in support of the basic theoretical and methodological approach taken by Harris, Solow and Akerlof also noted that the “the actual measurement of damages under the applicable legal standard is intrinsically difficult to implement under the facts and circumstances of this case” and that, under those facts and circumstances, “there may be more than one way to measure damages.” One senses from these remarks, and from 
amici
’s lack of elaboration in evaluating plaintiffs’ approach, a certain unease with plaintiffs’ damages calculations. It is no wonder.

Putting aside any questions regarding the scientific validity of the survey on which Harris relied, there is a fundamental flaw in his approach. To understand why, one must first recall the purpose of the
benefit-of-the-bargain rule, which is to compensate the plaintiff for the pecuniary loss occasioned by the defendant’s fraud, that is, for “the amount which the plaintiff is actually out of pocket by reason of the transaction. 19A Ill. L. & Prac. 
Fraud 
§61 (1991). If a plaintiff cannot prove that he was any worse off financially as a result of the defendant’s deceit, his personal feelings of disappointment or dissatisfaction with the transaction are of no consequence. Financial loss is not measured by subjective feelings. It is determined by the choices and values actually available to a consumer in the marketplace. See, 
e.g.
, Restatement (Second) of Torts §549, Comment 
c
, at 110
-
12 (1977) (for purposes of measuring damages in action for fraudulent misrepresentation, value is normally determined by the price for which an item could be resold in an open market or by private sale if its quality or other characteristics that affect its value were known).

The need for objective, market-based standards to prove financial

loss is not being raised here for the first time. It was recognized by defendant’s damages expert and is fatal to the plaintiffs’ damages model. While the Internet survey commissioned for this case may have
shown that survey respondents would have placed a lower subjective value on cigarettes that lacked the health qualities claimed by PMUSA in its marketing of Marlboro Lights and Cambridge Lights, the marketplace demonstrated that, in reality, consumers would not have paid less to satisfy their tobacco habits had the lights’ true properties been known. They would not have stopped smoking, for they were addicted, and they could not have bought cigarettes that cost 77.7% less or 92.3% less, for no such cigarettes existed. At most, they would have reverted back to “full-flavored” versions of the cigarettes.
(footnote: 2)
 Significantly, and as I have already observed, the price charged by PMUSA for such cigarettes, and the price consumers were willing to pay despite the absence of claimed health benefits, was precisely the same as the price charged for “lights.” In marked contrast to the situation with many products aimed at health consciousness, there was no cost differential for consumers between the “healthy” and “regular” versions of the product. Accordingly, while PMUSA’s misrepresentations may have deceived consumers into altering their purchasing decisions, the net change in consumers’ economic position as a result of those misrepresentations was zero. In other words, plaintiffs may not have received the benefit of their bargain, but the bargain (
i.e.,
 obtaining what were thought to be healthier cigarettes than they would otherwise have purchased) cost them nothing extra. In terms of pecuniary harm, plaintiffs were unaffected. Their financial status remained the same. 

This conclusion is not altered by the fact that PMUSA’s light cigarettes were more toxic than the full-flavored versions. The additional toxicity unquestionably had adverse effects on plaintiffs’ health. It bears repeating, however, that health effects are not part of plaintiffs’ damages claim. They are not seeking compensation for personal injury, only pecuniary loss based on their switch to lights in
reliance on PMUSA’s misrepresentations. For purposes of calculating
pecuniary loss, the increased toxicity of lights would be relevant only
if one could show (1) that an alternative cigarette with equally high toxicity levels was available on the market at lower cost than the price
charged for lights and (2) that consumers would have switched to that
lower cost alternative had the truth about lights been known.

The notion that cigarette manufacturers could successfully market
a cigarette known to be more toxic than regulars is inconsistent with
the realties of consumer demand for more healthful products that led to the development of light cigarettes. It is therefore unsurprising that
there is no evidence that a cheaper but more toxic brand of cigarette is actually available for purchase. Given the nature of the class bringing
this suit, that is, smokers interested in a product less harmful to their health, it is also highly unlikely that any of them would change to a different
brand that was more harmful than regulars, even at a reduced price. The testimony of the class representatives certainly does not suggest they would, and plaintiffs’ Internet survey does not speak to the issue.

The Internet respondents were not queried about it. The Internet survey looked to hypothetical conduct assuming that a truly healthier version existed. It did not measure or purport to measure how consumers would actually behave if, as is really the case, there is no truly healthier version.

Having sustained no pecuniary harm, plaintiffs lack the actual economic damages necessary to sustain their cause of action under the Consumer Fraud Act. When the same situation confronted the representative for the putative Illinois class in 
Avery
, we concluded that the deficiency was fatal to his consumer fraud claim (
Avery
, 216 Ill. 2d at 199) and reversed the judgment for plaintiffs outright. We should not hesitate to reach the same conclusion here.

Here, as in 
Avery
, there is no need to remand for a new trial on the damages question. This case does not present a situation in which erroneous rulings by the trial court hampered plaintiffs’ ability to fully present their evidence or theory of recovery. The record is complete, and plaintiffs were given wide latitude in developing their damages claim. Further proceedings would serve no purpose. Plaintiffs’ claim fails as a matter of law. Because they sustained no actual economic damages, no judgment in their favor under the Consumer Fraud Act could ever stand.

Plaintiffs’ consumer fraud claim cannot be revived on the theory
that they might be entitled to an award of nominal damages notwithstanding their inability to show actual damages. Nominal damages
can only be awarded where a plaintiff prevails in a case. As already
discussed, however, a plaintiff cannot sustain a private right of action
under the Consumer Fraud Act unless he or she has sustained actual
damages. Unless all of the elements of the cause of action, including
the element of actual damages, are established, nominal damages cannot
be recovered. See 
Tolve v. Ogden Chrysler Plymouth, Inc.
, 324 Ill. App. 3d 485, 491-92 (2001). The lack of actual damages would therefore preclude plaintiffs from recovering nominal damages even if the case were remanded.
(footnote: 3)
 Similarly, plaintiffs cannot sidestep the lack of actual damages on the grounds that they are nevertheless entitled to an award of punitive damages. Illinois law does not permit an award of punitive damages in the absence of compensatory damages. See 
Lowe v. Norfolk & Western Ry. Co.
, 96 Ill. App. 3d 637, 648 (1981). The Consumer Fraud Act is no exception. Punitive damages are in addition to compensatory damages and cannot be allowed unless actual damage is shown. See 
In re Application of Busse
, 124 Ill. App. 3d 433, 438 (1984). Because plaintiffs sustained no actual damages here, their claim for punitive damages must therefore fail as well. See 
Florsheim v. Travelers Indemnity Co. of Illinois
, 75 Ill. App. 3d 298, 310 (1979).

For the foregoing reasons, I fully concur in the result reached by the majority. Plaintiffs cannot recover under the Consumer Fraud Act, and the circuit court’s judgment awarding them damages under the Act cannot stand. In reaching this conclusion, I hasten to add, as the majority opinion did, that rejection of plaintiffs’ cause of action should in no way be construed as an endorsement of PMUSA’s conduct. Our reversal of the circuit court’s judgment is not an exoneration of PMUSA. It is merely a conclusion that this particular cause of action by this particular group of claimants seeking this particular form of recovery cannot be sustained under the law of Illinois.

JUSTICE FITZGERALD joins in this special concurrence.

JUSTICE FREEMAN, dissenting:

This is a consumer fraud class action brought under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 
et seq.
 (West 1998)) and the Uniform Deceptive Trade Practices Act (Deceptive Practices Act) (815 ILCS 510/1 
et seq.
 (West 1998)). The circuit court found Philip Morris USA (PMUSA) liable for consumer fraud for using the materially false and deceptive terms “lights” and “lower tar and nicotine” in marketing its Marlboro Lights and Cambridge Lights cigarettes. This court reverses the judgment on the basis that the action is barred by section 10b(1) of the Consumer Fraud Act, which exempts conduct “specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.” The court holds that the Federal Trade Commission (FTC), through the use of two “consent orders,” specifically authorized all American tobacco companies to use descriptive terms such as “lights,” or “lowered tar and nicotine” in marketing and promoting cigarettes. Slip op. at 67. Therefore, PMUSA was exempt from civil liability for the use of those terms under section 10b(1) of the Consumer Fraud Act and section 4 of the Deceptive Practices Act. Slip op. at 73.

The court’s action today is predicated upon an erroneous and irresponsible interpretation of our Consumer Fraud Act, an act which I note is to be interpreted so as to give full protection to the citizens of this state against the fraudulent conduct of others. The protection of consumers from unfair practices is, of course, a traditional state police power function. The court’s construction of section 10b(1) serves not only to dilute needlessly the force of our state consumer protection legislation, but to limit unnecessarily our state’s citizens’ consumer protection in this area to a federal agency. For these reasons and because I do not agree that PMUSA was exempt from liability under section 10b(1), I cannot join in the court’s opinion. Rather, I would hold that the FTC did not specifically authorize PMUSA, within the meaning of section 10b(1) of the Consumer Fraud Act, to use the disputed descriptors. I therefore respectfully dissent.

I. Background

Plaintiffs filed their initial complaint on February 10, 2000. In it, they alleged violations of the Consumer Fraud Act and claims of unjust enrichment against PMUSA on behalf of a purported class of Illinois residents who had purchased “Light” cigarettes in Illinois since the introduction of Marlboro Lights in 1971. Plaintiffs claimed that the word “lights” and the phrase “lowered tar and nicotine” were deceptive in that those words led each consumer to believe that he or she would receive lower tar and nicotine from these cigarettes, and that, as a result, smoking them would be less hazardous than smoking regular, full-flavored cigarettes. Plaintiffs alleged that all class members purchased Lights because of a belief that they were less hazardous, and provided health benefits not associated with regular, full-flavored cigarettes, and that no one would have purchased Lights “but for” PMUSA’s “unfair and/or deceptive acts and/or practices.” Plaintiffs sought damages solely for economic loss. Plaintiffs moved for class certification on September 8, 2000. PMUSA opposed the motion, arguing that the plaintiffs failed to satisfy the requirements of the Illinois class action statute, because, 
inter alia
, individual questions of fact predominated over any common issues shared by the purported class members. The circuit court certified the class on February 8, 2001.

Following class certification, PMUSA moved for summary judgment. PMUSA argued that Congress, in enacting the Federal Cigarette Labeling and Advertising Act (Labeling Act) (15 U.S.C. §1331 
et seq.
 (2000)), had specified the warnings that cigarette manufacturers must give to consumers and had expressly prohibited states from requiring additional disclosures. PMUSA also argued that the FTC had adopted the FTC test method to measure tar and nicotine yields and had allowed and encouraged manufacturers to use descriptive terms such as “lowered tar and nicotine” and “lights” so long as those terms were consistent with the FTC method. Any inconsistent state-law duty, PMUSA contended, would conflict with the FTC’s policies regarding tar and nicotine disclosures. For this reason, PMUSA asserted that its conduct as alleged by the plaintiffs was exempt from the Consumer Fraud Act by virtue of section 10(b). Both parties thereafter submitted affidavits of experts on this issue. Plaintiffs’ expert averred that the FTC did not have an official policy which permitted cigarette companies to use these terms. Plaintiffs further maintained that the FTC had not had occasion to ever consider the terms at issue, “lowered tar and nicotine” and “lights” as those descriptors were used by PMUSA in this case, Finding that there were “significant disputes about several material facts which can only be decided at trial,” the circuit court “reserved judgment” on the matter until trial.

At trial, as it was during the pretrial proceedings, it was PMUSA’s position, established through testimony and exhibits, that its use of the terms “lights” and “lowered tar and nicotine” were in compliance with FTC policies. Dr. John Peterman testified as an expert on behalf of PMUSA with respect to the FTC’s relationship to cigarette advertising. The FTC in 1955 established “Cigarette Manufacturing Guides,” which set forth the FTC’s policies on the disclosure of tar and nicotine yields in cigarettes. The Guidelines permitted a manufacturer to make claims regarding tar and nicotine yields only if the manufacturer could substantiate the claims “by competent and scientific proof.” In the late 1950s, scientists began to discern a relationship between exposure to cigarette tar and tumors in laboratory animals. Cigarette manufacturers responded by testing the amount of tar produced by their cigarettes and advertising the results. Each manufacturer used different machines to measure the tar, and confusion ensued. According to Dr. Peterman, in response to the multiple testing systems being used, the FTC developed a uniform testing system for use throughout the country. Tar and nicotine measures could be advertised provided that they were measured according to the FTC’s testing method. Under this testing methodology, a low tar cigarette is a cigarette which had a tar level of 15 milligrams or less. However, the FTC did not enact or adopt any trade regulation rule with respect to cigarette advertising. Indeed, the parties do not dispute the fact that there is not any industrywide formal rulemaking authorizing the use of the disputed descriptors at issue in this case, “lights” and “lowered in tar and nicotine.” Nor do they dispute the fact that the FTC does not have any industrywide formal rule which authorizes or requires cigarette manufacturers to use the terms “light” or “low tar” or any variation thereof. Moreover, it is undisputed that the FTC views what it considers to be a “regulatory” scheme in this area as a “voluntary approach.” See slip op. at 7.

Defendant’s expert, Dr. Peterman, testified that the primary mission of the FTC is to enforce a variety of federal antitrust and consumer protection laws. The FTC is primarily a law enforcement agency, conferred with both investigative and enforcement powers. However, to the best of Dr. Peterman’s knowledge, there was no bureau, section, or other subset of the FTC dedicated to, or even associated with, tobacco regulation. The two primary tools the FTC employs to enforce consumer protection laws are trade regulation rules and enforcement procedures. Trade regulation rules are promulgated though formal notice and comment rulemaking. FTC policy is adopted or approved by the FTC commissioners acting collectively as the commission. Dr. Peterman admitted that an individual FTC commissioner giving a speech discussing FTC policy is not, 
per se
, FTC policy. An FTC staff member cannot create FTC policy.

Dr. Peterman, defendant’s expert, testified that there has never been an FTC trade regulation rule governing cigarette advertising that has been put into effect. In 1964, the FTC formally promulgated a trade regulation rule declaring it an unfair and deceptive practice within the meaning of the FTC Act to fail to prominently disclose, in all cigarette advertising and packaging, that cigarette smoking is dangerous and may cause death from cancer or other diseases. Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8325 (1964). However, in 1965, Congress enacted the federal Labeling Act. This Act, 
inter alia
, vacated the newly promulgated FTC cigarette health warning trade regulation rule. No FTC regulation, document, or official statement has ever regulated “low tar” and “lights” descriptors. Further, the FTC has disavowed any “official” definition of these terms as well as the term involved in this case, “lowered tar and nicotine.” Rather, a cigarette company’s decision to use descriptors such as “light,” or “low tar,” is voluntary; there is no FTC rule requiring or governing their use. A cigarette company could stop using those descriptors, and there is no FTC policy that would prohibit it.

Dr. Peterman did not offer an expert opinion that the FTC has a policy that prohibits states from regulating the term “lights” on cigarettes. Nor did he offer an expert opinion that the FTC has granted cigarette companies the right to use the “lights” and “low tar” descriptors and, thereby, immunize them from state regulation of those descriptors.

In 1970, the FTC proposed a formal trade regulation rule that would have required cigarette companies to disclose in their advertising FTC-measured tar and nicotine content of their cigarettes. See 35 Fed. Reg. 12,671 (proposed August 8, 1970). However, the FTC dropped this proposed order after eight cigarette companies entered into a voluntary trade agreement. Those signatories voluntarily agreed to provide the information on their cigarette packages. See 36 Fed. Reg. 784 (1971). The 1970 voluntary trade agreement was not all-inclusive; not every cigarette company signed the agreement. Those companies that did not sign the agreement have not included tar and nicotine rates in their cigarette advertising. Up to the time of trial, the FTC has taken no enforcement action against those companies.

In 1971, the FTC and a cigarette company, American Brands, Inc., reached an agreement that was memorialized in a consent order. In the 1971 consent order, the FTC charged that American Brands’ advertisements of its cigarettes designated as “Pall Mall Gold” 100s, “Pall Mall Menthol” 100s and “Lucky Filters” was imprecise and misleading because the cigarettes were being described as “lower than the best selling filter king.” In actual fact, however, the FTC found that these brands were higher in tar levels than many other brands. The FTC and American Brands agreed that American Brands’ advertisements which stated that its cigarettes were low in tar must contain the tar and nicotine yield results as measured under the FTC testing methods (the advertisements challenged by the FTC in this action did not contain any tar and nicotine yield results). If American Brands’ advertisements contained a comparison to another product, then the advertisement had to include the tar and nicotine yield of that product as well. 
In re American Brands, Inc.
, 79 F.T.C. 225 (1971).

During the direct examination of defendant’s expert witness, Dr. Peterman, he stated that the 1971 consent order against American Brands, Inc., was “an official act of the FTC.” Further, the order provided “industry guidance to [PMUSA] and others regarding the use of descriptors.” This “guidance” was found in the terms of the order against American Brands. According to Dr. Peterman, nonparties to a consent order, even an entire industry, learn from the order how far it can and cannot go. According to Peterman, the 1971 consent order was exemplary of the FTC intending to provide industrywide guidance with respect to issues addressed in consent orders.

However, on cross-examination, Dr. Peterman qualified his direct examination testimony by admitting that the 1971 consent order did not mention the descriptor “lights.” Also, the consent order did not define the descriptor “low tar,” or establish a numerical standard for that term. This form of “compliance” is a voluntary decision on the part of each cigarette company. It is not a trade regulation rule. Further, PMUSA was never a party to the proceeding and never signed the consent order. Each cigarette company, including PMUSA, and the entire industry collectively, could simply stop using the disputed descriptors if they so chose. Peterman further acknowledged that the FTC has never taken any enforcement action against a cigarette manufacturer of these so-called “light” brands because that manufacturer did not use the word “light” in the brand name. There is no evidence in the record that PMUSA ever complied with this consent order.

In 1995, the FTC and another cigarette company, American Tobacco Company, reached an agreement that was memorialized in a consent order. In the 1995 consent order, the FTC and American Tobacco agreed that “presentation of the tar and/or nicotine ratings of any of respondent’s brands of cigarettes and the tar and/or nicotine ratings of any other brand (with or without an express or implied representation that respondent’s brand is ‘low,’ ‘lower,’ or ‘lowest’ in tar and/or nicotine) shall not be deemed” to violate an existing ban on numerical comparisons. 
In re American Tobacco Co.
, 119 F.T.C. 3 (1995). Dr. Peterman testified that the FTC intended to provide industrywide guidance with respect to issues addressed in the 1995 consent order against American Tobacco Company.

At the conclusion of the trial, the circuit court denied PMUSA’s affirmative defense based upon section 10b(1) of the Consumer Fraud Act. The court specifically found Dr. Peterman’s testimony to be “unpersuasive” on PMUSA’s claim that the issues in this case could potential cause a conflict between state and federal law. Moreover, the court found that Dr. Peterman did not have any “expertise in assessing FTC involvement in regulation of the issues” and that the plaintiffs’ claims in this case did not conflict in any way with the federal Labeling Act or the regulations and policies of the FTC. With respect to the FTC, the court ruled:

“The false and misleading use of the descriptors ‘Lights’ and ‘Lowered Tar and Nicotine’ has never been specifically authorized by law. Philip Morris voluntarily chose to use these terms on its packages of Marlboro Lights and Cambridge Lights. No regulatory body has ever required (or even specifically approved) the use of these terms by Philip Morris. The court finds that Philip Morris has not established that its conduct is ‘specifically authorized’ by law.”

The circuit court further found plaintiffs had proven that PMUSA violated the Consumer Fraud Act through the deceptive act of misrepresenting its Cambridge Lights and Marlboro Lights products as “lights” and misrepresenting Marlboro Lights as “Lowered in Tar and Nicotine.”

II. Section 10b(1) of the Consumer Fraud Act

Section 10b(1) of the Consumer Fraud Act exempts conduct “specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.” 815 ILCS 505/10b(1) (West 1998). PMUSA contends that the FTC’s policies regarding cigarette advertising falls within the scope of the phrase “specifically authorized by laws administered by an regulatory body or officer acting under statutory authority of this State or the United States.” Because PMUSA asserted section 10b(1) as an affirmative defense, PMUSA has the burden of proving it. See 
Pascal P. Paddock, Inc. v. Glennon
, 32 Ill. 2d 51, 54 (1964) (observing “elementary” rule that party asserting affirmative defense has the burden of proving it); 
In re Marriage of Jorczak
, 315 Ill. App. 3d 954, 957 (2000) (same).

After reviewing the plain language of the statute, this court’s case law concerning section 10b(1), and the facts in this case, I am unable to conclude, as the court today does, that section 10b(1) exempts Philip Morris from suit. I believe that a fair reading of the statute compels the conclusion that the policies of the FTC, as presented at trial, do not rise to the level of specific authorization contemplated by our legislature when it enacted the statute.

My colleagues correctly point out that the primary rule of statutory construction is to ascertain and give effect to the intent of the legislature; that the best indicator of legislative intent is the statutory language; that a court gives undefined words their plain and ordinary meaning; and that it is appropriate to use a dictionary to ascertain the meaning of undefined terms. Slip op. at 48-49. I note, however, that the court ignores several other principles of statutory construction. For example, the court does not mention that, in examining a statute’s plain language, “ ‘[t]he statute should be evaluated as a whole, with each provision construed in connection with every other section.’ ” 
Eden Retirement Center, Inc. v. Department of Revenue
, 213 Ill. 2d 273, 291 (2004), quoting 
Paris v. Feder
, 179 Ill. 2d 173, 177 (1997); accord 
In re Detention of Lieberman
, 201 Ill. 2d 300, 308 (2002) (recognizing that “words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute”); 
Huckaba v. Cox
, 14 Ill. 2d 126, 131 (1958); 2A N. Singer, Sutherland on Statutory Construction §46:05 (6th ed. 2000); 73 Am. Jur. 2d 
Statutes
 §165 (2001). Nor does the court acknowledge the fundamental canon of statutory construction which provides that “in determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved.” 
Lieberman
, 201 Ill. 2d at 308.

Section 11a of the Consumer Fraud Act mandates: “This Act shall be liberally construed to effect the purposes thereof.” 815 ILCS 505/11a (West 1998). By virtue, then, of its plain language, courts are mandated to give the Act a liberal construction: “This section provides a clear mandate to Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief to consumers.” 
Totz v. Continental Du Page Acura
, 236 Ill. App. 3d 891, 901 (1992); accord 
American Buyers Club of Mt. Vernon, Illinois, Inc. v. Honecker
, 46 Ill. App. 3d 252, 257 (1977) (expressly referring to statute). Thus, in construing the exemption provided in section 10b(1) of the Act, it is not merely proper for this court to consider, 
inter alia
, the evils sought to be remedied and the purpose to be achieved, but the Act itself affirmatively mandates such consideration. Although the court acknowledges that the Act is to be liberally construed (slip op. at 50), its actual interpretation of section10b(1) is decidedly not a liberal one, as it constricts, rather than expands, the Act’s ambit.

What does “liberal construction” mean?

“Liberal statutory construction signifies an interpretation that produces broader coverage or more inclusive application of statutory concepts. [Citation.] Liberal construction is ordinarily one that makes a statute apply to more things or in more situations than would be the case under strict construction. [Citation.] ‘ “ ‘[L]iberal construction’ means to give the language the language of a statutory provision, freely and consciously, its commonly, generally accepted meaning, to the end that the most comprehensive application thereof may be accorded, without doing violence to any of its terms.” ’ [Citation.]” 
Board of Education of Community Consolidated School District No. 59 v. State Board of Education
, 317 Ill. App. 3d 790, 795 (2000).

Accord 
Smith v. Stevens
, 82 Ill. 554, 556 (1876) (observing that statute “is emphatically a remedial act, and, in accordance with a well established canon, it must receive a liberal construction, and made to apply to all cases which, by a fair construction of its terms, it can be made to reach”); 3 N. Singer, Southerland on Statutory Construction §58:2, at 88 (6th ed. 2001); 73 Am. Jur. 2d 
Statutes
 §179 (2001). Thus, section 11a of the Consumer Fraud Act actually directs courts to employ judicial construction to supply gaps in the statutory language, in order to afford broader coverage or a more inclusive application. 
Bank One Milwaukee v. Sanchez
, 336 Ill. App. 3d 319, 321-22, 324 (2003); 
Hurlbert v. Cottier
, 56 Ill. App. 3d 893, 896 (1978).

In this case, however, rather than using judicial construction to effectuate expansive coverage of the Consumer Fraud Act, the court employs arduous judicial construction to establish limitations on the reach of the Act. The court breaks down the statutory term “specifically authorized by laws administered by” and, with the aid of a dictionary, separately and in a vacuum defines the word “specific” and the word “authorize.” Slip op. at 49. Based on this dissection, the court speculates that the legislature “must have intended” the phrase “laws administered by” to require deference to agency policy and practice. Slip op. at 49-50. I disagree with this interpretation. Courts have long recognized that ascertaining legislative intent is not always properly accomplished by mechanically applying the dictionary definitions of individual words and phrases. See, 
e.g.
, 
Whelan v. County Officers’ Electoral Board
, 256 Ill. App. 3d 555, 558 (1994). As Judge Learned Hand observed:

“Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing ***. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish ***.” 
Cabell v. Markham
, 148 F.2d 737, 739 (2d Cir. 1945).

 The court’s tortured construction of section 10b(1) ignores the rule that statutes are to be construed as a whole, and the fact that expansive construction of the Act comes from the Act itself.

Even more disturbing than the dissection of the statutory language of section 10b(1) is the court’s speculation as to the “apparent legislative intent.” Slip op. at 50. The court states that section 10b(1):

“serves to channel objections to agency policy and practice into the political process rather than into the courts. [Citations.] Parties who desire to bring about change in agency policies or rules can take their complaints to the agency itself and can participate in the formal rulemaking process. If their concerns are not addressed by the agency, they may seek assistance from their legislators and may use the political process, including the power of the ballot box, if their voices are not heard.” Slip op. at 50-51.

This statement is a brazen usurpation of the power of the legislature. Not only does it completely ignore the statutorily mandated expansive construction of the Act, but it injects the court’s own preferred public policy into this statutory provision without any basis in law or fact.

Such an expansive reading of section 10b(1) flies in the face of the plain language of the Act read as a whole. First, as I have explained, the plain language of section 11a mandates an expansive construction. 815 ILCS 505/11a (West 1998). Second, the plain language of section 10b(1) exempts conduct “specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.” 815 ILCS 505/10b(1) (West 1998). Accepting that this plain language is “the most reliable indicator of the legislature’s objectives” in enacting the Consumer Fraud Act (
Michigan Avenue National Bank v. County of Cook
, 191 Ill. 2d 493, 504 (2000)), it is clear that the legislature would not consider PMUSA’s conduct exempt under section 10b(1). The record simply does not establish that the FTC’s regulatory activity constituted “specific authorization” for PMUSA to use the disputed descriptors, 
i.e.
, “Lights,” and “lowered tar and nicotine,” in marketing Marlboro Lights or Cambridge Lights.

Further, section 10b(1) pf the Consumer Fraud Act lists 
exemptions
 from the otherwise expansive and inclusive reach of the Act. Because of this, I believe that the court’s expansive reading of section 10b(1), an exception to the Consumer Fraud Act, not only flies in the face of the plain language of the Act mandating an expansive construction, but also ignores another rule of statutory construction: exceptions in a statute, being designed to qualify or limit what is declared in the body of an act, should be strictly construed. 
Mid-South Chemical Corp. v. Carpentier
, 14 Ill. 2d 514, 519 (1958) (and cases cited therein); see 
People v. Chas. Levy Circulating Co.
, 17 Ill. 2d 168, 171 (1959); 82 C.J.S. 
Statutes
 §371 (1999). “
Where a general rule is established by statute with exceptions, the court ordinarily will not curtail the former or add to the latter by implication
.” (Emphasis added.) 82 C.J.S. 
Statutes
 §371, at 496-97 (1999). I note that “[t]hese rules are particularly applicable where, in general, the law itself is entitled to a liberal construction.” 73 Am. Jur. 2d 
Statutes
 §212, at 402 (2001). Courts may give apparently plain words a restrictive meaning if such is understood by the statute as a whole, or by the persuasive gloss of legislative history. 
United States v. Witkovich
, 353 U.S. 194, 199, 1 L. Ed. 2d 765, 769, 77 S. Ct. 779, 782 (1957); 
Whelan
, 256 Ill. App. 3d at 558; 
Fleischer v. Board of Community College District No. 519
, 128 Ill. App. 3d 757, 760 (1984). The court’s disregard for the combination of the statutorily mandated expansive and inclusive construction of the Consumer Fraud Act, and the well-settled rule of statutory construction that exceptions in statutes are to be strictly construed, fatally undercuts the persuasiveness of its statutory construction.

The court holds that “the FTC’s informal regulatory activity, including the use of consent orders, comes within the scope of section 10b(1)’s requirement that the specific authorization be made ‘by laws administered by’ a state or federal regulatory body.” Slip op. at 61. However, neither the court’s lengthy discussion of FTC policy and practice nor the court’s citations to our case law establish that the FTC’s regulatory activity constituted “specific authorization” for PMUSA to use the disputed descriptors in marketing Marlboro Lights or Cambridge Lights.

The court correctly observes that our past decisions “make it clear that mere compliance with applicable federal regulations is not necessarily a shield against liability under the Consumer Fraud Act.” Slip op. at 52. My colleagues, in fact, devote several pages of their analysis to discussing some of this court’s decisions involving section 10b(1). Slip op. at 51-56 (discussing 
Lanier v. Associates Finance, Inc.
, 114 Ill. 2d 1 (1986), 
Martin v. Heinold Commodities, Inc.
, 163 Ill. 2d 33 (1994), and 
Jackson v. South Holland Dodge, Inc.
, 197 Ill. 2d 39 (2001)). None of these cases, however, support the court’s holding in this case.

In 
Lanier
, for example, the issue was whether the “specific authorization” requirement of section 10b(1) was found in a Federal Reserve Board staff interpretation of a federal regulation. This court explained as follows:

“The Truth in Lending Act was enacted by Congress to assure meaningful disclosure of credit terms, so that consumers can readily compare various credit options available to them. [Citation.] Congress granted the Federal Reserve Board the authority to prescribe regulations to carry out the purposes of the Truth in Lending Act. [Citation.] Pursuant to that authority, 
the Board enacted a comprehensive set of rules, known as Regulation Z 
[citation]
, implementing the principles of the Truth in Lending Act.
” (Emphasis added.) 
Lanier
, 114 Ill. 2d at 11.

In 1973, the Federal Reserve Board staff issued an “official interpretation” of Regulation Z. 
Lanier
, 114 Ill. 2d at 12. This court further explained:

“Although not binding upon the courts, the Federal Reserve Board’s formal interpretations are entitled to a great degree of deference. This deference is especially appropriate in interpreting the Truth in Lending Act and the Board’s own Regulation Z. [Citation.] The Supreme Court has stated that ‘[u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or regulation [Z] should be dispositive.’ [Citations.]” 
Lanier
, 114 Ill. 2d at 13.

The 
Lanier
 court explained as follows. The Federal Reserve Board is the agency that Congress empowered to prescribe implementing and interpretive regulations for the Truth in Lending Act. Therefore, the Board is entitled to the greatest respect in the interpretation of its own regulations. Further, it is unimportant that “formal interpretations” are issued by Federal Reserve Board staff rather than the Board itself, because judicial deference is based on agency expertise. Moreover:

“Congress included compliance with official staff interpretations when it absolved creditors from liability under the Truth in Lending Act for ‘any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations.’ (15 U.S.C. sec. 1640(f) (1980).) Section 1640 evinces a clear congressional determination to treat the Board’s administrative interpretations under the Truth in Lending Act as authoritative.” 
Lanier
, 114 Ill. 2d at 13-14.

The 
Lanier
 court concluded that the disclosure required by the Board’s staff interpretation of Regulation Z implicitly provided “specific authorization” not to make any additional disclosures. 
Lanier
, 114 Ill. 2d at 17-18.
(footnote: 4)
 The clarity and strength of the agency regulation in 
Lanier
 stands in marked contrast to the implicit and uncertain methodology of the FTC in this case. 
Lanier
 involved a formal staff interpretation of an agency’s formally promulgated regulation. Indeed, the enabling legislation recognizes such a staff interpretation. In this case, the FTC has never promulgated any industrywide formal rule that regulates the use of the disputed descriptors. There is no formal rule to interpret, either formally or informally. The evidence adduced at trial established that, rather than employ even informal rulemaking, the FTC took a “voluntary approach” to regulating the cigarette industry. Dr. Peterman acknowledged that the FTC, generally, does not adopt trade rules that approve conduct that an FTC-regulated business may choose to engage in. Rather, the FTC adopts regulations that require or forbid specific conduct. Regarding cigarettes, the FTC has never promulgated a single trade regulation governing cigarette advertising that has ever been in effect. No FTC regulation, document, or official statement has ever regulated “low tar” and “lights” descriptors. Further, the FTC has disavowed any “official” definition of these terms. Rather, a cigarette company’s decision to use descriptors such as “light,” or “low tar,” is voluntary; there is no FTC rule requiring their use. A cigarette company could stop using those descriptors and there is no FTC policy that would prohibit it. Indeed, Dr. Peterman admitted that if “light” cigarettes delivered the same level of tar and nicotine as “regular” cigarettes, the “light” descriptor would be false and misleading.

In its opinion, the court describes a 1970 FTC proposal that would have declared it an unfair or deceptive practice under the FTC Act for cigarette manufacturers to fail to disclose in their advertising the tar and nicotine content of the product, based on the most recent FTC test results. Slip op. at 7. The court notes that this proposal was dropped after eight cigarette companies voluntarily agreed to provide the information on their cigarette packages. Slip op. at 7. The court, however, fails to observe that, during his cross-examination, Dr. Peterman recognized that the 1970 trade agreement was not all-inclusive. In other words, not every cigarette company signed the agreement. Further, those companies who did not sign the agreement have not included tar and nicotine rates in their cigarette advertising. Indeed, up to the time of trial, the FTC has taken no enforcement action against those companies.

Unwilling to allow the FTC’s lack of definitive regulations in the area of cigarette advertising to control the question of the application of section 10b(1) to this case, the court holds that two consent orders entered into by the FTC and another tobacco producer constitute the type of regulatory activity that falls within the scope of section 10b(1). The majority opinion describes the background to the 1971 consent order against American Brands (slip op. at 8-11) and the 1995 consent order against American Tobacco (slip op. at 19-20).

During his direct examination, Dr. Peterman, defendant’s expert, testified that the 1971 FTC consent order against American Brands, Inc., was “an official act of the FTC.” Further, the order provided “industry guidance to [PMUSA] and others regarding the use of descriptors.” This “guidance” was found in the terms of the order against American Brands. According to Dr. Peterman, nonparties to a consent order, even an entire industry, learn from the order how far it can and cannot go. According to Peterman, the 1971 consent order was exemplary of the FTC intending to provide industrywide guidance with respect to issues addressed in consent orders.

However, the 1971 consent order did not mention the descriptor “lights.” Nor did it concern the disputed descriptor in this case, “lowered tar and nicotine.” The consent order did not define the descriptor “low tar,” or establish a numerical standard for that term. Peterman testified that this form of “compliance” is a voluntary decision on the part of each cigarette company. It is not a trade regulation rule. Peterman acknowledged that PMUSA was never a party to the proceeding and never signed the consent order. Each cigarette company, including PMUSA, and the entire industry collectively, could simply stop using the disputed descriptors if they so chose. Peterman further acknowledged that the FTC has never taken any enforcement action against a cigarette manufacturer of these so-called “light” brands because that manufacturer did not use the word “light” in the brand name. There is no evidence in the record that PMUSA ever complied with this consent order.

Dr. Peterman also testified that the FTC intended to provide industrywide guidance with respect to issues addressed in the 1994 consent order against American Tobacco Company. However, as with the 1971 consent order, the 1994 consent order did not mention the descriptor “lights.” Also, it did not define the descriptor “low tar,” or establish a numerical standard for that term. Indeed, the two consent orders upon which PMUSA relies were not directed at it, but at other parties. This is the issue: whether PMUSA’s conduct was “specifically authorized” by the two FTC consent orders directed at other parties: American Brands, Inc., and American Tobacco Company. See slip op. at 57. I observe that Dr. Peterman did 
not
 offer an expert opinion that the FTC has granted cigarette companies the right to use “light” or “low tar” descriptors and immunize them from state regulation of those descriptors.

Further proof as to the lack of regulatory action with respect to the disputed descriptors can be found in Dr. Peterman’s testimony. The FTC, in 1997, asked for comments as to whether the use of the disputed descriptors “should be changed or in any way are potentially misleading.” According to Peterman, “that investigation remained open as of the date of his testimony.” Slip op. at 33. Given that the record evidence establishes that the FTC’s position on the use of the descriptors “remained open,” it is difficult to understand how the FTC’s activities in this area can be deemed to be “specific authorization” of anything.

In light of the above, I believe the regulatory action present in this case is much less specific than the regulatory action taken by the Federal Reserve Board with respect to Regulation Z in 
Lanier. Lanier
, therefore, is distinguishable from and, contrary to, not consistent with, the court’s conclusion in this case. 
Jackson
 is likewise distinguishable from the court’s holding in this case.

Unlike my colleagues in the majority, I do not believe that the Illinois General Assembly intended that such “implicit” and “uncertain” (see slip op. at 59) methods of agency action, such as consent orders, directed at other parties, constitute the “specific authorization” required in section 10b(1) to exempt conduct from the broad coverage of the Consumer Fraud Act. I note that the court refers to a 1964 FTC Statement that offers “ten reasons why a formal rulemaking proceeding may be preferable to an adjudicative proceeding, or a series of adjudicative proceedings.” Slip op. at 58. While not condemning the use of agency adjudicative proceedings to establish agency policy, the court’s own quotations clearly evince a FTC preference for formal rulemaking. Slip op. at 58-59. Given the agency’s own preference for formal rulemaking, it is not unreasonable for our legislature to have likewise had this understanding of administrative law in mind in enacting section 10b(1) as an exception to the expansive reach of the Act.

Further, while an agency has the discretion to use adjudicatory proceedings to announce a sectorwide substantive principle or standard of conduct, it must be remembered that the consent orders upon which PMUSA relies are not directed at PMUSA. The court reasons:

“The FTC’s 
observation
 that adjudication 
could
 be used to announce ‘a substantive principle or standard of conduct having general application’ 
suggests
 that a consent order 
may
 serve as authorization for nonparties to the order to follow its directives.” (Emphases added.) Slip op. at 59.

This reasoning, by its own terms, is based on mere conjecture and suggestion. The proof to which the court points in support of this conclusion–two FTC reports to Congress (slip op at 61)–is, in my opinion, insufficient to show that these two consent orders establish sectorwide policy. I view these reports as the FTC describing its efforts to obtain voluntary compliance with the two consent orders. 
Negotiations to obtain voluntary compliance from individual parties do not equate with announcing an industrywide substantive principle or standard of conduct.

Federal courts share my view of consent orders. An administrative consent order is an agreement reached in an administrative proceeding between parties, one of which is usually the agency’s litigation staff. If the agency accepts the agreement, the agency issues an order as a court issues a consent decree. 
A.R. ex rel. R.V. v. New York City Department of Education
, 407 F.3d 65, 77 n.12 (2nd Cir. 2005) (and authorities cited therein). While the interpretation of a statute by the agency charged with its administration is accorded deference, a consent order simply memorializes an agreement of the parties to end litigation upon certain terms. An unsubstantiated assertion of a legal proposition in an administrative consent order is untested in the adversarial crucible. It reflects nothing more than the drafting or view of an agency staff member that has not been considered carefully by the agency itself. “Hence, it is not necessarily reliable evidence of an agency’s considered view of the issue.” 
Commodity Futures Trading Comm’n v. Hanover Trading Corp.
, 34 F. Supp. 2d 203, 206 n.19 (S.D.N.Y. 1999).

Continuing with the accepted analogy between administrative consent orders and judicial consent decrees, it is clear that the 1971 and 1995 FTC orders cannot be considered to have industrywide legal force. The United States Supreme Court has explained:

“Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the 
decree
 itself cannot be said to have a purpose; rather the 
parties
 have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.” (Emphases in original.) 
United States v. Armour & Co.
, 402 U.S. 673, 681-82, 29 L. Ed. 2d 256, 263, 91 S. Ct. 1752, 1757 (1971).

Thus, a court has no authority to expand or contract a consent order’s terms to reflect “what might have been.” 
Willie M. v. Hunt
, 657 F.2d 55, 60 (4th Cir. 1981).

This authority demonstrates that it is simply incorrect for the court to refer to the 1971 and 1995 consent orders as establishing FTC policy. Only the FTC commissioners can formally adopt policy. The FTC staff members who drafted the consent orders cannot make agency policy. Further, the orders have not been subjected to adversarial testing. The 1971 and 1995 consent orders must be viewed only as what they are: two private agreements between the FTC and individual cigarette companies without industrywide force of law.

It is clear from the long history of FTC regulation of the cigarette industry, as described in the court’s opinion, that consent orders are economic, 
i.e.
, they are not based on substantive law. The cases before the FTC are filed as a result of competitors complaining one against the other. They are simply administrative and are not binding authority. At most they may be persuasive to other participants in the industry. Indeed, in Part I(A) of the court’s opinion (“History of FTC Regulation of the Cigarette Industry”), the court mentions 
Federal Trade Comm’n v. Brown & Williamson Tobacco Corp.
, 778 F.2d 35, 37 (D.C. Cir. 1985), which I believe to be instructive on this point. Slip op. at 14-15. In 
Brown & Williamson
, the manufacturer claimed that its Barclay brand of cigarettes contained 1 milligram of tar. Brown & Williamson’s competitors complained that the design of the Barclay filter caused it to register very low tar measurements. Publishing its findings, the FTC determined that the Barclay claim was false and deceptive. The FTC attempted to require Brown and Williamson to state a higher tar content. Brown & Williamson refused and retained the 1 milligram claim, but voluntarily qualified the claim. The FTC thereafter sought an injunction to prevent such advertising. 
Brown & Williamson
, 778 F.2d at 37-38. Even after making published findings, the FTC nonetheless had to resort to a court order to enforce compliance. In my view, this demonstrates why the FTC’s “voluntary” compliance scheme cannot equate to formal agency rulemaking.

Despite the uncertain nature of FTC involvement in this area, the court today concludes that the FTC’s “informal regulatory activity, including the use of consent orders,” satisfies the requirement of section 10b(1) (slip op. at 61) and has the force of law. I very much doubt, however, that a federal court would regard the FTC consent orders as “law” in the context of section 10b(1). For example, in 
Wabash Valley Power Ass’n v. Rural Electrification Administration
, 903 F.2d 445 (7th Cir. 1990), the Seventh Circuit Court of Appeals was presented with the issue of whether a letter from a federal agency to the regulated business was sufficient for federal preemption. The court held that it was not. The court recognized that to preempt state authority, the agency was required to establish rules with the force of law, and that regulations adopted after notice and comment rulemaking have the effect of law. 
Wabash Valley Power
, 903 F.2d at 453-54. However, the court recognized that the agency sent the regulated business a letter. “There was no notice, no opportunity for comment, no statement of basis, no administrative record, no publication in the Federal Register–none of the elements of rulemaking under the [Administrative Procedure Act]. 5 U.S.C. §553.” 
Wabash Valley Power
, 903 F.2d at 454 (collecting cases). The court concluded: “Procedural shortcomings prevent giving this letter the force of law.” 
Wabash Valley Power
, 903 F.2d at 454.

In the present case, as in 
Wabash Valley Power
, the FTC has never promulgated an industrywide formal rule. Just as the agency letter in 
Wabash
 was not based on a formal rule, the two consent orders in this case are not based on any formal rule. If the letter in 
Wabash Valley Power
 cannot be considered as “law” as a matter of federal law, then there is no basis for concluding that the consent orders constitute “laws” administered for the purposes of section 10b(1).

As a final matter, the court, in its opinion, “note[s] with great interest” (slip op at 65) a decision by the United States District Court for the Eastern District of Arkansas. 
Watson v. Philip Morris Cos., Inc.
, No. 4:03–CV–519 GTE (E.D. Ark., December 12, 2003), 
aff’d
, 420 F.3d 852 (8th Cir. 2005), involved an Arkansas consumer fraud class action, which charged Philip Morris with the same fraudulent misconduct as in this case. Philip Morris removed the cause from Arkansas state court to federal court pursuant to 28 U.S.C. §1442(a)(1) (2000), which provides for removal where a person is sued for actions taken under the direction of a federal officer. Philip Morris claimed that it satisfied the requirements of the federal officer statute “because it was acting under the direct control of the [FTC] when it engaged in the allegedly unlawful conduct.” 
Watson
, 420 F.3d at 854.

A key requirement for federal removal jurisdiction is that the defendant act under the direction of a federal officer.

“ ‘[R]emoval by a “person acting under” a federal officer must be predicated upon a showing that the acts ... were performed pursuant to an officer’s direct orders or to comprehensive and detailed regulations.’ 
Virden v. Altria Group, Inc.
, 304 F. Supp. 2d 832, 844 (N.D. W. Va. 2004) (quoting 
Ryan v. Dow Chem. Co.
, 781 F. Supp. 934, 947 (E. D. N.Y. 1992)). Mere participation in a regulated industry is insufficient to support removal unless the challenged conduct is ‘closely linked to detailed and specific regulations.’ 
Virden
, 304 F. Supp. 2d at 844.” 
Watson
, 420 F.3d at 857.

The model cases in which private actors have successfully removed cases to federal court under the statute have involved: government contractors with limited discretion; Medicare program contractors because they serve as agents of the federal government; and private actors whose functions are so intertwined with the federal government that they are considered effectively to be federal employees. 
Virden v. Altria Group, Inc.
, 304 F. Supp. 2d 832, 845 (N.D. W. Va. 2004) (and cases cited therein). “Removal under §1442(a)(1) will not be permitted if the defendant cannot establish direct and detailed control but only that the relevant acts occurred under the general auspices of a federal officer, as would be the case, for example, if the defendant were simply a participant in a regulated industry.” 
Paldrmic v. Altria Corporate Services, Inc.
, 327 F. Supp. 2d 959, 966 (E.D. Wis. 2004).

The district court in 
Watson
 reasoned that the FTC often regulates industries within its purview by compelling voluntary agreements and consent orders rather than by promulgating formal regulations. See slip op. at 66. Further, the district court stated that “the FTC coerced Philip Morris and other cigarette manufacturers into ‘voluntary’ cooperation with its cigarette labeling and advertising policies ‘in such a way that a formal rule’ was not required to create federal jurisdiction.” See slip op. at 66-67. The court of appeals agreed with the district court’s view of the record: “We are convinced that the record in this case shows a level of compulsion that establishes that Philip Morris was indeed ‘acting under’ the direction of a federal officer.” 
Watson
, 420 F.3d at 859. Regarding the 1970 voluntary agreement: “The FTC effectively used its coercive power to cause the tobacco companies to enter the agreement. *** This ‘voluntary agreement’ was a substitute for a formal rule.” 
Watson
, 420 F.3d at 859. Regarding the consent orders, the court of appeals opined that the consumer fraud class action “directly implicates the enforcement and wisdom of the FTC’s tobacco policies” as explained in the 1971 consent order. 
Watson
, 420 F.3d at 862.

In this case, the court concludes:

“The issue addressed by the 
Watson
 court–whether removal to federal court was proper–has no bearing on the present case. However, the federal district court’s detailed analysis does support our conclusion that specific authorization for the use of the disputed descriptors may be found in consent orders rather than in formally promulgated trade regulation rules of the FTC.” Slip op. at 67.

I respectfully disagree.

I note with great interest that removal actions “have been brought in other jurisdictions, and courts have generally declined to permit Philip Morris to remove, concluding that the FTC did not exercise direct and detailed control over the acts for which it was being sued.” 
Paldrmic
, 327 F. Supp. 2d at 966. Indeed, the federal district courts in 
Paldrmic
 and 
Virden
 candidly acknowledged the contrary holding of the district court in 
Watson
. 
Paldrmic
, 327 F. Supp. 2d at 966 n.2; 
Virden
, 304 F. Supp. 2d at 846. Likewise, the court of appeals in 
Watson
 candidly acknowledged the contrary holding of the district courts. 
Watson
, 420 F.3d at 857-59. Although the district court’s reasoning in 
Watson
 was affirmed on appeal, 
Watson
 was the only district court to hold that the FTC “regulated” the use of the disputed descriptors to such a degree as to qualify for federal officer removal jurisdiction.

The 
Virden
 and 
Paldrmic
 courts recognized that Philip Morris has never acted as an agent or an employee of the federal government. 
Virden
, 304 F. Supp. 2d at 846. “At most, it [Philip Morris] is a private corporation doing business in a regulated industry.” 
Paldrmic
, 327 F. Supp. 2d at 968. Indeed, in the court of appeal’s decision in 
Watson
, a member of that panel concurred “to emphasize that our decision today should not be construed as an invitation to every participant in a heavily regulated industry to claim that it, like Philip Morris, acts at the direction of a federal officer merely because it tests or markets its products in accord with federal regulations.” 
Watson
, 420 F.3d at 863 (Gruender, J., concurring). The concurring judge believed that “in most instances, a contract, principal-agent relationship, or near-employee relationship with the government will be necessary to show the degree of direction by a federal officer necessary to invoke removal under 28 U.S.C. §1442(a)(1).” 
Watson
, 420 F.3d at 863 (Gruender, J., concurring). However, because the concurring judge viewed the level of FTC regulation of the cigarette industry as “extraordinary,” he opined that “this is a rare case in which federal officer jurisdiction is appropriate even in the absence of a contract, principal-agent relationship, or near-employee relationship with the government.” 
Watson
, 420 F.3d at 864 (Gruender, J., concurring).

However, as the 
Virden
 court concluded: “The indicia of federal control present in cases finding federal officer removal jurisdiction are wholly lacking here.” 
Virden
, 304 F. Supp. 2d at 846. In 
Paldrmic
, the court found that Philip Morris did not establish that its use of the disputed descriptors “was mandated by the FTC.” 
Paldrmic
, 327 F. Supp. 2d at 966. Both courts focused on the voluntary nature of the 1970 agreement. According to the 
Virden
 court, “the most that can be said is that the FTC has been impliedly regulating the tobacco industry through its tacit acceptance of a voluntary private agreement made thirty years ago.” 
Virden
, 304 F. Supp. 2d at 846. The 
Paldrmic
 court reasoned: “while it may be true that the cigarette companies preferred an agreement to a regulation, the fact remains that they entered into the agreement voluntarily.” 
Paldrmic
, 327 F. Supp. 2d at 966. These courts, therefore, reasoned:

“On some level the FTC clearly has coercive control over the tobacco companies’ tar and nicotine advertising based on its power to regulate deceptive advertising. However, in this Court’s opinion, neither the right to control, nor the threat of taking control, constitutes the direct and detailed control required for the application of federal officer removal jurisdiction.” 
Virden
, 304 F. Supp. 2d at 846-47.

See 
Paldrmic
, 327 F. Supp. 2d at 966.

I disagree with the reasoning in 
Watson
, on which the court relies, and agree with the better-reasoned decisions such as 
Paldrmic
 and 
Virden
.

In light of the above, I believe that a proper statutory construction analysis leads to the conclusion opposite to that reached by the majority. The analysis must begin with our Consumer Fraud Act, viewed as a whole. Its plain language mandates expansive coverage and the use of judicial construction to effectuate that mandate. Section 10b of the Consumer Fraud Act exempts from the Act conduct “specifically authorized by laws administered by” Illinois or federal regulatory bodies. In this case, the two consent orders upon which PMUSA relies, directed at other parties, did not establish an industrywide standard of conduct for PMUSA. Stated simply, PMUSA did not carry its burden in proving the existence of this affirmative defense.

Further, 
regardless of
 how the FTC views the role of consent orders in industrywide rulemaking, for purposes of the Consumer Fraud Act, including section 10b(1), a court may not 
expand
 the exemption of section 10b(1) by implication. I do not believe that the consent orders in this case are sufficient to “specifically authorize” PMUSA’s use of the disputed descriptors, so as to exempt that conduct from the statutorily mandated expansive scope of the Consumer Fraud Act.

III. Damages

Although I could end my dissent here, I feel compelled to address the special concurrence’s suggestion that reversal is warranted for a “more basic reason” than section 10b(1). The special concurrence claims that plaintiffs failed to establish that they sustained actual damages and suggests the absence of actual damages is an alternate basis for the result the majority reaches. The special concurrence applies the wrong measure of damages, however, to plaintiffs’ consumer fraud claim. A proper application of the law to the facts at issue leads to the conclusion that the alternate basis suggested by the special concurrence is lacking in merit.

The special concurrence begins with a frank assessment of the deceptive practices employed by PMUSA in promoting its cigarette products:

“The record in the case before us shows that PMUSA developed and marketed Marlboro Lights and Cambridge Lights cigarettes in response to heightened public concern over health risks posed by smoking. The company believed that it could forestall declining sales by offering a product which consumers perceived as better for them than conventional ‘full-flavored’ brands. Pursuant to that strategy, PMUSA advertised Marlboro Lights and Cambridge Lights cigarettes in a way that led consumers to believe that the brands posed a lower health risk than their ‘full flavored’ counterparts. In reality, and as PMUSA was fully aware, the so-called ‘light’ cigarettes not only offered no health benefits, but were actually more toxic.” Slip op. at 75-76 (Karmeier, J., specially concurring, joined by Fitzgerald, J.).

The special concurrence further comments, “When a consumer chooses one product over another in the belief that it will be less harmful to his or her health, only to discover later that it may have been more harmful, the existence of damages might seem self-evident.” Slip op. at 76 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). The “self-evident” nature of the damages, however, hardly gives pause to the special concurrence in its quest to prove that plaintiffs failed to establish actual damages.

The special concurrence notes that class representative Sharon Price “continued smoking PMUSA’s light cigarettes even after this litigation alerted her to the fact that the cigarettes were not, in fact, any healthier and may actually be more harmful than the regular version of those cigarettes.” Slip op. at 77 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). Additionally, the special concurrence notes that “[n]ews that PMUSA’s low tar and light representations were illusory” did not deter class representative Michael Fruth “from continuing to smoke, although he testified that he did switch back from lights to regulars.” Slip op. at 77 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). From these observations, the special concurrence concludes:

“Whatever valuation the class representatives may have placed on the health component of light cigarettes, that valuation had no observable economic consequences. Neither Price nor Fruth offered any testimony suggesting that switching from regulars to lights resulted in their paying any more for cigarettes than they would have otherwise. There was no price disparity between light cigarettes and their full-flavored counterparts, and there is no indication that the switch from regulars to lights caused them to buy more packages of cigarettes. The price they paid did not go up. The quantity they purchased did not increase.
[
(footnote: 5)]
 No additional ancillary or incidental costs were identified. Moreover, neither Price nor Fruth complained that the cigarettes were not worth what they paid for them. To the contrary, Price’s continued purchase of lights even after being alerted to their lack of health benefits suggests that she was entirely satisfied with the value of what she received for her cigarette-purchasing dollar.” Slip op. at 77 (Karmeier, J., specially concurring, joined by Fitzgerald, J.).

Having explained that the class representatives did not sustain damages because they continued to smoke after learning the true nature of light cigarettes, the special concurrence makes a similar argument regarding smokers and class members in general. The special concurrence recognizes that the Knowledge Network Survey respondents placed a “lower subjective value on cigarettes that lacked the health qualities claimed by PMUSA in its marketing of Marlboro Lights and Cambridge Lights.” Slip op. at 80 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). However, the special concurrence maintains that real world “consumers would not have paid less to satisfy their tobacco habits had the lights’ true properties been known.” Slip op. at 80 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). According to the special concurrence, “consumers would not have stopped smoking, for they were addicted, and they could not have bought cigarettes that cost 77.7% less or 92.3% less,
[
(footnote: 6)]
 for no such cigarettes existed. At most, they would have reverted back to ‘full-flavored’ versions of the cigarettes.” Slip op. at 80 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). Since the price of light cigarettes and regular cigarettes were the same at all times, the special concurrence concludes that “while PMUSA’s misrepresentations may have deceived consumers into altering their purchasing decisions, the net change in consumers’ economic position as a result of those misrepresentations was zero.” Slip op. at 80 (Karmeier, J., specially concurring, joined by Fitzgerald, J.).

The special concurrence’s analysis, as it applies to both the class representatives and to the members of the class, suffers from a fundamental misunderstanding of the measure of damages in an action that is based upon a fraudulent misrepresentation made by a defendant. This court’s opinions in 
Drew v. Beall
, 62 Ill. 164 (1871), and 
Gerill Corp. v. J. L. Hargrove Builders
, 128 Ill. 2d 179 (1989), are particularly instructive. In 
Drew
, the plaintiff traded a house and lot in Dixon, Illinois, in return for acreage in Missouri and the sum of $800. The plaintiff charged that the defendant had made certain misrepresentations concerning the Missouri land. The defendant sought to limit the plaintiff’s damages, arguing the proper measure of damages was the value of the house and lot in Dixon, less the $800, and less the actual value of the land in Missouri. The defendant maintained that this would restore the plaintiff to the condition he was in before the exchange of property. On appeal, the defendant argued the trial court should have allowed the jury to hear testimony regarding the value of the house and lot in Dixon. This court disagreed, holding that the proper measure of damages was “the difference between the actual value of the land and the value of such a tract of land as defendant’s land was represented to be, and the value of the Dixon house and lot was not properly involved.” 
Drew
, 62 Ill. at 168. The court reasoned that the “parties had, by their agreement fixed an estimate and value upon the property which each sold and transferred to the other, and it was not for the jury to make a new contract for them, or fix a new price upon the plaintiff’s property for them. The plaintiff was entitled to the benefit of his bargain.” 
Drew
, 62 Ill. at 168.

The court in 
Drew
 thus sharply distinguished between the benefit-of-the-bargain rule for the measure of damages in cases of fraud and deceit and the out-of-pocket rule measure of damages.
(footnote: 7) The plaintiff in a fraud and deceit case is not merely entitled to be placed in the condition he was in before the bargain was made. He is entitled to the benefit of his bargain. Moreover, the courts will not rewrite the plaintiff’s bargain by assigning a different price to an item than what the plaintiff and defendant originally agreed to.

In 
Gerill
, 128 Ill. 2d at 179, Gerill Corporation and Jack L. Hargrove Builders, Inc., had formed a joint venture to develop land owned by Gerill in Woodridge, Illinois. Eventually, the parties approached John Rosch with the proposition that Rosch purchase Hargrove’s interest in the joint venture. Rosch purchased Hargrove’s interest after reviewing a 19-page handwritten list of the joint venture’s outstanding loans and open invoices prepared by Hargrove. Upon consummation of the sale, Rosch’s accountant discovered that Hargrove had misrepresented the joint venture’s liabilities in that a number of liabilities related to the Woodridge properties had either been omitted from the list or misstated. The circuit court awarded damages to Rosch for Hargrove’s fraudulent misrepresentations and the appellate court affirmed.

In this court, Hargrove argued that the circuit court’s computation of damages was incorrect. Hargrove claimed that under the benefit-of-the-bargain rule, damages for fraudulent misrepresentation must be based upon the amount of money the plaintiff paid as a result of the misrepresentation. Thus, Hargrove argued, the circuit court should not have excluded evidence that the misrepresented liabilities were either never paid or were not paid until after Rosch sold his interest in the joint venture. The court rejected this argument, reasoning:

“Under the benefit-of-the-bargain rule, which governs the damage computations in fraudulent misrepresentation cases, damages are determined by assessing the difference between the actual value of the property sold and the value the property would have had if the misrepresentations had been true. (
Hicks v. Deemer
 (1900), 187 Ill. 164, 170; 
Munjal v. Baird & Warner, Inc.
 (1985), 138 Ill. App. 3d 172, 186-87; 
Kinsey v. Scott
 (1984), 124 Ill. App. 3d 329, 341.) In this case, it was found that Hargrove represented the joint venture’s liabilities as being less than they actually were. The proper measure of damages under the benefit-of-the-bargain rule, then, and the formula that was used by the circuit court, was the difference between the joint venture’s liabilities as misrepresented by Hargrove and what those liabilities actually were. How Rosch or the joint venture subsequently dealt with those liabilities was irrelevant to this determination.” 
Gerill
, 128 Ill. 2d at 196.

The 
Gerill
 court restated that the proper measure of damages in an action for fraudulent misrepresentation is the difference between the actual value of the property sold and the value the property would have had if the misrepresentations had been true. The court added that the bargain, and the measure of damages, 
are not affected by subsequent actions
. Rosch might or might not have been held liable for the full amount of the liabilities of the joint venture. However, whether Rosch was made to pay for the liabilities mattered not to the determination of damages. See also 
Antle & Brothers v. Sexton
, 137 Ill. 410, 416 (1891) (where the land conveyed consisted of 30 acres rather than 80 acres as represented, the trial court did not err “in refusing evidence tending to show that notwithstanding the shortage [in acreage] plaintiffs got the worth of their money in the whole trade”); 
Kinsey v. Scott
, 124 Ill. App. 3d 329 (1984) (holding the proper measure of damages was the difference in value between the apartment building as a five-unit structure including a basement unit and as a four-unit structure in 1973, the year of the purchase. In addition, the rental income which the plaintiff received from the basement unit, which defendant had not built to code, from 1973 to 1981 also belonged to the plaintiff as owner of the building). And see 
City of Chicago v. Michigan Beach Housing Cooperative
, 297 Ill. App. 3d 317 (1998) (observing that in an appropriate case, a plaintiff may recover the difference between the value of the note or security interest as represented, and the value of the note or security interest received); 
Kleinwort Benson N. America v. Quantum Financial Services
, 285 Ill. App. 3d 201 (1996) (reversing entry of summary judgment and holding that a question for a fact finder existed as to the amount of damages where counterclaimant purchased the company at a premium and evidence showed that, without the promised institutional sale force, the company had no value beyond the book value of assets); 
Poeta v. Sheridan Point Shopping Plaza Partnership
, 195 Ill. App. 3d 852 (1990) (holding that a benefit-of-the-bargain analysis for damages is appropriate in an action for fraud); 
Four “S” Alliance, Inc. v. American National Bank & Trust Co. of Chicago
, 104 Ill. App. 3d 636, 640 (1982) (trial court properly applied the benefit-of-the-bargain formula in awarding plaintiff “the profit difference for the gas actually sold during the three months [at the gas station plaintiff leased from defendants] and the volume of sales which had been represented orally”).

The special concurrence and PMUSA concede that the proper measure of damages in the case at bar, as in an action for common law fraudulent misrepresentation, is the benefit-of-the-bargain. Slip op. at 76 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). Having made that concession, however, the special concurrence applies a measure of damages that is closer to the out-of-pocket measure of damages than the benefit-of-the-bargain measure. In the process, the special concurrence impermissibly rewrites the bargain that plaintiffs entered into in purchasing light cigarettes from PMUSA. As to the class representatives, the focus of the analysis that the special concurrence employs is the continued use of cigarettes by the representatives beyond the time that they learned the true properties of light cigarettes. The special concurrence maintains that, since the class representatives continued to smoke after they learned that the health benefits were illusory, the class representatives could not have placed any real value on the health components of light cigarettes, and hence could not have suffered any economic loss when the representations regarding the health benefits turned out to be false. The special concurrence thus looks beyond the time frame of the bargain between the parties, and rewrites the bargain in light of the representatives’ subsequent behavior. In other words, rather than look to the time frame when plaintiffs were deceived by PMUSA’s representations and purchased light cigarettes for their perceived health benefits, the special concurrence looks to the time frame when the class representatives learned of the falsity of the representations.
(footnote: 8) The fact that the class representatives knew of the true properties of light cigarettes in the second time frame and bargained for cigarettes based on that knowledge, however, does not in any way undercut the damages they sustained in the first time frame, when they purchased light cigarette for the health benefits touted by PMUSA.

A simple illustration makes the point. I purchase 10 acres of land for development upon a representation that the land is never subject to flooding. After constructing houses on nine acres, I discover that the remaining acre is not suitable for development because it lies below the flood plain and is subject to periodic flooding. I construct a fishing pond on part of the remaining acre and leave the balance in its natural state so the purchasers of the houses may benefit from the view. Under the benefit-of-the-bargain measure of damages, I am entitled to the difference between the value of the land as promised, that is, the value of land suitable for development 
in toto
, and the value of the land as received, that is, the value of land with only nine acres suitable for development. Contrary to this approach, the special concurrence would focus on the development of the fishing pond and the benefit of the natural view, and conclude that I must have placed a higher value on the land received since I was able to find some use for it. The special concurrence would rewrite my bargain by assigning a greater value to the land based on my actions subsequent to the time of the purchase.

The special concurrence repeats the same mistake in its analysis regarding the class members in general. As noted above, the special concurrence recognizes that the Knowledge Network Survey respondents placed a lower value on cigarettes that lacked the health qualities claimed by PMUSA. However, the special concurrence does not focus on the difference between the value of the cigarettes as represented by PMUSA and the value of the cigarettes without the health benefits. Instead, the special concurrence focuses on two factors: (1) discounted cigarettes were not available for purchase in the marketplace; and (2) the class members were addicted to the use of cigarettes. From these factors the special concurrence concludes that the class members did not incur damages, and are not entitled to compensation, because they would have purchased cigarettes at the nondiscounted prices to continue feeding their addiction.

In essence, the special concurrence rewrites the bargain that plaintiffs made. The special concurrence ignores the evidence that cigarette consumers would have required a steep discount to purchase light cigarettes without the health benefits. Instead, the special concurrence asserts that cigarette consumers would have continued to purchase light cigarettes, at nondiscounted prices, even knowing the true properties of the cigarettes. In the alternative, the special concurrence asserts that cigarette consumers would have purchased regular cigarettes at a price equal to the price paid for light cigarettes as misrepresented by PMUSA. But the focus under the benefit-of-the-bargain is the difference in value, as of the time of the transaction, between the goods as received and the goods as promised. Thus, the 
Gerill
 court focused on the difference between the joint venture’s liabilities as misrepresented and what those liabilities actually were. How Rosch subsequently dealt with those liabilities was irrelevant to the determination of damages. Hargrove could not share in the forgiveness of any of the liabilities by rewriting the bargain to assign a higher value to the joint venture.

The result that the special concurrence advocates is, at best, surprising. PMUSA misrepresented the qualities of its light cigarettes. The misrepresentations led cigarette consumers to overcome their aversion to the taste of light cigarettes and purchase light cigarettes in an unsuccessful attempt to lower their intake of the harmful products to which they were exposed in smoking cigarettes. While PMUSA saw its profits increase because of the sale of light cigarettes, cigarette consumers did not receive the health benefits for which they bargained. The special concurrence dispenses with the inequities in the transaction, however. So long as the price the consumers paid for the false light cigarettes was no more than the price for the nonbargained for cigarettes, PMUSA could make misrepresentations of whatever kind it desired.

When considered in light of the addictive nature of cigarettes, the special concurrence’s position is not only surprising but untenable. Recall the special concurrence’s acknowledgment that “PMUSA was fully aware, the so-called ‘light’ cigarettes not only offered no health benefits, but were actually more toxic.” Slip op. at 76 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). Also recall the special concurrence’s claim that cigarette consumers could “not have stopped smoking, for they were addicted.” Slip op. at 80 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). The stepping stones to the special concurrence’s position are as follows. Cigarette manufacturers, including PMUSA, could market a highly addictive and toxic product, a cigarette, with the result that the consumer became addicted to the product. PMUSA could then market a light cigarette, just as addictive as a full-flavored cigarette, that it claimed contained less toxic compounds than a full-flavored cigarette. Consumers could flock to the light cigarette, believing the misrepresentations regarding the health benefits flowing from the claimed reduction of toxic compounds in the light cigarette. PMUSA could reap increased profits as customers switched to the light cigarette marketed by PMUSA. However, consumers could not recover for the misrepresentations because they could not break free of the addiction directly flowing from PMUSA’s marketing of full-flavored and light cigarettes.

Far from bolstering the result reached by the majority, the special concurrence serves as a reminder of the problems associated with the out-of-pocket measure of damages in an action for fraud or deceit. In an opinion joined by the author of today’s majority opinion, our appellate court observed:

“The rule set forth in [
Perry v. Engel
, 296 Ill. 549 (1921)] comports with section 549, comment I of the Restatement (Second) of Torts, which discusses the measure of damages in misrepresentation cases where the recipient of the misrepresentation has suffered no out-of-pocket loss. That section provides as follows:

‘When the value of what the plaintiff has received under the transaction with the defendant is fully equal to the value of what he has parted with, he has suffered no out-of-pocket loss, and under the rule stated in subsection (1), clause (a) [providing that the recipient of misrepresentation may choose to recover his actual out-of-pocket loss], he could recover no damages. This would mean that the defrauding defendant has successfully accomplished his fraud and is still immune from an action in deceit. Even though the plaintiff may rescind the transaction and recover the price paid, the defendant is 
enabled to speculate on his fraud and still be assured that he can suffer no pecuniary loss. This is not justice between the parties
. The admonitory function of the law requires that the defendant not escape liability and justifies allowing the plaintiff the benefit of his bargain.’ (Emphasis added.) Restatement (Second) of Torts §549, Comment I, at 115 (1977).

See also W. Keeton, Prosser & Keeton on Torts §110, at 768 (5th ed. 1984) (‘in many cases the out-of-pocket measure will permit the fraudulent defendant to escape all liability and have a chance to profit by the transaction if he can get away with it’).” 
Kirkruff v. Wisegarver
, 297 Ill. App. 3d 826, 837 (1998).

Perhaps these words still ring true in the heart of the author of today’s majority opinion, and are the reason that the majority of the court does not endorse the position advanced by the special concurrence. Be that as it may, I note that the proper measure of damages in Illinois in a fraud and deceit action, whether based on statute or at common law, is the benefit-of-the-bargain, rather than the out-of-pocket measure of damages or some close relative thereof. I note further that the record contains sufficient evidence to support an award of damages to the plaintiff class. Several members of the class testified that they switched to light cigarettes because they wanted to reduce their exposure to the harmful compounds in regular cigarettes. Class representative Sharon Price testified that, having switched to light cigarettes because of concerns about lung cancer and other diseases, she would not have gone back to regular cigarettes even if they were offered to her for free. In a similar vein, the Knowledge Network Survey respondents stated that they would have required a steep discount had they known that light cigarettes either did not offer any health benefits compared to regular cigarettes or were actually more harmful than regular cigarettes. The fact remains that the members of the plaintiff class were defrauded because of the misrepresentations made by PMUSA regarding light cigarettes. Illinois law should not tolerate the use of deceptive practices aimed at defrauding the consumers of this state.

IV. Conclusion

Today marks the second time in just six months that this court has completely reversed a multibillion dollar verdict in favor of a corporate defendant. See 
Avery v. State Farm Mutual Automobile Insurance Co.
, 216 Ill. 2d 100 (2005). To do so in
 Avery
, the court construed an insurance contract strictly against an insured despite its ambiguities and our own precedent to the contrary. See 
Avery
, 216 Ill. 2d at 215-29 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). In this case, the court does so by interpreting section 10b(1) so narrowly that it dilutes the very purpose of the Act. In addition, not content with just speaking to section 10b(1), the two specially concurring justices 
engage 
in nothing more than a conclusory analysis on damages–an analysis which, as I have detailed above, overlooks or ignores several salient legal points which serve to greatly undercut their position. Suffice it to say, the issue of damages is not as cut and dry as these justices would have one believe.

The manner in which these two, highly publicized cases have been decided by this court leads me to several troubling conclusions. First, a majority of this court has become increasingly desensitized to the interests of the average Illinois consumer. There is little doubt in my mind that these decisions will send a chill wind over consumer protection. That said, I am not blind to the very real problems that exist in the world of class action lawsuits. As I stated in my separate opinion in 
Avery
, I share in the concerns that the class action vehicle has the potential to be greatly abused. However, that concern must not transcend the rules of law that have been set by this court in past decisions. In my view, this means that all cases, even class actions filed in our Fifth District, must be guided by the same long-recognized standards of review, rules of construction, procedural requirements, and burdens of proof that have guided all other types of actions over the years. Aspects of the court’s opinion today and in its opinion in 
Avery
 cause me to fear that a majority of my colleagues will continue to hold large class actions to different standards in an effort to reduce the perception that the Illinois court system serves as a playpen for the disingenuous class action practitioner.

JUSTICE KILBRIDE joins in this dissent.

JUSTICE KILBRIDE, also dissenting:

I fully agree with all aspects of Justice Freeman’s dissent and I join in it. I write separately to express additional concerns with the majority opinion.

The majority notes that neither party has offered argument regarding the meaning of the phrase “by laws administered by” in section 10b(1) of the Consumer Fraud Act. Slip op. at 49. The majority then concludes that the phrase reflects legislative intent requiring deference to agency policy and practice in its performance of duties delegated by Congress or the General Assembly. Slip op. at 49. As support for this conclusion, the majority asserts the legislature would have referred to state or federal statutes, rather than laws, if it intended to require that specific authorization be contained in the law itself. Slip op. at 49-50. The majority fails to explain or describe any conceptual difference between “laws” and “statutes.” The majority’s conclusion therefore does not logically follow from the premise. Further, although the majority acknowledges that the term “specifically authorized” in the statute “indicates a legislative intent to require a certain degree of specificity or particularity in the authorization” (slip op. at 49), it points to no specificity or particularity in the claimed authorization here. Indeed, “agency policy and practice” and the consent orders relied on by the majority as authorization are neither specific nor particular.

 Nowhere in section 10b(1) is there any reference to “agency policy and practice.” Yet the majority concludes that agency policy and practice have the force of law. Statutes and published rules made in accordance with statutory authority are clearly “laws administered by a regulatory body.” To the extent statutes and published rules authorize certain conduct, that conduct cannot serve as a predicate for an action under the Consumer Fraud Act. That was the import of this court’s holding in 
Lanier
.

Lanier
 did not, however, hold that agency policy and practice allowed use of the unexplained “Rule of 78’s” term in loan documents. Instead, we held that Regulation Z permitted use of the term without further elaboration. Regulation Z is a set of comprehensive rules, enacted and published by the Federal Reserve Board, pursuant to authority granted by Congress implementing the principles of the Truth in Lending Act. 
Lanier
, 114 Ill. 2d at 11. In holding the conduct complained of was specifically authorized by law, we relied on a formal, published Federal Reserve Board staff interpretation of a section of Regulation Z. That regulation required identification of the method of computing any unearned portion of the finance charge in the event of prepayment. The published staff interpretation concluded that a simple reference by name to the “Rule of 78’s” without describing its operation satisfied the identification requirement. 
Lanier
, 114 Ill. 2d at 12.

We held that the Federal Reserve Board’s formal, 
published
 interpretation of its own rules is entitled to great deference, absent any obvious repugnance to the Truth in Lending Act. 
Lanier
, 114 Ill. 2d at 13. We observed that the Truth in Lending Act absolved creditors from liability “for ‘any act done or omitted in good faith in conformity with any rule, regulation, 
or interpretation thereof by the Board or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations
.’ [Citation.]” (Emphasis added.) 
Lanier
, 114 Ill. 2d at 14.

 We concluded that the foregoing provision evinced a congressional determination to treat the Board’s administrative determinations under the Truth in Lending Act as authoritative. 
Lanier
, 114 Ill. 2d at 14. Thus, we held section 10b(1) of the Consumer Fraud Act exempted from liability conduct authorized by federal statutes and regulations, including those administered by the Federal Reserve Board, and that “defendant’s compliance with the disclosure requirements 
of the Truth
 
in Lending Act 
is a defense to liability under the Illinois Consumer Fraud Act in the present case.” (Emphasis added.) 
Lanier
, 114 Ill. 2d at 18.

 It is apparent, therefore, that 
Lanier
 upheld the creditor’s section 10b(1) defense because the disclosure was specifically authorized by the federal Truth in Lending Act. We found defendant complied with the requirements of the Act because a formal, published agency interpretation of a regulation authorized by Congress, specifically authorized the disputed conduct.

Conversely, the record in this case does not present a basis for application of 
Lanier. 
Congress has empowered and directed the Federal Trade Commission to prevent the use of unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. §45. It has also delegated rulemaking authority to the Commission. 16 C.F.R. §1.22. As the defendant’s expert, Dr. Peterman, conceded, the Commission has never promulgated any rule authorizing the use of the specific descriptors at issue in this case. The Commission is primarily an enforcement agency charged with protecting consumers from unfair and deceptive trade practices. Unlike the Truth in Lending Act, the Federal Trade Commission Act contains no provision absolving from liability persons who in good faith comply with official interpretations of its regulations. Further, as the Commission has not published any functional equivalent to Regulation Z, there is no comparable Commission regulation governing the conduct at issue here.

Hence, 
Lanier
 offers no support for the conclusion that use of the descriptors claimed to be deceptive in this case is specifically authorized by federal law. 
Lanier 
teaches only that section 10b(1) can bar a Consumer Fraud Act remedy if the conduct is specifically authorized by a federal law. It neither holds nor suggests that informal agency policy or policy enforcement techniques short of formal, published rulemaking could invoke the section 10b(1) exemption from liability. The majority concludes, however, that “the FTC’s informal regulatory activity, including the use of consent orders, comes within the scope of section 10b(1)’s requirement that the specific authorization be made ‘by laws administered by’ a state or federal regulatory body,” contending that this assertion “is consistent with our holding in 
Lanier.” 
Slip op. at 61. Again, 
Lanier
 simply offers no support for this conclusion.

Additionally, the majority acknowledges, as noted in my special concurrence in 
Jackson
, that mere compliance with applicable law does not necessarily bar Consumer Fraud Act liability and that, rather, the conduct at issue must be specifically authorized. Slip op. at 54. Yet, the majority effectually ignores that principle in its analysis.

The majority can take no comfort in the reasoning of the Seventh Circuit in
 Bober
. The alleged deceptive statement in that case was held specifically authorized by a rule formally adopted by the FDA and codified in the Code of Federal Regulations. 
Bober
, 246 F.3d at 941. 
Bober
 is remarkably similar to this court’s holding in 
Lanier
, finding a formal published interpretation of a regulation of the Federal Reserve Board to authorize specifically the disclosures in question.

In this case, the federal law in question forbids unfair or deceptive acts or practices affecting commerce. The FTC has issued no formal rule or regulation authorizing the descriptors in question, as in 
Bober
, and it has issued no formal interpretations of any regulations, as in 
Lanier
.

The majority asserts that 
Lanier 
is authority for the proposition that an agency staff interpretation may be a sufficient basis for a finding of specific authorization and that formal rulemaking is therefore not a prerequisite for specific authorization. Slip op. at 56. It must be remembered that the staff interpretation in 
Lanier
 was both formal and published and that Congress expressly provided that reliance on staff interpretations would excuse liability. Opening the door to informal policy advice could lead to absurd results. For instance, advice given casually between an FTC commissioner and a PMUSA executive could not and should not serve as the specific authorization required by section 10b(1). Common sense indicates that no specific authorization by law can derive from informal policymaking or agency practices. Thus, there is no basis for the majority to conclude that either informal agency policy and practice or the use of consent orders involving other parties are within the ambit of our holding in 
Lanier
.

Nevertheless, the majority relies on 1971 and 1995 FTC consent orders entered in resolution of claims asserting that American Brands, Inc., and American Tobacco Company, respectively, violated the Act’s prohibition of unfair methods of competition and unfair and deceptive acts and practices in commerce. I
n the case of the 1971 order, the FTC filed a complaint in 1969 detailing advertising claims related to American Brands products it found deceptive. American Brands then agreed, in a consent order, without admitting it violated the law as alleged in the complaint, to refrain from advertising that its cigarettes were low or lower in tar by use of the words “low,” “lower” or “reduced,” or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure of the tar and nicotine content in milligrams in the smoke produced by the advertised cigarette. 
In re American Brands, Inc.
,79 F.T.C. 255 (1971).

It is apparent that the complaint against American Brands was directed at particular advertising used only by that company. The order forbade only American Brands from making the reduced tar claims, and authorized only American Brands to use “low tar” descriptors only if accompanied by conspicuous disclosures of tar and nicotine content. The order cannot reasonably be viewed as directing the use of the descriptors. Indeed, it 
prohibited 
their use unless certain conditions were met. No reference whatever is made to the descriptors “light” or “lights,” as used by PMUSA. The plain facts, therefore, demonstrate no basis to conclude that “lights” is a like qualifying term to “low in tar.” Thus, even if other cigarette marketers read the published consent order, they could not reasonably conclude it specifically authorized any descriptors other than “low tar” or “lower in tar.” Nor could they conclude that the agreed resolution of the Commission’s claim against American Brands was anything other than the compromise of a disputed claim. It was not, and did not purport to be, a rule or regulation permitting the entire cigarette industry to use these or any other descriptors.

Similarly, the 1995 consent order was entered after the FTC filed a complaint alleging that American Tobacco Company committed unfair and deceptive acts or practices in advertising its Carlton brand of cigarettes. The complaint alleged the advertisements claimed that 10 packs of Carltons contained less tar than one pack of five competing brands. The Commission alleged that, in truth, consumers would not get less tar by smoking 10 packs of Carltons because of the behavior of compensatory smoking. As in the 1971 consent order, American Tobacco entered into an agreement for settlement purposes, without admitting it had violated the law. American Tobacco consented to entry of an order forbidding the disputed representations unless the representations were true as confirmed by competent and reliable scientific evidence. The 1995 order further provided that comparison of the tar and nicotine ratings of American Tobacco’s cigarette brands and the ratings of competing brands, with or without representation that respondent’s brand is “low,” “lower,” or “lowest” in either tar or nicotine, would not be deemed violations of the consent order under certain conditions. Specifically, use of the descriptors was not forbidden if American Tobacco did not visually depict more than a single cigarette or pack of its and the comparative brands. 
In re American Tobacco Co.
, 119 F.T.C. 3 (1995).

Like the 1971 consent order, the 1995 consent order made no reference whatever to the terms “light” or “lights.” The reference to “low tar” in the 1995 order is clearly not a Commission authorization to use that term or similar terms. It only refers to comparisons of brands 
with or without
 use of such descriptors. The 1995 consent order merely resolved a disputed claim against American Tobacco Company arising from alleged false advertising of one particular brand of cigarettes. Competitors of American Tobacco Company might look to the order for guidance concerning what advertising practices the Commission may deem unfair or deceptive, but could not reasonably conclude that the use of any descriptors were specifically authorized by the order. The 1995 complaint did not even question American Tobacco’s use of particular descriptors. Instead, it contended that American Tobacco’s comparative claim was untrue. Thus, that consent order forbade conduct not at issue in this case, and only conditioned use of “low tar” descriptors on American Tobacco’s forbearance of using more than a depiction of a single cigarette or pack of its brand versus a single cigarette or pack of any other brand.

Both the 1971 and 1995 consent orders dealt with conduct deemed by the Commission to violate the FTC Act. The orders have the force of law 
only
 as to the parties entering into the settlement agreements–American Brands and American Tobacco Company. At most, the orders may be predictive of Commission attitudes toward advertising practices in future cases. Simply stated, those consent orders cannot reasonably be deemed to be an industrywide specific authorization for the use of particular advertising descriptors.

Equally important, the FTC has certainly not closed the book on the issue of deceptive cigarette advertising. In 1997, it sought public comment on whether its policies regarding testing methods and the use of descriptors should be revised. At the agency’s request, the National Cancer Institute (NCI) studied the issues and, in November 2001, published Monograph 13. The NCI concluded there was no convincing evidence that cigarettes lower in tar and nicotine yield reduced the disease burden on a population basis. Monograph 13 was critical of industry testing practices and its use of comparative descriptors. According to Dr. Peterman, the FTC, at the time of trial, was evaluating whether to change its policies in light of the NCI’s conclusions. The ongoing FTC review should indicate to industry competitors that agency policy on the use of cigarette comparative descriptors was, and remains, in a state of flux.

The foregoing illustrates why policies, as opposed to formal published regulations and statutes, cannot be deemed to have the force of law within the meaning of section 10b(1). The legislative purpose of the exemption in section 10b(1) is to shield defendants from liability for conduct specifically authorized by 
law
. That purpose is not served if discernment of what is forbidden and what is authorized rests on the shifting sands of ever-changing and evolving agency policy. A statute or published regulation, on the other hand, remains in effect unless formally repealed. Policy change can be effected simply by an agency decision to commence an enforcement proceeding. Thus, consent orders enforceable only against parties to an enforcement proceeding are not laws administered by a federal agency within the meaning of section 10b(1). Accordingly, I agree with the trial court that defendant did not establish its section 10b(1) affirmative defense.

On a different issue, I am compelled to respond to Justice Karmeier’s argument that plaintiffs did not prove damages. Justice Karmeier observes that plaintiffs cited no authority permitting opinions of Internet survey respondents to establish actual damages under the Consumer Fraud Act because the representative plaintiffs have not been harmed in the way the survey respondents claimed they would be in answering the survey hypotheticals. Slip op. at 78 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). The Internet survey was admitted in evidence during the testimony of Dr. Cohen, a credentialed survey expert, who validated the survey. Dr. Cohen testified that the Knowledge Networks survey was “proper” and represented “appropriate ways of gathering information from smokers via survey method.” Dr. Dennis, who conducted the survey, is highly credentialed in survey research practices and was recognized by the trial court as a qualified and experienced expert in survey research.

On appeal, defendant has not challenged the trial court’s qualification of Dr. Dennis as an expert, nor could it legitimately question his qualifications. At the time of the trial, defendant’s own damage expert, Dr. Viscusi, was working with Dr. Dennis on a government-sponsored survey research project utilizing the Knowledge Networks survey methodology. Similarly, defendant’s survey expert, Dr. Mathiowetz, had coauthored a learned treatise with Dr. Dennis concerning survey techniques.

 Admittedly, Dr. Dennis was subjected to extensive cross-examination, and his conclusions were challenged by defendant’s expert witness, Dr. Mathiowetz. Nonetheless, the record reveals no pretrial request for a 
Frye 
hearing on the issue of general acceptance of the Knowledge Networks survey methodology. See 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923). Although defendant moved to strike Dr. Dennis’ testimony regarding the survey on foundation and 
Donaldson 
grounds, no challenge to the general acceptance of his survey methods was enunciated for the record. Thus, no coherent requisite challenge to the general acceptance of the survey method appears either in the trial record or in defendant’s briefs. 
Frye
 issues are reviewed under an abuse of discretion standard. 
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 76 (2002). Accordingly, there is no basis in the record to conclude the trial court abused its discretion in admitting the Knowledge Networks survey because of its authentication by credentialed witnesses and defendant’s failure to lodge a sufficient challenge to the general acceptance of the survey method.

Thus, in addition to the points asserted by Justice Freeman, I conclude that neither section 10b(1), nor the admission of the Knowledge Network survey, provides a basis for reversing the trial court’s judgment. Therefore, I respectfully dissent.

JUSTICE FREEMAN joins in this dissent.

Dissent Upon Denial of Rehearing

JUSTICE FREEMAN, dissenting:

Plaintiffs petitioned for rehearing in this case. Because I believe that this court’s judgment may have been erroneous, I dissent from the denial of the petition for rehearing.

I

As a preliminary matter, plaintiffs correctly question the precedential value of this court’s decision. Plaintiffs observe that no rationale in the December 15, 2005, judgment received a majority of votes. In other words, there was no holding by a majority opinion–except for the disposition of the cause, 
i.e.
, four justices voted for reversal. 

Justice Garman’s opinion, holding that PMUSA’s conduct was exempt under section 10b(1) of the Consumer Fraud Act (815 ILCS 505/10b(1) (West 1998)), was joined by Justice McMorrow. Justice Karmeier, joined by Justice Fitzgerald, did not specifically agree with Justice Garman’s section 10b(1) holding. Slip op. at 74 (Karmeier, J., specially concurring, joined by Fitzgerald, J.) (“I agree that the judgment of the circuit court should be reversed. In my view, however, that conclusion is not dependent on the applicability of section 10b(1) of the Consumer Fraud Act”). “On this point, the language this court uses when it delivers a divided opinion can use some clarification. A ‘special concurrence’ is one where the authoring Justice joins both the opinion and the judgment. A ‘concurrence’ is one where the authoring Justice joins only the judgment of the court.” 
People v. Cruz
, 162 Ill. 2d 314, 389 n.1 (1994) (Heiple, J., dissenting, joined by Bilandic, C.J.). In this case, Justice Karmeier expressly states: “I fully concur 
in the result
 reached by the majority.” (Emphasis added.) Slip op. at 83 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). Since Justice Karmeier does not join Justice Garman’s opinion, his opinion should not be designated a “special concurrence” but, rather, a “concurrence.”

Justice Garman’s opinion in this case did not receive the assent of four justices. Therefore, it cannot constitute “the opinion of the court.” Rather, Justice Garman delivered the judgment of the court in an opinion that presents the views of only a plurality of this court. “The only thing four justices agree on today is that reversal is necessary. In terms of precedent, none of the opinions filed in this case has the force of law.” 
Cruz
, 162 Ill. 2d at 389 n.1 (Heiple, J., dissenting, joined by Bilandic, C.J.).

Perhaps the fact that the court’s decision is not binding precedent is for the best. As this dissent upon denial of rehearing will establish, a majority of this court has not responded, in any way, to the critical points plaintiffs have raised during this rehearing period. Given the plurality’s “erroneous and irresponsible interpretation of our Consumer Fraud Act” (slip op. at 83 (Freeman, J., dissenting, joined by Kilbride, J.)), we do well to remember that Justice Garman’s interpretation of our Consumer Fraud Act does not have the force of law and the issues that the opinion discusses remain open for a better-reasoned adjudication.

II

In their petition for rehearing, plaintiffs contend that Justice Garman’s plurality opinion overlooked or misapplied four critical points. Plaintiffs first contend that the plurality failed to properly apply the canons of statutory construction and, accordingly, misinterpreted section 10b(1) of the Consumer Fraud Act (815 ILCS 505/10b(1) (West 1998)). Specifically, plaintiffs argue that Justice Garman’s plurality opinion fails to apply section 11a of the Consumer Fraud Act, which requires a court to liberally construe the Act (815 ILCS 505/11a (West 1998)), and overlooks the canon of statutory construction that exceptions in a statute should be liberally construed (see 
Mid-South Chemical Corp. v. Carpentier
, 14 Ill. 2d 514, 519 (1958) (and cases cited therein)).

Plaintiffs also contend that Justice Garman’s plurality opinion misapplied the 
de novo
 standard of review, or mischaracterized the standard of review it actually utilized. Justice Garman’s plurality opinion concluded that 
de novo
 review is appropriate because the actions of the FTC with respect to the use of the disputed descriptors are a matter of public record. Therefore, reasons the plurality, section 10b(1) is being applied to essentially undisputed facts. The plurality concludes that “we need not evaluate the credibility of witnesses or weigh conflicting testimony to determine whether the actions of the FTC have resulted in specific authorization of the use of these terms by cigarette manufacturers.” Slip op. at 43 (Garman, J., joined by McMorrow, J.). However, plaintiffs argue that Justice Garman’s plurality opinion did precisely this.
(footnote: 9)
 Plaintiffs next contend that Justice Garman’s plurality opinion relied heavily on the testimony of defendant’s expert witness Dr. Peterman, yet at the same time ignores his testimony on cross-examination. Plaintiffs further argued that Justice Garman’s plurality opinion overlooked PMUSA’s “Petition for Rulemaking” filed in the FTC on September 18, 2002, which it submitted as an exhibit at trial. PMUSA’s own trial witness, Nancy Lund, testified on direct examination that PMUSA filed this FTC petition for the following purpose:

“There were kind of three areas where we asked for guidance. One was in the measurement itself, the FTC method; one was about disclaimers about talking about what descriptions and low tar cigarette yields is actually all about; and the last one was some guidance on descriptors, such as lights and ultra lights.”

Plaintiffs argue that this FTC petition and Lund’s corresponding trial testimony, PMUSA acknowledged in this litigation that, as of 2002, the FTC had never authorized PMUSA’s use of the terms “lights” or “lowered tar and nicotine.” Indeed, as plaintiffs reasoned in the petition for rehearing, if the FTC had previously authorized PMUSA to use the disputed descriptors as part of consent decrees it had entered into with other tobacco companies in 1971 and 1995, then there would have been no reason for PMUSA to petition the FTC for “guidance” and rulemaking on the use of these very same descriptors.

Plaintiffs also contend that the plurality acknowledged PMUSA’s intentional fraud. Slip op. at 20 (Garman, J., joined by McMorrow, J.), at 75 (Karmeier, J., specially concurring, joined by Fitzgerald, J.). However, according to plaintiffs, Justice Garman’s plurality opinion erroneously concluded that the FTC “specifically authorized” such fraud. In reaching this erroneous conclusion, Justice Garman’s plurality opinion misinterprets the scope of FTC voluntary consent orders, in direct conflict with federal precedent. Consent orders are binding only upon the named parties and represent a settlement in which neither side has insisted upon an adjudication on the merits. FTC consent orders represent a compromise between the parties to the consent order and no precedential weight is given to such a consent order for purposes of FTC enforcement proceedings against another party. Plaintiffs inform this court that we have no authority under state law, 
i.e.
, the Consumer Fraud Act or the Deceptive Practices Act, to expand the scope and meaning of an FTC consent order. As plaintiffs inform us, “federal law is clear that a consent order involving other parties cannot serve as authorization or permission for a different industry participant to engage in the same conduct–let alone conduct that is not covered by the prior consent order.” Plaintiffs insist that the 1971 and 1995 consent orders “are no more than isolated voluntary agreements having nothing to do with PMUSA and the conduct at issue in this litigation.”

Also, according to the petition for rehearing, Justice Garman’s plurality opinion overlooks the fact that neither the 1971 nor the 1995 consent orders applied to PMUSA’s misconduct and, in any event, PMUSA failed to comply with these orders. 

Plaintiffs filed a supplement to their petition for rehearing, which focuses on their contention that Justice Garman’s plurality opinion misinterprets the scope of FTC voluntary consent orders. Plaintiffs inform us that the FTC itself has plainly held that a “consent agreement [with one party] is binding only between the Commission and [that party].” 
Trans Union Corp.
, 118 F.T.C. 821, 864 n.18 (1994), 
aff’d
, 245 F.3d 809 (D.C. Cir. 2001). Thus, according to plaintiffs, an FTC voluntary consent order cannot be used as a shield by a third party.

Indeed, plaintiff further informs us that the 1971 consent order, upon which Justice Garman’s plurality opinion relies, was terminated by FTC rule between the FTC and the actual party to that voluntary agreement–American Brands. According to plaintiffs: “Therefore, it is not possible for this Court to rely upon this terminated order with a different party concerning different conduct as ‘specific authorization’ for Philip Morris to engage in the intentional fraud at issue in this litigation.”

These contentions are significant and persuade me to vote for rehearing.

III

In plaintiffs’ supplement to their petition for rehearing, pursuing their contention regarding the misinterpretation of the FTC voluntary consent orders, plaintiffs: (A) invoke the doctrine of primary jurisdiction, and (B) suggest a means by which this court could implement the doctrine. 

A

“Despite the name, the doctrine of primary jurisdiction does not involve jurisdictional questions. It is a common law doctrine used to coordinate administrative and judicial decisionmaking.” 
Red Lake Band of Chippewa Indians v. Barlow
, 846 F.2d 474, 476 (8th Cir. 1988). “Nor can it be questioned that the doctrine applies to the states.” 
Agricultural Services Ass’n v. Commonwealth
, 210 Va. 506, 509, 171 S.E.2d 840, 843 (1970); accord 
Segers v. Industrial Comm’n
, 191 Ill. 2d 421, 428 (2000) (“noting doctrine of primary jurisdiction is not technically a question of jurisdiction at all but rather a question of judicial self-restraint and relations between the courts and administrative agencies”), citing 
Peoples Energy Corp. v. Illinois Commerce Comm’n
, 142 Ill. App. 3d 917, 931 (1986); 
Flo-Sun, Inc. v. Kirk
, 783 So. 2d 1029, 1037-38 (Fla. 2001) (“It is also important to note that the application of the doctrine of primary jurisdiction is a matter of deference, policy and comity, not subject matter jurisdiction”); 
State v. United States Steel Corp.
, 307 Minn. 374, 380, 240 N.W.2d 316, 319 (1976) (“The judicially created doctrine of primary jurisdiction is concerned with the orderly and sensible coordination of the work of agencies and courts”). 

The doctrine of primary jurisdiction

“applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.” 
United States v. Western Pacific R.R. Co.
, 352 U.S. 59, 64, 1 L. Ed. 2d 126, 132, 77 S. Ct. 161, 165 (1956).

Accord 
Port of Boston Marine Terminal Ass’n v. Rederiaktiebolaget Transatlantic
, 400 U.S. 62, 68, 27 L. Ed. 2d 203, 209, 91 S. Ct. 203, 208 (1970) (“When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved”); 
Kellerman v. MCI Telecommunications Corp.
, 112 Ill. 2d 428, 444-45 (1986). Courts recognized long ago that coordination between traditional judicial machinery and administrative agencies “was necessary if consistent and coherent policy were to emerge. [Citation.] The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed.” 
Port of Boston
, 400 U.S. at 68, 27 L. Ed. 2d at 208-09, 91 S. Ct. at 208.

The rationale for the doctrine of primary jurisdiction has been described as follows:

“ ‘[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.’ ” 
Weinberger v. Bentex Pharmaceuticals, Inc.
, 412 U.S. 645, 654, 37 L. Ed. 2d 235, 242, 93 S. Ct. 2488, 2494 (1973), quoting 
Far East Conference v. United States
, 342 U.S. 570, 574-75, 96 L. Ed. 576, 582, 72 S. Ct. 492, 494 (1952).

Accord 
Western Pacific
, 352 U.S. at 64-65, 1 L. Ed. 2d at 132, 77 S. Ct. at 165; 
Kellerman
, 112 Ill. 2d at 444-45 (both cases quoting 
Far East Conference
). There is no fixed formula for applying the doctrine of primary jurisdiction. In each case, the question is whether the reasons for the doctrine are present, and whether the purposes of the doctrine will be furthered by its application in the particular litigation. 
Western Pacific
, 352 U.S. at 64, 1 L. Ed. 2d at 132, 77 S. Ct. at 165.

In their supplement to their petition for rehearing, plaintiffs request that this court solicit the FTC’s views on the issue of the 1971 and 1995 FTC voluntary consent orders. A majority of this court, however, apparently believes that this request should go unanswered with no response to the compelling legal arguments made in support of it. Unlike my colleagues, I believe that the plaintiffs in their supplemental petition for rehearing have raised legitimate questions about this court’s decision and the denial of their request merits some form of discussion.

I note that plaintiffs have made this request for the first time, before this court, in their petition for rehearing. Consequently, we could deem this issue procedurally forfeited. See 188 Ill. 2d R. 341(e)(7) (“Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing”). Indeed, since the doctrine of primary jurisdiction does not refer to the subject matter jurisdiction of a court, primary jurisdiction is an issue that can be waived or forfeited. 
Gross Common Carrier, Inc. v. Baxter Healthcare Corp.
, 51 F.3d 703, 706 (7th Cir. 1995); 
Kendra Oil & Gas, Inc. v. Homco, Ltd.
, 879 F.2d 240, 242 (7th Cir. 1989); 
Segers
, 191 Ill. 2d at 428; see, 
e.g
., 
Northwest Airlines, Inc. v. County of Kent
, 510 U.S. 355, 366 n.10, 127 L. Ed. 2d 183, 195 n.10, 114 S. Ct. 855, 863 n.10 (1994) (declining to invoke, 
sua sponte
, primary jurisdiction doctrine where parties failed to brief or argue it).

However, the waiver rule is a principle of administrative convenience, an admonition to the parties; it is not a jurisdictional requirement or any limitation upon the jurisdiction of a reviewing court. In this regard, this court has recognized that a reviewing court may, in furtherance of its responsibility to provide a just result and to maintain a sound and uniform body of precedent, override considerations of waiver that stem from the adversarial nature of our system. 
In re C.R.H.
, 163 Ill. 2d 263, 274 (1994); 
Hux v. Raben
, 38 Ill. 2d 223, 224-25 (1967); accord 155 Ill. 2d R. 366(a)(5). In this case, for the following reasons, this responsibility outweighs plaintiffs’ procedural default. See, 
e.g.
, 
Dillon v. Evanston Hospital
, 199 Ill. 2d 483, 504-05 (2002) (and cases cited therein).

As our rule of procedural default is a principle of administrative convenience for the courts, similarly, the doctrine of primary jurisdiction “exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties.” 
Distrigas of Massachusetts Corp. v. Boston Gas Co.
, 693 F.2d 1113, 1117 (1st Cir. 1982). Accordingly, a court may examine, 
sua sponte
, whether the doctrine applies. For example, in 
Western Pacific
, 352 U.S. at 63, 1 L. Ed. 2d at 131-32, 77 S. Ct. at 165, the United States Supreme Court felt obliged to address the issue of primary jurisdiction, although neither party had challenged that aspect of the lower court’s rulings. Indeed, “courts often invoke the doctrine on their own motion.” 
Fontan de Maldonado v. Lineas Aereas Costarricenses, S.A.
, 936 F.2d 630, 632 (1st Cir. 1991) (collecting cases); see also 
Syntek Semiconductor Co. v. Microchip Technology Inc.
, 307 F.3d 795, 780 n.2 (9th Cir. 2002) (“Although the parties did not raise the question of primary jurisdiction, we may do so 
sua sponte
”); 
Williams Pipe Line Co. v. Empire Gas Corp.
, 76 F.3d 1491, 1496 (10th Cir. 1996) (same); 
Red Lake Band
, 846 F.2d at 475-76 (addressing primary jurisdiction issue raised for first time in petition for rehearing); 
Baltimore & Ohio Chicago Terminal R.R. Co. v. Wisconsin Central Ltd.
, 154 F.3d 404, 411 (7th Cir. 1998) (acknowledging that court “would relieve the parties of their waiver” if primary jurisdiction doctrine were “of transcendent importance” to administration of statute); 
Gross Common Carrier
, 51 F.3d at 706 n.3 (noting that a court’s failure to address the doctrine may, in some cases, constitute plain error).

Another recent example is found in 
Cole v. U.S. Capital, Inc.
, 389 F.3d 719 (7th Cir. 2004). 
After
 oral argument in 
Cole
, the United States Court of Appeals for the Seventh Circuit invited the FTC to file an 
amicus curiae
 brief to inform the court of the agency’s views. 
Cole
, 389 F.3d at 722 n.2. The court of appeals apparently raised this issue 
sua sponte
 and was not concerned with any notion of procedural default.

Given the foregoing, I do not believe that plaintiffs’ procedural default would serve as a bar to this court’s granting of its request to address the doctrine of primary jurisdiction. Turning to the merits of plaintiffs’ arguments, I agree with plaintiffs that the doctrine 
applies in the present case. It is clear that the reasons for the doctrine are present. Justice Garman’s plurality opinion purports to resolve this case by construing and applying section 10b(1) of the Consumer Fraud Act (815 ILCS 505/10b(1) (West 2000)). The opinion attempts the following explanation:

“Operation of section 10b(1) is not dependent on the intent of Congress. Rather, it is dependent on the intent of the Illinois General Assembly to allow regulated entities to engage in commercial conduct that might otherwise be alleged to be fraudulent or deceptive without risk of civil liability, so long as that content is specifically authorized by the regulatory body.” Slip op. at 74.

This is precisely the context for application of the primary jurisdiction doctrine. The application of section 10b(1) of the Consumer Fraud Act depends on whether the alleged conduct of PMUSA was “specifically authorized” by the FTC. Plaintiffs’ Consumer Fraud Act claim, originally cognizable in the circuit court, requires the resolution of an issue, 
i.e.
, the existence and extent of the FTC’s “specific authorization” of PMUSA’s conduct, which lies within the special competence of the FTC. See 
Western Pacific
, 352 U.S. at 64, 1 L. Ed. 2d at 132, 77 S. Ct. at 165.

The purposes of the doctrine will be furthered by its application in this case. The purposes of the primary jurisdiction doctrine are to: (1) ensure desirable uniformity in the determination of certain types of administrative questions, and (2) promote resort to administrative agency experience and expertise where the court is presented with a question outside its conventional experience. 
Western Pacific R.R.
, 352 U.S. at 64, 1 L. Ed. 2d at 132, 77 S. Ct. at 411. The furtherance of these purposes is more than sufficient to override the effect of plaintiffs’ procedural default. See, 
e.g.
, 
Dillon
, 199 Ill. 2d at 504-05.

In the present case, Illinois courts necessarily have become embroiled in the technical aspects of FTC voluntary consent orders to determine if the FTC “specifically authorized” PMUSA’s conduct. Plaintiffs seek referral to the FTC of the question whether the terms of the FTC voluntary consent orders, involving American Brands and American Tobacco, specifically authorized representations by PMUSA, which was not a party to those consent orders. Referral in this case would obviously promote uniformity in the determination of this crucial issue and would correctly acknowledge the FTC’s experience and expertise in the function and interpretation of FTC voluntary consent orders. See, 
e.g.
, 
In re Starnet, Inc.
, 355 F.3d 634, 639 (7th Cir. 2004) (“Instead of trying to divine how the FCC would resolve the ambiguity *** we think it best to send this matter to the Commission under the doctrine of primary jurisdiction”); 
Access Telecommunications v. Southwestern Bell Telephone Co.
, 137 F.3d 605, 609 (8th Cir. 1998) (finding that determination of dispositive issue would necessarily embroil court in technical aspects of FCC matter, and that “FCC has far more expertise than the courts” concerning administrative matter; concluding that “the need to draw upon the FCC’s expertise and experience” was present).

If, as Justice Garman’s plurality opinion contends, the FTC has been actively concerned with the complex policy issues that cigarette advertising presents, then prudential judicial restraint should counsel referral of this specific dispositive issue to the specialized agency that Congress intended to deal with this issue–the FTC. See generally 
Hansen v. Norfolk & Western Ry. Co.
, 689 F.2d 707 (7th Cir. 1982). The FTC should first address this issue to avoid the possibility of a multitude of interpretations by several states of the same FTC voluntary consent orders, and to achieve a uniform administration of FTC policy. See 
Agricultural Services Ass’n
, 210 Va. at 509, 171 S.E.2d at 842-43, quoting 
Service Storage & Transfer Co. v. Commonwealth of Virginia
, 359 U.S. 171, 179, 3 L. Ed. 2d 717, 722, 79 S. Ct. 714, 719 (1959).

Indeed, a question of how to interpret an administrative agency order is the sort of determination “classically committed to agency discretion under the doctrine of primary jurisdiction.” 
Zapp v. United Transportation Union
, 727 F.2d 617, 625 (7th Cir. 1984). The denial of plaintiffs’ referral request appears to constitute a rejection of “orderly and sensible coordination of the work of agencies and courts” (
United States Steel
, 307 Minn. at 380, 240 N.W.2d at 319), and indicates that this court is insensitive to the emergence of “consistent and coherent policy.” 
Port of Boston
, 400 U.S. at 68, 27 L. Ed. 2d at 208, 91 S. Ct. at 208.

B

Plaintiffs suggest that this court can implement referral by soliciting the FTC to submit an 
amicus curiae
 brief. I agree with plaintiffs that the FTC, through an 
amicus
 brief, can speak definitively to the issues without undue delay. The only question this court would primarily ask the FTC is simply what it intended to do when it entered into the 1971 and 1995 voluntary consent orders. I believe that “this question can be answered fully and quickly through amicus participation. If more elaborate agency proceedings are required, the agency can so inform us.” 
Distrigas
, 693 F.2d at 1119. Further, the FTC regularly accommodates referral requests. Indeed, a visit to the agency’s website, www.ftc.gov, leads to an on-line sample of their 
amicus
 briefs.

My research has revealed two common examples of referral requests: one general and one more specific.

An example of a general referral is found in 
Cole v. U.S. Capital, Inc.
, 389 F.3d 719, 722 n.2 (7th Cir. 2004):

“After oral argument, the court invited the Federal Trade Commission (‘FTC’), the agency charged with administering the FCRA [Fair Credit Reporting Act], to file a brief as amicus curiae. The FTC accepted the court’s invitation, and the court expresses its thanks to the FTC for the assistance that it has rendered.”

The Seventh Circuit’s invitation took the form of the following order issued through the court’s clerk office:

“Because this case presents issues that will have a significant effect on the enforcement of the Fair Credit Reporting Act, the court invites the Federal Trade Commission to file a brief as amicus curiae. If the Commission accepts our invitation, the brief should be filed within 45 days of this order. The brief should not exceed 30 pages.

The court would also appreciate the Commission’s informing the court, as soon as practicable, as to whether it plans to file such a brief. This notification can be effected through a letter to the Clerk.

If the Commission accepts the court’s invitation, the parties may file supplemental reply briefs addressing matters presented in the Commission’s brief. Any such reply brief should not exceed 20 pages in length and shall be filed within 20 days of the filing of the Commission’s brief with this court.”

As the court acknowledged in its opinion, the FTC accommodated the court with an 
amicus
 brief, which aided the court in reaching its decision.

Another example of a general request is found in 
Distrigas
, where the First Circuit Court of Appeals concluded its original opinion as follows:

“We therefore shall hold this case on the docket, while instructing the clerk to send a copy of this opinion to the Solicitor General along with this court’s request that FERC [Federal Energy Regulatory Commission] file an amicus brief. The parties may file responses to FERC’s brief. This court will then take such further action as is appropriate.” 
Distrigas
, 693 F.2d at 1119.

The next section of the opinion, captioned “MEMORANDUM AND ORDER,” acknowledged receipt of the agency’s 
amicus
 brief, and disposed of the case. 
Distrigas
, 693 F.2d at 1119.

In contrast to a court’s general request for an 
amicus
 brief, the form of the request can be very specific, resembling a certified question. For example, in 
Phillips v. AWH Corp.
, 376 F.3d 1382 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit denied the petition for rehearing, but allowed rehearing 
en banc
. The court invited 
amicus
 briefs from several administrative agencies, including the FTC, to address seven specific questions. 
Phillips
, 376 F.3d at 1383. The FTC joined in an 
amicus
 brief and the court ultimately decided the case. 
Phillips v. AWH Corp.
, 415 F.3d 1303 (Fed. Cir. 2005).

With respect to the present case, I would have allowed plaintiffs’ petition for rehearing. I also would have requested the FTC to file an 
amicus
 brief in order to address specifically the following question: Did the FTC specifically authorize Philip Morris’ conduct (
i.e.
, the use of the terms “Lights” or “Lowered Tar and Nicotine” on the packages of Marlboro Lights or Cambridge Lights from October, 1973 through February 8, 2001) through any of the following FTC actions:

(1) the 1971 consent order between the FTC and American Brands, Inc.;

(2) the 1995 consent order between the FTC and American Tobacco Company; and/or

(3) the 1970 voluntary agreement?

Further, was Philip Morris’ use of “Lights” and/or “Lowered Tar and Nicotine” on the packages of Marlboro Lights or Cambridge Light cigarettes, governed by and thereby “in compliance” with the 1971 and 1995 consent orders?

Further, had the FTC accepted the invitation, I would have held this case on our docket until we could have decided this appeal with the benefit of the FTC’s experience and expertise.

IV

Plaintiffs raise significant points which this court has overlooked or misapprehended. Plaintiffs also suggest a reasonable and generally accepted means by which this court can obtain the FTC’s view of that agency’s own consent orders. The adoption of this approach would obviously be of great benefit to this court in the present appeal. Further, such a basic request addressed to the FTC would indicate that this court: (1) is cognizant of the need for uniformity in the determination of administrative issues such as this, and (2) is sensitive to the need for prudential judicial restraint. Regrettably, however, the court appears more concerned with finality than reaching the most informed decision possible based on highly pertinent–if not dispositive–information from the very federal agency whose consent orders are at the heart of Justice Garman’s analysis. The court’s denial of the petition for rehearing does not speak well of this court. It is disappointing, and will ultimately prove to be embarrassing. History will be the judge.

For the foregoing reasons, I dissent from the court’s denial of the petition for rehearing.

JUSTICE KILBRIDE joins in this dissent.

FOOTNOTES
1:     
1
Courts have been criticized for erroneously using the terms “damage” and “damages” interchangeably when these should actually be considered distinct concepts, damage being the loss or hurt that results from injury and damages being the amount awarded to compensate for damage. J. Fischer, Understanding Remedies §161(c), at 506 (1999). Without passing on the merits of this criticism, I note that there is no such confusion here. The need to prove damages and not merely damage is based not on a judicial gloss, but on the express language of section 10a of the Consumer Fraud Act, which authorizes consumers to bring an “action for 
damages
” and recover 
“actual economic 
damages
.” 815 ILCS 505/10a (West 2000). (Emphasis added.)

2:     
2
The “full-flavored” versions manufactured by PMUSA used the very same tobacco as the light brands. The only difference between the cigarettes was the filters. Ironically, to the extent that the light brands were more toxic, the filters were to blame. The filters had the additional effect of impairing the light brands’ flavor. The only reason lights were chosen over their full-flavored versions was their perceived health benefits.

3:     
3
Because actual damages must be shown to prevail in a private right of action for damages under the Consumer Fraud Act, nominals actually serve no purpose in such cases. If a plaintiff shows actual damages, he or she will receive real compensation. When compensation is awarded, there is no need for the largely symbolic function served by nominals. That is no doubt why plaintiffs did not request nominals in their complaint and were not awarded nominals by the circuit court.

4:     
4
The court also discusses a subsequent decision of this court, 
Jackson v. South Holland Dodge, Inc.
, 197 Ill. 2d 39 (2001). Slip op. at 53. Although the court does not rely on 
Jackson
 in its holding, I note that 
Jackson
 involved the same federal disclosure requirement as in 
Lanier
. 
Jackson
, 197 Ill. 2d at 45-47.

5:     
5
My reading of the record differs on this point from that of the special concurrence. When Price switched to Cambridge Lights in 1986, she smoked one pack of cigarettes a day. Her consumption increased to 1½ packs of cigarettes a day. In 2002, after she learned of the lawsuit, Price was able to reduce her cigarette consumption to one-half to one pack per day. A summary of Price’s cigarette consumption admitted into evidence as Plaintiffs’ Exhibit 99 reflected the increase in cigarette consumption.

6:     
6
The Knowledge Network Survey respondents would have demanded a discount of 77.7% had they known that light cigarettes did not provide any health benefit when compared to the full-flavored cigarettes, and a discount of 92.3% had they known that light cigarettes were more harmful than regular cigarettes. 

7:     
7
According to W. Keeton, Prosser & Keeton on Torts §110, at 767-68 (5th ed. 1984), the “out of pocket” rule, followed by a minority of perhaps a dozen American jurisdictions, “looks to the loss which the plaintiff has suffered in the transaction, and gives him the difference between the value of what he has parted with and the value of what he has received. If what he received was worth what he paid for it, he has not been damaged, and there can be no recovery.” In contrast, the loss-of-bargain rule, adopted by some two-thirds of the courts which have considered the question in actions for deceit, “gives the plaintiff the benefit of what he was promised, and allows recovery of the difference between the actual value of what he has received and the value that it would have had if it had been as represented.” 

8:     
8
The class period for purchases of Cambridge Lights was from 1986 to 2001. The class period for purchases of Marlboro Lights was from 1971 to 2001. Plaintiffs did not seek damages for cigarette purchases made outside of those time periods. For example, class representative Sharon Price testified that she learned that light cigarettes were not truly lower in tar and nicotine in the spring of 2002. Plaintiffs entered into evidence a summary of her cigarette purchases from 1986 until February 1, 2001. 

9:     
9
Justice Garman’s plurality opinion relies heavily upon the testimony of defendant’s expert witness Dr. Peterman. Viewing the totality of Dr. Peterman’s testimony, both on direct and cross-examination, it is clear that the facts relating to the FTC’s supposed “specific authorization” of the fraud in this case were highly disputed by the parties. Justice Garman’s plurality opinion selectively weighs Dr. Peterman’s testimony, crediting his testimony on direct examination and ignoring his testimony on cross-examination. Such action on review is inconsistent with a 
de novo
 standard of review.